**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MULLEN AUTOMOTIVE, INC.,

                          Plaintiff,

         vs.

                                No. 1:23-cv-10637 (LLS)

IMC FINANCIAL MARKETS, CLEAR STREET
MARKETS LLC, UBS SECURITIES LLC, and
JOHN DOES 1 THROUGH 10,

                        Defendants.

---

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO DISMISS THE COMPLAINT
<u>FOR FAILURE TO STATE A CLAIM</u>**

**CAHILL GORDON & REINDEL LLP**
Herbert S. Washer
Tammy L. Roy
32 Old Slip
New York, NY 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
troy@cahill.com

*Attorneys for UBS Securities LLC*

**MORRISON & FOERSTER LLP**
Anthony S. Fiotto
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 648-4774
Facsimile: (617) 830-0142
afiotto@mofo.com

Eric D. Lawson
250 West 55th Street
New York, NY 10019
Telephone: (212) 336-4067
Facsimile: (212) 468-7900
elawson@mofo.com

*Attorneys for Clear Street Markets LLC*

**PAUL HASTINGS LLP**
Jennifer L. Conn
Robert A. Silverstein
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6004
Facsimile: (212) 319-7004
jenniferconn@paulhastings.com
robertsilverstein@paulhastings.com

Ryan P. Phair
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1751
Facsimile: (202) 551-0251
ryanphair@paulhastings.com

*Attorneys for IMC Financial Markets*

## **<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 4

LEGAL STANDARD ............................................................................................. 9

ARGUMENT ......................................................................................................... 10

I.       MULLEN FAILS TO STATE A CLAIM UNDER THE EXCHANGE ACT ................ 10

      A.     Mullen Fails To Adequately Allege a Manipulative Act by Any Defendant ....... 10

      B.     Mullen Fails To Adequately Allege a Strong Inference of Scienter .................... 17

             1.     Mullen Has Not Alleged Facts Sufficient To Show Any Defendant Had Motive To Commit Fraud .......................................................................... 18

             2.     Mullen Has Not Alleged Sufficient Facts To Support a Showing of Conscious Misbehavior or Recklessness ................................................... 22

      C.     Mullen Does Not Adequately Allege Loss Causation .......................................... 26

             1.     Mullen Does Not Sufficiently Allege a Long-Term Price Impact From the Supposed Spoofing ................................................................................... 27

             2.     Mullen Does Not Allege That It Traded Sufficiently Close in Time to the Alleged Spoofing ..................................................................................... 29

II.      MULLEN FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD ................. 33

CONCLUSION ...................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)..........................................................................25

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004)..................................................................................4

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)..........................................................................................................9, 30

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  2008 WL 850473 (S.D.N.Y. Mar. 27, 2008) .....................................................................15

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)........................................................................................ *passim*

*C.F.T.C.* v. *Wilson*,
  2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018).....................................................................23

*Cartwright* v. *D'Alleva*,
  2018 WL 9343524 (S.D.N.Y. Aug. 27, 2018), *aff'd*, 782 F. App'x 77 (2d Cir.
  2019) ....................................................................................................................................33

*CFTC* v. *Oystracher*,
  203 F. Supp. 3d 934 (N.D. Ill. 2016) .................................................................................25

*In re Citigroup Auction Rate Sec. Litig.*,
  700 F. Supp. 2d 294 (S.D.N.Y. 2009).................................................................................26

*City of Pontiac Police & Fire Ret. Sys.* v. *BNP Paribas Sec. Corp.*,
  92 F.4th 381 (2d Cir. 2024) ................................................................................................9

*Cohen* v. *Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010)...............................................................10, 22, 26, 33

*CP Stone Fort Holdings, LLC* v. *John*,
  2016 WL 5934096 (N.D. Ill. Oct. 11, 2016).......................................................................15

*Cyberlux Corp.* v. *AJW Partners, LLC*,
  2008 WL 11513151 (S.D.N.Y. Mar. 17, 2008) ..................................................................12

*DiMuro* v. *Clinique Labs., LLC*,
  572 F. App'x 27 (2d Cir. 2014) ..........................................................................................11

*In re Duane Reade Inc. Sec. Litig.*,
　　2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ....................................................20

*Dura Pharm., Inc.* v. *Broudo*,
　　544 U.S. 336 (2005) ............................................................................................32

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
　　553 F.3d 187 (2d Cir. 2009) ...............................................................................18

*Feiner Family Tr.* v. *Xcelera.com, Inc.*,
　　2008 WL 5233605 (S.D.N.Y. Dec. 15, 2008) ......................................................21

*Fezzani* v. *Bear, Stearns & Co. Inc.*,
　　777 F.3d 566 (2d Cir. 2015)................................................................................33

*Gamma Traders - I LLC* v. *Merrill Lynch Commods., Inc.*,
　　41 F.4th 71 (2d Cir. 2022) ........................................................................ *passim*

*In re Gentiva Sec. Litig.*,
　　932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................................21

*Glaser* v. *The9 Ltd.*,
　　772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................21, 23, 25

*Harrington Global Opportunity Fund, Ltd* v. *CIBC World Markets Corp.*,
　　2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023)......................................................15

*Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l, Inc.*,
　　309 F. Supp. 3d 100 (S.D.N.Y. 2018)..................................................................20

*Jackson* v. *Abernathy*,
　　960 F.3d 94 (2d Cir. 2020)..................................................................................25

*Kalnit* v. *Eichler*,
　　264 F.3d 131 (2d Cir. 2001).............................................................17, 18, 20, 22

*Kessev Tov LLC* v. *Doe(s)*,
　　2022 WL 2356626 (N.D. Ill. June 30, 2022).............................................15, 23, 24

*Kessev Tov, LLC* v. *Doe(s)*,
　　2023 WL 4825110 (N.D. Ill. July 27, 2023)........................................................25

*Lentell* v. *Merrill Lynch & Co., Inc.*,
　　396 F.3d 161 (2d Cir. 2005)................................................................................30

*In re London Silver Fixing Ltd. Antitrust Litig.*,
　　2023 WL 3582198 (S.D.N.Y. May 22, 2023) ......................................................27

*In re London Silver Fixing Ltd., Antitrust Litig.*,
  332 F. Supp. 3d 885 (S.D.N.Y. 2018)...................................................................26, 30

*In re Merrill, BOFA, & Morgan Stanley Spoofing Litig.*,
  2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ......................................................30

*Mod. Settings, Inc.* v. *Prudential-Bache Sec., Inc.*,
  602 F. Supp. 511 (S.D.N.Y. 1984) ....................................................................11

*In re MRU Holdings Sec. Litig.*,
  769 F. Supp. 2d 500 (S.D.N.Y. 2011)...............................................................24

*Nesbeth* v. *New York City Mgmt. LLC*,
  2019 WL 110953 (S.D.N.Y. Jan. 4, 2019) ......................................................13

*Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*,
  2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023) .......................................... *passim*

*Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*,
  2024 WL 620648 (S.D.N.Y. Feb. 14, 2024).....................................................15

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000).................................................................................18

*Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90* v. *Intercept Pharms., Inc.*,
  2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) ...................................................20

*Rothman* v. *Gregor*,
  220 F.3d 81 (2d Cir. 2000)....................................................................................6

*Shields* v. *Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994).................................................................................11

*Stone Family Trust* v. *Credit Suisse AG*,
  2022 WL 954743 (S.D.N.Y. Mar. 30, 2022) ...................................................10

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)..................................................................9

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)..........................................................................................17, 26

*Tyler* v. *Liz Claiborne, Inc.*,
  814 F. Supp. 2d 323 (S.D.N.Y. 2011)...............................................................19

*United States* v. *Coscia*,
  866 F.3d 782 (7th Cir. 2017) .............................................................................25

*Venkataraman* v. *Kandi Techs. Grp., Inc.*,
    2021 WL 4952260 (S.D.N.Y. Oct. 25, 2021) ........................................................................22

Defendants IMC Financial Markets ("IMC"), Clear Street Markets LLC ("Clear Street"), and UBS Securities LLC ("UBS") (each a "Defendant" and together, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Complaint ("Complaint" or "Compl.") of Plaintiff Mullen Automotive, Inc. ("Plaintiff" or "Mullen") for failure to state a claim.[1]

## PRELIMINARY STATEMENT

In August 2023, facing the threatened delisting of its stock from Nasdaq, Mullen filed its first lawsuit seeking to blame others for the poor performance of its stock price. In that suit, Mullen alleged that several financial institutions (none of the Defendants here) engaged in a convoluted short selling scheme that "devastated Mullen's share price and crippled its business." Just a few months after making these claims, however, in December 2023, Plaintiff voluntarily dismissed all of its claims against those defendants and filed this action.

Now, Plaintiff alleges that a completely different set of defendants engaged in a completely different market manipulation scheme called "spoofing"—which Plaintiff claims is the real reason its stock price has declined. Plaintiff's claims are meritless. Mullen's stock price has declined because of pervasive mismanagement by its officers and the massive dilution of its stock through Mullen's own issuance of *billions* of new shares.[2] This action—a second attempt by Mullen to distract and deflect from its own conduct that is devoid of any credible factual detail or a plausible legal theory—is precisely the kind of abusive litigation that courts should check by enforcing the exacting pleading requirements set forth in Rule 9(b) of the Federal Rules of Civil Procedure and

---

[1] Unless otherwise noted, emphasis is added and internal citations and quotations are omitted. References to "Roy Decl." refer to the March 11, 2024 Declaration of Tammy L. Roy in Support of Defendants' Joint Motion to Dismiss the Complaint for Failure to State a Claim, filed herewith.

[2] Indeed, these issues of potential corporate mismanagement (if not fraud) are currently the subject of at least two lawsuits against Mullen currently pending in federal court. *See In re Mullen Auto. Inc. Sec. Litig.*, No. 2:22-cv-03026-DMG-AGR (C.D. Cal.) and *In re Mullen Auto., Inc. Derivative Litig.*, No. 2:22-cv-05336-DMG-AGR (C.D. Cal.).

the Private Securities Litigation Reform Act ("PSLRA").

In its Complaint, Plaintiff claims that all of the Defendants separately and simultaneously embarked upon identical spoofing schemes to drive down the price of Mullen's stock over the exact same twenty-four month period, in concert with ten unidentified "John Doe" defendants, all without coordination or communication of any kind.  Plaintiff alleges that, over this two-year time period, Defendants engaged in a "spoofing pattern" of trading by collectively placing "thousands of spoofing orders" that "create[d] the illusion that the share price of Mullen was declining" for the purpose of enabling Defendants to purchase Mullen shares at artificially deflated prices that saved Defendants fractions of a penny per share.  In support of its theory, Mullen offers four purported "spoofing examples," without citing to any source, and asks the Court to infer that these examples are representative of thousands of other unidentified and unspecified "spoofing episodes" over a two-year period.  Plaintiff's allegations are meritless and fail to state a plausible claim for multiple independent reasons.

***First***, Mullen fails to allege with particularity any manipulative act by any of the Defendants.  Instead, Plaintiff relies on pejorative labels, conclusory legal assertions, and group pleading, which are plainly insufficient under Rule 9(b) and the PSLRA.  Stripped of that rhetoric and impermissible pleading, the Complaint's factual allegations show only ordinary market activity by the Defendants.  Further, Mullen affirmatively alleges that the supposed trading at issue includes trades at the direction of each broker-dealer Defendant's clients.  (Compl. ¶ 24.)  But combining alleged orders, trades, and cancellations of numerous independent market participants does not show a "pattern" of trading activity by anyone, and it certainly does not adequately plead a manipulative act.  Indeed, if this pleading tactic were sufficient, anyone could state a market manipulation claim against any broker-dealer at any time based on cherry-picked market activity.

**Second**, Plaintiff fails to plead any inference of scienter, let alone the "strong inference" required by the PSLRA. Most notably, for three of the four spoofing examples, Plaintiff does not even attempt to allege that any Defendant actually profited from a sale of Mullen stock. And for the last example, the best Plaintiff could muster is an allegation that a Defendant supposedly profited by $0.28—twenty eight cents!—for the entire spoofing example. This is plainly insufficient to plead a motive to commit fraud. Mullen's attempt to plead conscious misbehavior or recklessness—through general group pleading and conclusory allegations—similarly fails.

**Finally**, Plaintiff fails to allege loss causation, meaning a factual basis to connect, on the one hand, its sales of its own Mullen shares at purportedly "deflated" prices, and on the other hand, the spoofing activity alleged in the Complaint. As federal courts have explained, the price impact from spoofing is brief and, in fact, the profitability of a spoofing scheme depends on the rapid reversion of prices back to market level. Accordingly, to plead loss causation, the Second Circuit has held that plaintiffs must either provide a specific factual basis to infer a longer-term price impact or allege that they traded sufficiently close in time to the spoofing to justify an inference that the price was still deflated. Mullen does neither.

For these reasons and those below, the Complaint should be dismissed with prejudice.[3]

---

[3] On February 26, 2024, Clear Street served Mullen and its counsel with a separate motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. As explained more fully in that motion, Clear Street investigated Mullen's allegations—which consist of purported factual allegations about the times, sizes, and prices of Clear Street's orders and trades in Mullen stock—and determined that ***Mullen's factual contentions are objectively and verifiably false***. In fact, every single factual allegation against Clear Street is flat wrong. Simply put, Clear Street did not enter the orders and trades alleged in the Complaint. If Mullen does not withdraw its Complaint by March 18, 2024, Clear Street intends to seek a pre-motion conference regarding its Rule 11 motion. Similarly, on March 11, 2024, IMC also served Mullen and its counsel with a separate motion for sanctions. As explained in that motion, Mullen completely fabricated the "spoofing" allegations against IMC in the Complaint and, indeed, IMC never even purchased Mullen stock on the dates listed in the Complaint. If Mullen does not withdraw its Complaint by April 1, 2024, IMC also intends to seek a pre-motion conference regarding its Rule 11 motion.

## FACTUAL BACKGROUND

### *The Parties*

All three Defendants are, as Mullen acknowledges, SEC-registered broker-dealers and market makers.  (Compl. ¶¶ 6, 8, 10, 48.)  A market maker is a "firm that stands ready to buy or sell a stock at publicly quoted prices."[4]  As such, market makers are required to continuously quote on both sides of the market.

Mullen is an electric vehicle manufacturer based in Southern California.  (Compl. ¶ 5.)  Mullen's stock began trading publicly on the Nasdaq under the ticker "MULN" on November 5, 2021.[5]  Despite the initial hype surrounding the stock, however, Mullen failed to perform.  Indeed, in both 2021 and 2022, Mullen publicly reported *zero* revenue.[6]  Unsurprisingly, this failure to generate any revenue caused Mullen's stock to slide precipitously.  For example, since November 2021, Mullen's stock price has declined from an adjusted peak of more than $357,000 per share to, now, roughly $7 per share.[7]

Mullen's financial difficulties and stock slide threatened the company's ability to continue to trade on Nasdaq and thus its continued viability as a public company.  On September 7, 2022, Mullen received a letter from Nasdaq's Listing Qualifications Staff, indicating that the bid price

---

[4] *See* Roy Decl. Ex. A (U.S. Securities and Exchange Commission, "Market Centers: Buying and Selling Stock" (Oct. 15, 2012), https://www.sec.gov/answers/market.htm).   "News articles, press releases and SEC filings may be considered on a motion to dismiss."  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 210 n.10 (S.D.N.Y. 2004).

[5] *See* Roy Decl. Ex. B (Mullen Automotive, Inc., Current Report (Form 8-K/A) (Nov. 19, 2021)); *see also* Roy Decl. Ex. C (Press Release, Mullen Automotive, Inc., "Mullen Automotive Commences Trading on NASDAQ" (Nov. 5, 2021), https://news.mullenusa.com/mullen-automotive-commences-trading-on-nasdaq); Roy Decl. Ex. D (Press Release, Mullen Automotive, Inc., "Mullen Issues Letter to Shareholders on Merger Completion" (Nov. 9, 2021), https://news.mullenusa.com/mullen-issues-letter-to-shareholders-on-merger-completion).

[6] *See* Roy Decl. Ex. E (Mullen Automotive, Inc. Annual Report (Form 10-K) (Dec. 29, 2021)); Ex. F (Mullen Automotive, Inc. Annual Report (Form 10-K/A) (Jan. 27, 2023)).

[7] *See* Roy Decl. Ex. G (Mullen Automotive, Inc. – Historical Data, Yahoo Finance, https://finance.yahoo.com/quote/MULN/history (last accessed on March 11, 2024)).

of the company's common stock had closed below $1.00 per share for 30 consecutive days in violation of Nasdaq's Minimum Bid Requirement and, as a result, Mullen had 180 calendar days to regain compliance or face delisting.[8]   On March 7, 2023, the company was provided an additional 180 days to demonstrate compliance, but ultimately could not do so.

On September 7, 2023, Mullen announced that it received a letter from Nasdaq indicating that Mullen had failed to meet a September 5, 2023 deadline to regain compliance with Nasdaq requirements and that Mullen faced delisting within 10 days.[9]   Mullen then requested a hearing in an attempt to further delay possible delisting.   The request for a hearing was ultimately granted and, on October 25, 2023, the Nasdaq Hearing Panel granted the company a further extension until January 22, 2024, to regain compliance.[10]

Faced with imminent delisting, Mullen engaged in a series of reverse stock splits, including three in 2023 alone, to try to regain Nasdaq compliance.   The company has also issued more than **5 billion** new shares since its initial public offering, thereby precipitating a massive dilution of its own shares.   (Compl. ¶ 82.)   In an attempt to quell shareholder dissent, Mullen's CEO issued a Letter to Shareholders, saying the reverse stock splits were necessary to maintain Mullen's Nasdaq listing, which in turn was necessary to generate the capital needed to fund operations.[11]   Mullen also began to explore ways in which to shift blame for its own failures by filing baseless lawsuits accusing third parties for Mullen's stock price decline.

---

[8] *See* Roy Decl. Ex. H (Mullen Automotive, Inc. Current Report (Form 8-K) (Sept. 8, 2022)).

[9] *See* Roy Decl. Ex. I (Press Release, Mullen Automotive, Inc., "Mullen Automotive Receives Delisting Determination from Nasdaq Staff for Failure to Maintain Minimum $1.00 Bid Requirement" (Sept. 7, 2023), https://news.mullenusa.com/mullen-automotive-receives-delisting-determination-from-nasdaq-staff-for-failure-to-maintain-minimum-1.00-bid-requirement).

[10] *See* Roy Decl. Ex. J (Mullen Automotive, Inc. Annual Report (Form 10-K) (Jan. 16, 2024)).

[11] *See* Roy Dec. Ex. K (Mullen CEO David Michery Letter to Shareholders (Dec. 19, 2023)).

### *Mullen's First Lawsuit*

On August 29, 2023, as it faced a September 5, 2023 delisting compliance deadline with Nasdaq, Mullen filed an initial lawsuit against TD Ameritrade, Inc., Charles Schwab & Co., Inc., and National Financial Services, LLC—none of which are defendants here—for allegedly engaging in manipulative trading to affect the market price of Mullen's stock between May 4, 2023 and August 25, 2023 (the "Short Seller Action").[12]  Mullen alleged that these defendants engaged in a naked "short selling" scheme, whereby they sold fictitious Mullen shares and/or removed Mullen shares from customers' accounts to cover their own short positions until new shares were issued.  (Roy Decl. Ex. L at ¶ 1.)

Mullen claimed to base these allegations on detailed trading data but failed to cite a single source for its information.  (*See, e.g.*, *id.* ¶¶ 32–33, 48, 54, 57.)  Mullen contended in the Short Seller Action that the defendants' short-selling scheme "devastated Mullen's share price and crippled its business."  (*Id* ¶ 1.)  Mullen also issued a press release informing investors that the alleged scheme "inject[ed] false and misleading information about Mullen into the market" and "caused many shareholders to sell their investments in Mullen."[13]

Notwithstanding Mullen's public proclamations that this alleged short selling scheme had caused its stock price to crash, just a few months later, on December 7, 2023, it voluntarily dismissed the Short Selling Action with prejudice before defendants in that case had even filed a response.[14]

---

[12] *See* Roy Decl. Ex. L (*Mullen Automotive, Inc. et al.* v. *TD Ameritrade, Inc. et al.*, No. 1:23-cv-07647, Dkt. 1 (S.D.N.Y. Aug. 29. 2023)).  This Court may take judicial notice of pleadings in other lawsuits attached to a motion to dismiss.  *See Rothman* v. *Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

[13] *See* Roy Decl. Ex. M (Press Release, Mullen Automotive, Inc., "Mullen Files Lawsuit Against Large Stock Brokerage Firms, Including TD Ameritrade, Charles Schwab, National Financial Services and Others" (Aug. 29, 2023), https://news.mullenusa.com/mullen-files-lawsuit-against-large-stock-brokerage-firms-including-td-ameritrade-charles-schwab-national-finance-services-and-others).

[14] *See* Roy Decl. Ex. N (Notice of Voluntary Dismissal, *Mullen Automotive, Inc. et al.* v. *TD Ameritrade, Inc. et al.*,

### *Mullen's Second Lawsuit (the Present Case)*

On December 6, 2023—the day before withdrawing the Short Seller Action—Mullen filed the instant action against IMC, Clear Street, and UBS, claiming that all three firms and 10 other unidentified "John Doe" defendants fraudulently manipulated Mullen's stock through a spoofing scheme that began days after Mullen went public and persisted for over two years, between November 9, 2021 and November 9, 2023 (the "Relevant Period"). (Compl. ¶¶ 1–4.) This new lawsuit was filed less than two weeks before Mullen broke the news to its shareholders that it needed to effect yet another reverse stock split to "bring the Company into compliance with the $1.00 minimum bid price requirement for maintaining its listing on Nasdaq."[15]

According to Mullen, the spoofing scheme alleged here involves "three steps." (*Id.* ¶ 26.) *First*, the spoofer "flood[s]" Nasdaq with "Baiting Orders" to sell to "deceive and mislead other market participants into believing that the market price of Mullen securities was moving downward." (*Id.*) "Baiting Orders," Mullen explains, "are intended to 'bait' or 'trick' investors into entering their own sell orders." (*Id.* ¶ 21.) *Second*, the spoofer places "Executing Orders . . . to purchase Mullen shares at the lower stock prices." (*Id.* ¶ 26.) *Third*, "[i]mmediately after" completing the Executing Purchases, the spoofer "cancel[s] and remove[s] all of their Baiting Orders" from Nasdaq. (*Id.*) The cancellation of Baiting Orders allegedly "complet[es] the spoofing cycle." (*Id.* ¶ 21.)

To support its claim, Mullen presents only four supposed spoofing "examples" occurring on October 25, 2022, December 15, 2022, June 6, 2023, and August 17, 2023. (*Id.* ¶¶ 61–81.)

---

No. 1:23-cv-07647, Dkt. 36 (S.D.N.Y. Dec. 7, 2023)).

[15] *See* Roy Decl. Ex. O (Press Release, Mullen Automotive, Inc., "Mullen Automotive Inc. Announces 1-for-100 Reverse Stock Split Effective December 21, 2023" (Dec. 19, 2023), https://news.mullenusa.com/mullen-automotive-inc.-announces-1-for-100-reverse-stock-split-effective-december-21-2023).

Each follows the same general pattern.  For each episode, Mullen alleges that one of the Defendants placed some unspecified number of "Baiting Orders" for Mullen stock at a range of prices in a short period of time, leaving that Defendant with "an imbalanced order book position . . . favoring the sell side." (*E.g.*, *id.* ¶ 61.)  Next, Mullen alleges that the Defendant "did not sell any shares of Mullen in attributed orders" in the two minutes following the supposed placement of the supposed "Baiting Orders," which Mullen alleges is "consistent with [their] fictitious nature." (*E.g.*, *id.* ¶ 62.)  The "Baiting Orders" allegedly "induced the entry of sell orders from other market participants, driving the price of Mullen shares downward." (*E.g.*, *id.* ¶ 63.)  Each Defendant then allegedly "took advantage of this artificial downward pressure and executed Executing Purchases," which allowed the Defendant to "purchase these shares at a price below the prevailing best offer at the time." (*E.g.*, *id.* ¶¶ 63–64.)  Finally, the Defendant allegedly "cancelled the artificial supply injected by all of its Baiting Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market." (*E.g.*, *id.* ¶ 65.)

Based on these four purported examples, Mullen alleges—without any supporting detail—that Defendants collectively spoofed on 359 of the 504 trading days during the Relevant Period (*see id.* ¶ 95), and presents a summary table of what it contends are additional "Spoofing Episodes" by the Defendants (*id*. ¶ 96).  The summary table offers no information whatsoever as to the "three steps" Mullen itself claims are required for the spoofing scheme it purports to allege, including the time, number, volume, or price ranges of any orders or trades for these alleged additional spoofing episodes.  Nonetheless, Mullen asserts that each of these purported episodes created a "pile-on" effect that drove down Mullen's share prices.  (*Id.* ¶¶ 28, 30.)  Notably, Mullen fails to cite to a single source for its alleged trading data beyond general allusions to "publicly available" "deanonymized market data" from Nasdaq.  (*See id.* ¶¶ 29 n.3, 95.)  Mullen contends, without any

factual support, that Defendants' collective alleged spoofing ultimately caused it to suffer "hundreds of millions of dollars, if not more, in losses." (*Id.* ¶ 3.)

Mullen brings claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5(a) and (c) thereunder, Section 9(a)(2) of the Exchange Act, and New York common law fraud. (*Id.* ¶¶ 106–25.) For all of the reasons explained below, Mullen's Complaint should be dismissed with prejudice.

## LEGAL STANDARD

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible when it provides enough factual content to support the reasonable inference that the defendant is liable for the misconduct alleged, and presents more than a sheer possibility of liability." *City of Pontiac Police & Fire Ret. Sys.* v. *BNP Paribas Sec. Corp.*, 92 F.4th 381, 390 (2d Cir. 2024). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Securities fraud claims are subject to the heightened pleading requirements of both Rule 9(b) and the PSLRA, which require plaintiffs to set forth "with particularity the circumstances constituting [the] fraud." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008); *see also ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) ("Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b).").

## ARGUMENT

### I.  MULLEN FAILS TO STATE A CLAIM UNDER THE EXCHANGE ACT

To plead market manipulation under Section 10(b) of the Exchange Act, Plaintiff must allege, *inter alia*, a manipulative act, scienter, and a sufficiently close causal connection between a defendant's conduct and plaintiff's alleged damages.  *ATSI*, 493 F.3d at 101.  Similarly, to plead a claim under Section 9(a)(2), Plaintiff must "identify transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security with the intent to deceive or defraud investors."  *Cohen* v. *Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010).  "The analysis of claims under Section 9(a) 'closely parallels' the analysis of claims under Section 10(b)."  *Stone Family Trust* v. *Credit Suisse AG*, 2022 WL 954743, at *6 (S.D.N.Y. Mar. 30, 2022).

Plaintiff's Exchange Act claims should be dismissed for at least three independent reasons: (i) Plaintiff fails to adequately plead a manipulative act; (ii) Plaintiff fails to adequately plead a strong inference of scienter; and (iii) Plaintiff fails to adequately plead a causal connection between its purported losses and any alleged act by a Defendant.

### A.    Mullen Fails To Adequately Allege a Manipulative Act by Any Defendant

To state a claim for market manipulation, a plaintiff must "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants," including "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."  *ATSI*, 493 F.3d at 102.  "General allegations not tied to the defendants or resting upon speculation are insufficient."  *Id.*  The Complaint falls far short of these requirements; it relies on conclusory labels, speculative inferences, and impermissible group pleading rather than factual allegations that would support a claim against any of the Defendants.

Plaintiff's theory of market manipulation is largely based on its own labelling of certain cancelled orders as "Baiting Orders" and asserting—without supporting factual allegations—that these orders were never "intended to be executed."  (Compl. ¶ 19.)  But merely labelling an order a "Baiting Order" is insufficient.  As a matter of law, conclusory labels do not meet the pleading requirements of Rule 9(b).  *See, e.g.*, *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming dismissal of securities fraud claims where plaintiff's "pleading technique [was] to couple a factual statement with a conclusory allegation of fraudulent intent"); *Mod. Settings, Inc.* v. *Prudential-Bache Sec., Inc.*, 602 F. Supp. 511, 514 (S.D.N.Y. 1984) (dismissing market manipulation claim as "speculative" where allegations "read more like factual hypotheses than like factual descriptions of events which have transpired"); *see also DiMuro* v. *Clinique Labs., LLC*, 572 F. App'x 27, 30 (2d Cir. 2014) (affirming dismissal of complaint "riddled with repeated conclusory labels," which "are not facts, and certainly not facts sufficient for Rule 9(b)").

Moreover, Plaintiff's labels are circular.  Plaintiff first defines a "Baiting Order" to be ***any*** order cancelled within two minutes of an Executing Purchase.  (*See* Compl. ¶ 61 n.6.)  Plaintiff then claims each Defendant engaged in spoofing because it purportedly cancelled "all of its Baiting Orders" within two minutes of an Executing Purchase.  (*See, e.g.*, *id.* ¶ 65.)  But one cannot properly plead a manipulative act by labelling ***all*** cancelled orders as "Baiting Orders" and then emphasizing that ***all*** "Baiting Orders" were cancelled.[16]

In addition, the underlying conduct on which Plaintiff bases its claims—various orders, purchases, and cancellations of orders—is merely routine market activity, which "is not, by itself,

---

[16] Moreover, by Plaintiff's own allegations, not all orders created by the Defendants during the so-called "Baiting Period" were "subsequently cancelled."  (*See, e.g.*, Compl. ¶ 66 & n.8 (citing to a price range of orders created by Defendants over a two-minute window and a separate price range of "Baiting Orders" that were "placed" during the same two-minute window and "subsequently cancelled").)  The creation of *bona fide* orders to sell during the Baiting Period is entirely inconsistent with a spoofing scheme.

manipulative." *ATSI*, 493 F.3d at 101.  As the Second Circuit has explained, "[t]o be actionable as a manipulative act, [routine activity] must be willfully combined with ***something more*** to create a false impression of how market participants value a security." *Id.*  Plaintiff attempts to plead the requisite "something more" by purporting to identify a "distinctive pattern" of trading that Plaintiff argues is suggestive of spoofing.  (Compl. ¶ 37.)  According to Plaintiff, "one of the clear signs of manipulative spoofing is a rapid reversal of trading direction—for example, where a market participant places many sell orders, followed by a buy order, followed by the cancellation of the sell orders.  This type of behavior strongly suggests that the original sell orders were not intended to be executed[.]"  (*Id.* ¶ 20.)  But where, as here, ***different actors—i.e., each of the separate Defendants and their numerous respective customers—***are allegedly doing the selling, buying, and cancelling, their aggregate trading activity suggests nothing about anyone's actions or intent, let alone anything fraudulent.

Plaintiff draws baseless conclusions from aggregated trading activity in two impermissible ways.

***First***, the Complaint relies heavily on alleged aggregated trading activity and "median" trades across ***all*** defendants—three distinct named corporate Defendants and 10 "John Does." (*See, e.g.*, Compl. ¶ 44 (alleging that the "median" number of shares purchased across all "Defendants" following a purported "spoofing window" exceeded the median of "other market participants"); ¶ 45 (alleging that the "median" size of executed purchases across all "Defendants" exceeded the size of sell-side orders).)  Under both the heightened pleading requirements of Rule 9(b), and even the basic notice pleading requirements of Rule 8(a), a plaintiff cannot simply lump separate defendants together for pleading purposes.  *See, e.g.*, *Cyberlux Corp.* v. *AJW Partners, LLC*, 2008 WL 11513151, at *4 (S.D.N.Y. Mar. 17, 2008) (granting motion to dismiss market

manipulation claims where complaint failed to plead "with the specificity demanded by Fed. R. Civ. P. 9(b)" and "merely lumps all of the Defendants together"); *Nesbeth* v. *New York City Mgmt. LLC*, 2019 WL 110953, at *3 (S.D.N.Y. Jan. 4, 2019) ("[I]t is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes, and that Rule 8(a) is violated where a plaintiff, by engaging in group pleading, fails to give each defendant fair notice of the claims against it."). By combining the trading activity of different broker-dealers, Plaintiff has not identified, as required, "what manipulative acts were performed" or "which defendants performed them." *ATSI*, 493 F.3d at 102.

**Second**, even with respect to those allegations that purport to be Defendant-specific, Mullen alleges that the "spoofing patterns" are the product of the supposed aggregated trading activity in the proprietary account of each broker-dealer and the alleged trading activity of all of that broker-dealer's numerous distinct customers. (*See, e.g.*, Compl. ¶ 24 (alleging that the "spoofing schemes in which Defendants participated were employed for Defendants' own proprietary accounts ***and/or pursuant to the direction of their customers***"); ¶¶ 6, 8, 10 (Defendants are "broker-dealer[s].").)[17]

As such, Plaintiff necessarily asks this Court to speculate and unreasonably assume that ***all*** market activity attributable to a broker-dealer reflects the intent of a single decision-maker. It is only by assuming without basis that the same actor made the decisions to place "many sell orders, followed by a buy order, followed by the cancellation of sell orders" (Compl. ¶ 20) that one could suggest—as Plaintiff does here—that the trading identified in the Complaint presents a "pattern" that is potentially suggestive of spoofing. *See Gamma Traders - I LLC* v. *Merrill Lynch Commods*.,

---

[17] Although Mullen generally alleges that Defendants traded at the direction of their customers, Plaintiff provides no factual support for those allegations. In fact, and for example, Clear Street engages in only proprietary trading. Defendants must, however, accept all of Plaintiff's allegations as true for the purposes of this motion, including the allegation that Defendants were "[f]ollowing the instructions of . . . their customers." (Compl. ¶ 26.)

*Inc.*, 41 F.4th 71, 75 (2d Cir. 2022) (observing that spoofing involves "suspicious trading activity of ***one trader*** placing both buy- and sell-side orders in the same market").

A simple example illustrates Plaintiff's speculative pleading tactic.  Assume one of the Defendants has three customers who seek to transact in Mullen shares.  Customer A places an order to sell 50 shares for $0.50 per share at 9:15 a.m.; it is not accepted by any other market participant, and Customer A ultimately cancels her sell order 15 minutes later at 9:30 a.m.  Assume further that Customer B also places an order to sell 50 shares but offers a lower price, $0.48 per share, and does so at 9:25 a.m.  Customer C, who seeks to buy, naturally opts for the lower price offered by Customer B and buys his 50 shares at $0.48 per share at 9:28 a.m.  In this example, each customer is acting independently and in their own best interest.  It shows nothing more than routine, legitimate market activity.  Yet Plaintiff would aggregate the trading of all three customers and dub it "spoofing" simply because Customer A cancelled his sell order within two minutes of Customer C's "Executing Purchase."

Plaintiff's four alleged "illustrative examples" of "spoofing episodes" (Compl. ¶¶ 61–81) also lack any meaningful detail.  Indeed, although Plaintiff claims to have underlying trading data to support its claims (*see, e.g.*, *id.* ¶ 29.), it provides no allegations concerning the number of alleged Baiting Orders involved or the timing, price, or volume of such orders, much less who made the decision to place each order and why.  Instead, Plaintiff relies on allegations about the ***total sum*** of shares offered and ***a range*** of times and prices.  (*See, e.g.*, *id.* ¶ 61 (alleging "56,200 shares of Baiting Orders" across a range of prices over a two-minute interval).)  Plaintiff's failure to plead with any specificity, and rely instead on vague ranges and sums, makes it impossible for Defendants or the Court to identify or evaluate the particular trading activity Plaintiff is challenging.  The PSLRA and Rule 9(b) demand that Plaintiff provide more specificity to put

Defendants on notice of the purportedly manipulative conduct on which Plaintiff bases its claims. *See ATSI*, 493 F.3d at 102.

For each of these reasons, even with respect to its purported Defendant-specific allegations, Plaintiff simply has not identified, as it must, "what manipulative acts were performed" or "which defendants performed them."  All that Plaintiff has alleged is that ***someone*** cancelled an order to sell after ***someone*** purchased stock.  Such allegations "rel[y], at best, on speculative inferences." *ATSI*, 493 F.3d at 103.  The Second Circuit has made clear that "speculative inferences" do not adequately plead a claim for market manipulation.  *Id*.[18]

Moreover, even if the Court were to attribute each cancellation to the broker-dealer who executed it (and it should not), the mere fact of cancellations—even a cancellation made shortly after an order is placed—is not sufficient to plead a manipulative act.  *See CP Stone Fort Holdings, LLC* v. *John*, 2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) (dismissing claims where "plaintiff's theory boils down to an allegation that 'if a subset of orders was ultimately cancelled, those orders, in hindsight, must never have been intended to be executed'"); *Kessev Tov LLC* v. *Doe(s)*, 2022

---

[18] The Defendants acknowledge that the courts in *Harrington Global Opportunity Fund, Ltd* v. *CIBC World Markets Corp*., 2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023) and *Northwest Biotherapeutics, Inc*. v. *Canaccord Genuity LLC*, 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024) found a manipulative act was pled in different spoofing cases filed against other broker-dealers, rejecting arguments based on the fact that these broker-dealers were alleged to have traded for both their own accounts and the accounts of their customers.  However, unlike *Northwest Biotherapeutics*, where the court found that "Defendants' factual assertions that they were merely following their clients' instructions [could not] properly be credited on a motion to dismiss," 2023 WL 9102400, at *26, here, Plaintiff ***affirmatively alleges*** that Defendants were simply "[f]ollowing the instructions of . . . their customers" (Compl. ¶ 26).  And, unlike *Harrington*, where the plaintiff alleged ***specific details*** concerning a cross-border scheme in which the defendants provided their clients with commission-based access to stock exchanges through "Direct Market Access" to evade regulatory detection, Plaintiff's allegations here are threadbare and vague and suggest nothing more than the Defendants were processing client orders in the ordinary course.  *See Harrington Global Opportunity Fund, Ltd.* v. *CIBC World Markets Corp., et al.*, No. 1:21-cv-00761-LGS, ECF No. 133 at ¶¶ 28–30 (S.D.N.Y.); *see also Harrington*, 2023 WL 6316252, at *7 (noting that the plaintiff provided more than "bare allegations" that the broker defendants acted recklessly on behalf of a manipulative client).  In any event, and to the extent Plaintiff claims that its allegations here about customer trading are sufficient under *Harrington* and *Northwest Biotherapeutics*, Defendants also respectfully submit that any such argument—which necessarily rests on speculative assumptions about the trading of each Defendant—is inconsistent with this Court's and Second Circuit's decisions in *ATSI*.  *See ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 2008 WL 850473, at *3 (S.D.N.Y. Mar. 27, 2008) (imposing Rule 11 sanctions where only allegation against market maker was that it processed client orders in the ordinary course), *aff'd in relevant part, vacated in part*, 579 F.3d 143 (2d Cir. 2009).

WL 2356626 (N.D. Ill. June 30, 2022) ("*Kessev Tov I*") (holding that "placing rapid orders and cancelling them does not necessarily evince illegal market activity" and noting that "[o]ther courts have recognized the ubiquity of rapid trading across securities platforms").  In fact, the cancellation of an order is an expected and common aspect of trading in modern equity markets—only a "few percent" of equity orders are executed, and the "majority" are cancelled.[19]

Here, Plaintiff's Complaint rests on even less because it does not allege that anyone "quickly cancelled" any orders.   Again, without matching a ***specific order*** to a ***specific cancellation***, there is simply no basis to assume that any order was cancelled "quickly."  Thus, in the example of Customers A, B, and C discussed above, because Plaintiff aggregates the trading activity of multiple market participants, it would deem Customer A's cancelled order a "Baiting Order" even though it was cancelled ***15 minutes*** after it was placed.  Without differentiating between market participants, Plaintiff has not pleaded a timeline for the cancellation of any order, let alone a factual basis to assert there was a "short time period between the . . . placement and cancellation of the Baiting Orders."  (Compl. ¶ 34.)[20]

Finally, the inferences Plaintiff asks this Court to make are all the more speculative and implausible because they are based on the admittedly "limited data available to Plaintiffs" from a single exchange on which Mullen's stock traded.  (Compl. ¶ 29.)  Plaintiff's Complaint relies exclusively on its analysis of orders and trades placed on Nasdaq.  (*See id*.)  Yet the Complaint also acknowledges that Mullen's stock traded on numerous other exchange and off-exchange venues (*e.g*., NYSE Arca, BATS, *etc*.), and alleges that each of the Defendants "route orders and

---

[19] Roy Decl. Ex. P (U.S. Securities and Exchange Commission, "*The Speed of the Equity Markets*" (Oct. 9, 2013), https://www.sec.gov/marketstructure/data-highlight/speed-equity-markets).

[20] Similarly, Plaintiff does not allege that any of Defendants' orders to sell were "parked" behind lower-priced orders from other market participant—a factor some courts have relied on as suggestive of an intent not to execute an order. *See Northwest Biotherapeutics*, 2023 WL 9102400, at *19.

execute trades of Mullen shares" on these multiple "exchanges."  (*See id.* ¶ 5 ("[Mullen's]

securities . . . have been traded on Nasdaq, NYSE Arca, and BATS, as well as other electronic

execution venues[.]"); ¶¶ 7, 9, 11 (alleging each Defendant "route[s] orders and execute[s] trades

of Mullen shares on exchanges located in New York County").)  The Complaint fails to address

the obvious possibility that relevant executions occurred on other platforms.  Ignoring the trading

activity on these multiple other platforms and relying solely on cherry-picked orders placed on a

single exchange reveals absolutely nothing about the supposed trading of any of the Defendants.

In short, simply combining the routine market activity of separate market participants and

labelling it "spoofing" does not meet Plaintiff's obligations under Rule 9(b) and the PSLRA to

plead a manipulative act by any of the Defendants.

### B.    Mullen Fails To Adequately Allege a Strong Inference of Scienter

Plaintiff's Complaint should also be dismissed for the independent reason that it fails to

adequately plead scienter.  Under the strict pleading requirements of the PSLRA, Mullen must

plead, as to each separate Defendant, particularized facts to show a strong inference of "an intent

to deceive, manipulate or defraud."  *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); 15

U.S.C.A. § 78u-4.  Mullen fails to plead facts that give rise to a plausible inference of scienter as

to any Defendant.

The requisite "strong inference" "must be more than merely plausible or reasonable—it

must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  In other words, the "court

must consider plausible, nonculpable explanations for the defendant's conduct," and Mullen's

theory must be "***at least as likely as*** any opposing inference" that could be drawn from the facts

as alleged or supplemental facts.  *Id.* at 310–11 (emphasis in original).  "This pleading requirement

is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." *ATSI*, 493 F.3d at 102.

In the Second Circuit, to sufficiently allege scienter a plaintiff must plead facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 99. Mullen has done neither.

### 1.     Mullen Has Not Alleged Facts Sufficient To Show Any Defendant Had Motive To Commit Fraud

To adequately plead motive, a plaintiff must assert that "defendants benefitted in some concrete and personal way from the purported fraud." *Novak* v. *Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000); *see also ECA, Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). A "generalized motive" such as the desire for an entity to make a profit, "is not sufficiently concrete for purposes of inferring scienter." *Kalnit*, 264 F.3d at 140 (quoting *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996)); *see also ECA, Local 134*, 553 F.3d at 198.

Here, Mullen claims that Defendants were motivated to engage in spoofing transactions because they "were able to purchase millions worth of Mullen shares at depressed prices" and "converted these profits to cash by selling shares prior to the price decline or following a rebound." (Compl. ¶ 60.) But aside from this conclusory allegation, Mullen fails to allege any plausible motive for any of the three named Defendants to have engaged in the alleged scheme.

***First***, for the same reason that Mullen's attempt to plead a manipulative act fails, its scienter allegations also fail. In short, Mullen fails to reconcile its motive allegations with its allegation that the Complaint is based on the aggregation of the trading activity of numerous independent market participants. (*See, e.g., id.* ¶ 24 (asserting the alleged scheme was "employed

for Defendants' own proprietary accounts *and/or* pursuant to the direction of their customers"); ¶ 26 (same); ¶ 28 (same); ¶ 52 (same); *see also id.* ¶ 49 (asserting "each Defendant (*and/or their customers*)" executed the alleged scheme through algorithmic trading programs).) Again, this pleading tactic says nothing about any single Defendant's or their customer's intent or motive.  For example, in each of the "spoofing episodes" alleged in the Complaint, Mullen fails even to allege that the party that placed the alleged Baiting Orders was the same party who placed the alleged "Executing Purchase" at the "deflated price," instead only making reference to "Defendants" collectively.  (*See id.* ¶¶ 25–27.)  Mullen's vague allegations, which fail to identify who actually engaged in or profited from the alleged fraudulent activity, are plainly inadequate to plead motive.  *See Tyler* v. *Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 335 (S.D.N.Y. 2011) ("[T]he particular fraud alleged must specifically enable the schemes or business plans plaintiffs contend conferred concrete and personal benefits on the defendants.").  Moreover, having alleged that at least some portion of the trading was on behalf of customers (*see* Compl. ¶ 24), Mullen fails to explain how ***Defendants*** would have profited from those transactions.

**Second**, as Mullen's own allegations illustrate, any supposed "profit" Defendants could have earned from this alleged scheme would have been *de minimis* at best.  Again, Mullen bases its motive allegations in part on its claim that Defendants "were able to purchase millions worth of Mullen shares at depressed prices."  (Compl. ¶ 60.)  Yet in each of Plaintiff's four examples, each Defendant is alleged to have saved only fractions of a penny, ranging from $0.0107 to $0.015 per share.  (*Id.* ¶¶ 64, 69, 74, 79.)  Even assuming each Defendant saved at the top end of that range for the total volume of shares each is alleged to have purchased across the two-year Relevant Period (Compl. ¶ 35), the total purported benefit to each Defendant was *de minimis*:

| **Defendant** | **Total Shares Allegedly Purchased** | **Total Alleged Benefit Over Two Years** |
|---|---|---|
| IMC | 65,400 | $981.00 |
| Clear Street | 2,022,273 | $30,334.10 |
| UBS | 689,621 | $10,344.32 |

It would "def[y] economic reason" to believe that Defendants—all reputable market makers—would have been motivated by such small amounts to engage in fraudulent activity to drive down a stock price. *Kalnit*, 264 F.3d at 140–41; *see also Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90* v. *Intercept Pharms., Inc.*, 2022 WL 837114, at *20 (S.D.N.Y. Mar. 21, 2022) ("[P]rofits [that] totaled just under four and a half million dollars," albeit a "'handsome' sum," were "in context . . . not a sum sufficient to give rise to an inference of scienter."); *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *9 n.22 (S.D.N.Y. Nov. 25, 2003) ("plaintiff's theory of motive [was] 'belied by logic'" where fraudulent scheme would save money on acquisitions totaling $4.7 million, despite defendant having access to $79.3 million), *aff'd sub nom. Nadoff* v. *Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004); *Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 119 (S.D.N.Y. 2018) (allegations that defendant manipulated stock price "to access additional shares . . . at lower prices . . . 'fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit'" (quoting *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 528 (S.D.N.Y. 2012), *aff'd sub nom. Louisiana Pac. Corp.* v. *Merrill Lynch & Co.*, 571 F. App'x 8 (2d Cir. 2014))).

**Third**, Mullen's motive allegations are also based on its conclusory claim that, after allegedly purchasing shares at deflated prices, Defendants then "converted these profits to cash by selling shares prior to the price decline or following a rebound." (Compl. ¶ 60.) Yet Mullen has not identified **any sales** made by Defendants or their customers to realize any profits from the

alleged scheme.  Indeed, for Defendants IMC and Clear Street, Mullen has not identified *any* corresponding sales, much less sales for profit.  (*See* Compl. ¶¶ 61–70 (Clear Street), ¶¶ 71–75 (IMC).)  And Mullen only vaguely speculates that UBS "*would have* generated a return" from a single alleged spoofing episode on August 17, 2023 "*if*" sales it allegedly made that day happened to correspond to its alleged purchase of 200 shares.  (*See id.* ¶ 81.)[21]  These deficiencies are also fatal to Mullen's motive argument.  *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 381 (E.D.N.Y. 2013) ("A plaintiff alleging motive and opportunity in connection with stock sales must allege not only the defendants' selling activity . . . but also the defendants' net profits rather than their gross proceeds . . . ."); *Glaser* v. *The9 Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (rejecting motive argument where "allegations demonstrate[d] only gross proceeds without identifying net profits"); *Feiner Family Tr.* v. *Xcelera.com, Inc.*, 2008 WL 5233605, at *5–6 (S.D.N.Y. Dec. 15, 2008) (declining to find motive where "[t]he alleged benefits to Defendants [were] speculative"); *cf. Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*, 2023 WL 9102400, at *25 (S.D.N.Y. Dec. 29, 2023) ("[T]he actual profit Defendants earned from a particular Executing Purchase is measured by the price at which those shares were subsequently *sold.*"), *R. & R. adopted sub nom. Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*, 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024).

---

[21] For that "Spoofing Episode," Mullen alleges that UBS purchased 200 shares at a price of $0.8026 per share.  (Compl. ¶ 78.)  Mullen alleges UBS then sold 12,200 shares at a price of $0.804 per share.  (*Id.* ¶ 81.)  **Even if** 200 of those 12,200 sold shares corresponded to the alleged Executing Purchase, that would mean that UBS made a profit of ***only $0.28*** on those 200 shares.  Even if replicated for all of the Executing Purchases alleged as to all Defendants, amounting to 2,777,294 shares (*id.* ¶ 35), this still results in less than $3,889 of profit across all three Defendants over a two-year period—or, on average, just over $648 per Defendant per year.  For the reasons explained above, this is insufficient to plead scienter.

### 2.  Mullen Has Not Alleged Sufficient Facts To Support a Showing of Conscious Misbehavior or Recklessness

Where, as here, sufficient motive and opportunity have not been adequately alleged, a plaintiff may alternatively plead scienter by "identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142.  Mullen fails to meet that stringent standard.

Mullen's circumstantial theory of scienter rests entirely on its identification of sixteen alleged "facts" that it claims show Defendants' fraudulent intent.  (*See* Compl. ¶¶ 42–59.) However, in reciting its sixteen "facts," Mullen fails to make any distinction among the three Defendants (or the ten unidentified John Doe defendants) or their trading patterns.  (*See, e.g.*, *id.* ¶ 43 (alleging ***Defendants*** submitted Baiting Orders for a median of 5,700 sell-side shares); ¶ 44 (alleging ***Defendants*** purchased a median of 2,100 shares per spoofing window); ¶ 45 (comparing number of ***Defendants'*** executed sell-side orders to number of ***Defendants'*** Executing Purchases); ¶ 46 (comparing median size of ***Defendants'*** Baiting Orders to median size of ***Defendants'*** executed buy-side orders); ¶ 58 ("***Defendants*** carried out thousands of Spoofing Episodes.").)  As courts in this Circuit have made clear, "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for ***each defendant***; guilt by association is impermissible."  *Venkataraman* v. *Kandi Techs. Grp., Inc.*, 2021 WL 4952260, at *3 (S.D.N.Y. Oct. 25, 2021) (citing *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009)); *see also Cohen*, 722 F. Supp. 2d at 428 ("Conclusory statements . . . or generalized allegations of scienter against groups of defendants will not state a claim for securities fraud.").  Mullen's collective allegations of scienter—particularly those based on "median" statistics without any explanation of how these figures were determined, how they relate to any particular Defendant, or who engaged in the alleged transactions—are plainly inadequate.

In any event, even if Mullen had adequately distinguished between each separate Defendant, many of Mullen's purported "facts" are nothing more than descriptions of common activities of broker-dealers, and simply assume, without any factual basis, that fraudulent activity must have occurred.  For instance, Mullen alleges that "each Defendant . . . specifically designed and implemented algorithmic trading programs," (Compl. ¶ 49), that their "trading activities were approved by corporate officials," (*id.* ¶ 50), and that "Defendants were <u>required</u> to have internal policies, procedures and systems" in place "to monitor, detect, and prevent manipulative or fraudulent trading" (*id.* ¶ 52) (emphasis in original).  But such facts are insufficient to allege that those broker-dealers engaged in market manipulation.  *See ATSI*, 493 F.3d at 104 (rejecting claims of scienter where allegations amounted to standard trading activity, including claims that trading volumes were uneven and defendants' varying reactions to stock prices); *Kessev Tov I*, 2022 WL 2356626, at *9 ("placing rapid orders and cancelling them does not necessarily evince illegal market activity" and "[o]ther courts have recognized the ubiquity of rapid trading across securities platforms"); *Glaser*, 772 F. Supp. 2d at 593 (inference of fraud was "not as strong as the inference of non-fraudulent activity drawn from the facts viewed collectively").

What is more, Mullen's reliance on the placement of "Baiting Orders" to establish scienter is again circular.  (*See* Compl. ¶¶ 43, 46, 47, 53, 54, 55, 56, 57, 58, 60.)  Mullen defines "Baiting Orders"—with no factual basis—as having "no legitimate financial purpose and were never intended to be executed."  (*Id.* ¶ 24.)  In other words, Mullen claims without support that any time any order was cancelled, "regardless of whether the Defendant who placed it cancelled the specific Baiting Order," it was "never intended to be executed."  (*Id.* ¶ 61 n.6.)  Such circular reasoning, where the evidence offered to support a claim is a repetition of the claim itself, cannot create a strong inference of scienter.  *See, e.g.*, *C.F.T.C.* v. *Wilson*, 2018 WL 6322024, at *15 (S.D.N.Y.

Nov. 30, 2018) (dismissing Commodity Exchange Act market manipulation claim reliant on "circular" theory that prices were illegitimate because defendants intended to affect them); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) ("It is rather circular to say that the Individual Defendants committed fraud by concealing their intent to commit fraud."). Without more, "Plaintiff[] fail[s] to allege sufficient facts underpinning [its] allegations that [] the cancelled orders demonstrate a plan to deceive." *Kessev Tov I*, 2022 WL 2356626, at *10.

Mullen's allegations are also inconsistent with its own theory of spoofing, which requires the immediate cancellation of a Baiting Order. (Compl. ¶ 53.) In an effort to plead conduct consistent with what some courts have suggested may be indicative of market manipulation, Mullen generally contends that "Defendants placed and then canceled the Baiting Orders within ***seconds and even milliseconds***." (*Id.*; *see also id.* ¶ 54 (alleging that Defendants cancelled baiting orders "in a matter of seconds and sometimes milliseconds, all of which had been placed by Defendants mere seconds earlier").) But Plaintiff admits that it has ***not*** matched orders and cancellations (*see* Compl. ¶ 61 n.6), and thus has not actually pleaded the length of time between the placement and cancellation of any particular order. Further, even attributing all cancellations to the corresponding Baiting Orders, the time period between the placement and the completion of cancellations of the alleged "Baiting Orders" in all four spoofing "examples" was not within milliseconds or even seconds, but rather as much as four to five minutes later. (*See id.* ¶¶ 61–65 (alleged October 25, 2022 spoofing episode lasting four minutes); ¶¶ 66–70 (alleged June 6, 2023 spoofing episode lasting four minutes); ¶¶ 71–75 (alleged December 15, 2022 spoofing episode lasting four minutes); ¶¶ 76–81 (alleged August 17, 2023 spoofing episode lasting four minutes); ¶ 38 ("baiting period" lasted five minutes).)

This timing is far longer than allegations that courts have found may be indicative of spoofing activity, and the fact that all of the alleged Baiting Orders were open for such extended periods of time belies the notion that the entity who placed the orders did not intend for them to be executed.  *See, e.g.*, *United States* v. *Coscia*, 866 F.3d 782, 787 (7th Cir. 2017) (explaining that in spoofing episodes "large orders will be on the market for incredibly short periods of time (fractions of a second)").[22]

Lastly, Mullen pleads no facts showing that any agent's or employee's intent can be imputed to any of the Defendants.  *See Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (plaintiff must plead a "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter" when defendant is an entity (citation omitted)).  A lone conclusory allegation that "activities were approved by corporate officials" (Compl. ¶ 50), is insufficient without details of what was approved, when, and by whom.  *See, e.g.*, *Glaser*, 772 F. Supp. 2d at 591 ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient" to establish scienter.).  Without alleging a single fact about what any employee (much less executive) of any Defendant knew about this supposed "scheme," Mullen cannot satisfy the high bar for pleading scienter.  *See, e.g.*, *In re Adient plc Sec. Litig.,* 2020 WL 1644018, at *28

---

[22] Even those courts that have considered the speed of cancellation as a relevant factor in analyzing intent have not relied **solely** on that factor.  *See, e.g.*, *CFTC* v. *Oystracher*, 203 F. Supp. 3d 934, 945 (N.D. Ill. 2016) (finding CFTC adequately alleged lack of intent to execute where trader's alleged "trading behavior in the aggregate"—*e.g.*, a "pattern of passive spoof order placement at or near the best bid or offer price shielded by existing orders, flips, aggressive order placement, 'avoid orders that cross' tool usage, iceberg order usage, large order size" *etc.*—made it "clear that the CFTC relies on much more than 'solely . . . fast cancellations of large orders'"); *Kessev Tov, LLC* v. *Doe(s)*, 2023 WL 4825110 (N.D. Ill. July 27, 2023) ("*Kessev Tov II*") (holding manipulative act pled where complaint alleged that defendants "entered irrationally high bids that lasted for only milliseconds, thereby rendering them inexecutable" and "provided numerous exhibits plausibly suggesting that Defendants' actions were irrational and contradictory to ordinary market making behavior"); *Northwest Biotherapeutics*, 2023 WL 9102400, at *19 (finding manipulative acts, in part, based on allegations of "parking," which is not alleged here).  Plaintiff has not properly pled any such additional indicia that might suggest a lack of intent to execute the Baiting Orders.

(S.D.N.Y. Apr. 2, 2020) (dismissing for failure to plead scienter where plaintiff did not sufficiently allege executives had knowledge of, or reckless disregard for, falsity).

In sum, because Mullen has failed to plead any inference of an intent to deceive as to any Defendant, let alone a strong and compelling one, the claims against Defendants should be dismissed. *See Tellabs*, 551 U.S. at 314.

### C.   Mullen Does Not Adequately Allege Loss Causation

To state a claim for market manipulation, Mullen must plead facts showing a "legally cognizable loss" and a "causal connection between the alleged manipulation . . . and the loss." *Cohen*, 722 F. Supp. 2d at 430.  This requires Mullen to allege that it suffered "***specific*** economic harm as [a] result of Defendants' conduct."  *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009).[23]

The causation requirement is particularly stringent in spoofing cases because "[m]anipulative trading strategies like 'spoofing' . . . depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief."  *In re London Silver Fixing Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018).  As a result, plaintiffs can only meet the exacting loss causation requirement under two circumstances: (1) where a plaintiff sets forth allegations showing a "factual basis indicating that the effects of the spoof lasted for a protracted period" to "justify an inference that the market price was still artificial" when plaintiff traded (*i.e.*, a long-term price impact theory); or (2) where a plaintiff traded "so close in time to Defendants' spoofing" to "justify an inference that the market prices were artificial" when plaintiff traded (*i.e.*, a temporal proximity theory).  *Gamma Traders*, 41 F.4th at 80; *see also*

---

[23] Mullen's loss causation allegations are subject to the heightened pleading standard under Rule 9(b), *see, e.g.*, *Cohen*, 722 F. Supp. 2d at 432 n.9, but likewise fail even under Rule 8's pleading standards.

*Northwest Biotherapeutics*, 2023 WL 9102400, at *29.  Mullen does not sufficiently plead loss causation under either theory.

>    1.    **Mullen Does Not Sufficiently Allege a Long-Term Price Impact From the Supposed Spoofing**

Mullen's attempts to plead long-term price effects are nonsensical and conclusory and have been squarely rejected by this Court and the Second Circuit.

Mullen generally alleges that the "price impact of Defendants' spoofing activity was not limited to the time period immediately following each individual Spoofing Episode" (Compl. ¶¶ 97, 98) and that the "persistent and long-lasting" price decline lasted throughout the Relevant Period because "the market neither immediately nor fully rebounded from the manipulated prices once each of the spoofing events were completed" (*id.* ¶¶ 85, 97).

These allegations fail to support loss causation as a result of long-term price impact.  In fact, in *Northwest Biotherapeutics*, the Court rejected the exact same allegation—that "the market neither immediately nor fully rebounded from the manipulated prices once each of the Spoofing Episodes was completed."  2023 WL 9102400, at *31.  According to the Court, this "conclusory" allegation fails to allege "'facts' sufficient to justify an inference that the impact of Defendants' spoofing extended to sales by [Plaintiff] not in close proximity to the spoofing."  *Id.* at *31.  The Court explained that "[s]poofing is a different form of market manipulation" where the "virtually immediate cancellation of [Baiting Orders] . . . push[es] the price in the other direction."  *Id.* at *32.  Thus, Mullen's allegation "does not justify a reasonable inference . . . that spoofed Baiting Orders continue to emit a false pricing signal to the market after they have been cancelled and the spoofer has purchased and resold the stock."  *Id.*; *see also In re London Silver Fixing Ltd. Antitrust Litig.*, 2023 WL 3582198, at *10–11 (S.D.N.Y. May 22, 2023) (allegation "that prices never fully

recovered" was insufficient because complaint lacked facts that would permit the court to infer "the endurance of artificial prices caused by manipulation" as required by *Gamma Traders*).

Mullen attempts to overcome this on-point precedent by putting forward a convoluted statistical analysis, which it claims shows that "the average price impact of the Spoofing Episodes persists up to sixty minutes." (Compl. ¶ 102.)  Mullen argues that, "[b]ased on this evidence," the Court can infer that the "price impact of these Spoofing Episodes was persistent and continued over an extended period of time." (*Id.*)  But Mullen fails to explain why evidence of price impact of "up to sixty minutes" would support the inference that there was a persistent price impact over twenty-four hours or more.  Moreover, this Court has explicitly rejected the inference that spoofing impacts could last more than sixty minutes without additional factual allegations.  *See Northwest Biotherapeutics*, 2023 WL 9102400, at *31.

Further, Mullen's long-term price impact claim is belied by its own summary chart, which generally shows that the price for Mullen stock rapidly increased following the supposed spoofing episodes. (*See* Compl. ¶ 96.)  For example, Mullen's summary chart shows that Mullen sold shares for $0.60, based on its share price on February 24, 2022. (*Id.*)  Mullen's prices then jumped more than 10% to $0.67 the very next day. (*Id.*)  By March 10, 2022, Mullen's stock nearly doubled to $1.06. (*Id.*)  And by March 16, 2022, it had nearly tripled to $1.74. (*Id.*)  In that same time period, Mullen alleges that the Defendants were "repeated[ly]" and "continuously" spoofing. (*See id.* ¶ 27.)  "The reversion of the stock price in a brief period of time, as alleged in the [Complaint], undermines [Mullen's] speculative hypothesis that the spoofing had a long-term or persistent price impact." *Northwest Biotherapeutics*, 2023 WL 9102400, at *33.

In sum, Mullen utterly fails to "plead 'facts' sufficient to justify an inference that the impact of Defendants' spoofing extended to sales by [Mullen] not in close proximity to the spoofing." *Id.* at *31.

### 2. Mullen Does Not Allege That It Traded Sufficiently Close in Time to the Alleged Spoofing

Because it has not sufficiently alleged a long-term price impact, Mullen must allege a close temporal proximity between its trades and the Defendants' alleged spoofing. The Second Circuit's temporal proximity standard is stringent. The Second Circuit has held that courts "cannot reasonably infer that spoofing's effects last throughout the day" in the absence of factual allegations justifying an inference of a longer price impact. *Gamma Traders*, 41 F.4th at 80. Thus, absent such factual allegations, "[e]ven pleading same-day, post-spoof trades does not justify an inference of injury." *Id.* Here, Mullen does not allege that it sold shares **on the same day** as any of the alleged spoofing examples, much less the close temporal proximity required by the Second Circuit.

The Complaint contains only four examples of purported spoofing by Defendants, which supposedly occurred on October 25, 2022, December 15, 2022, June 6, 2023, and August 17, 2023. (*See* Compl. ¶¶ 61–81.) But Mullen alleges that it sold shares at least **two full days** after the alleged spoofing examples and that those sales were priced at least **one full day** after any alleged spoofing example.[24] This disconnect between the supposed spoofing examples and Mullen's stock sales is dispositive. *See Gamma Trader*s, 41 F.4th at 80; *Northwest Biotherapeutics*, 2023 WL 9102400,

---

[24] According to Mullen's own allegations, the nearest "Transaction Dates" following these supposed spoofing examples are on November 3, 2022, February 9, 2023, June 8, 2023, and September 12, 2023. (*See* Compl. ¶ 96.) Similarly, the nearest "Pricing Dates" following these spoofing examples are on November 4, 2022, February 24, 2023, June 7, 2023, and September 8, 2023. (*See id.*)

at *31 (explaining that even "four to more than six hours" between a spoofing episode and a corresponding stock sale is "too far removed . . . to be considered 'close'" under *Gamma Traders*).

Mullen's remaining allegations do not save its claims. ***First***, Mullen's general allegation that "over 5 billion shares were sold or issued for value by Mullen during the Relevant Period" (Compl. ¶ 95) is, at best, irrelevant. In fact, this Court has rejected nearly identical allegations—and for good reason. Even if Mullen had been "regularly in the market and transacting throughout the [Relevant Period], while Defendants were also placing spoof orders, it does not follow that any particular trade of the Plaintiff[]—or necessarily any of the trades made by Plaintiff[]—would have been affected by Defendants' alleged manipulative conduct." *In re Merrill, BOFA, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021). "To infer otherwise would be to sustain a claim based on rank speculation prohibited by the Supreme Court's decisions in *Twombly* and *Iqbal*." *Id.*; *see also In re London Silver Fixing Ltd., Antitrust Litig.*, 332 F. Supp. at 923 (similar); *Northwest Biotherapeutics*, 2023 WL 9102400, at *32 (similar).

Moreover, if anything, this allegation contradicts an attempt to plead loss causation. Indeed, the sheer volume of Mullen's issuances (*i.e.*, over 5 billion new shares) during the Relevant Period no doubt put tremendous downward pressure on the price of Mullen's stock. Mullen itself disclosed this as a substantial risk for the company.[25] Yet in its Complaint, Plaintiff fails to account for or even address this factor or any of the myriad independent factors that likely impacted Mullen's stock price over the relevant time period. *See Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) ("[A] plaintiff's claim fails when it has not adequately pled facts

---

[25] For example, in a February 3, 2022 prospectus filed with the SEC, Mullen disclosed that additional shares "may be issued at times and under circumstances so as to have a dilutive effect on earnings per share and on the equity ownership of the holders of our Common Stock." Roy Decl. Ex. Q (Mullen Automotive, Inc., Prospectus (Form 424B3) (Nov. 12, 2021), https://www.sec.gov/Archives/edgar/data/1499961/000110465922011676/tm2136584-7_424b3.htm); *see also id.* at 10 (disclosing that the issuance of equity securities pursuant to certain financing arrangements could cause "significant downward pressure on the price of our Common Stock").

which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.").

*Second*, Mullen includes a summary chart purportedly identifying the days during the Relevant Period on which its stock sales coincided with alleged spoofing episodes.  (Compl. ¶ 96.)  This summary chart includes "Pricing Dates," which were somehow used to price Mullen's stock sales on "Transaction Dates."  As explained above, ***none*** of the example spoofing episodes line up with the "Pricing Dates" in Mullen's chart.  Further, Mullen does not include ***any*** factual allegations about the supposed "Spoofing Episodes" referenced in the chart.  For example, Mullen's summary chart alleges that all three Defendants spoofed on March 10, 2023 for a total of 15 "Spoofing Episodes."  (*Id.*)  But Mullen does not explain which or how many of the 15 alleged "Spoofing Episodes" are attributed to each of Clear Street, UBS, and IMC.  Instead, Mullen groups all three Defendants together and attributes all 15 undifferentiated "Spoofing Episodes" to all three entities.  Mullen also fails to allege any facts about the "Spoofing Episodes" on March 10, 2023.  It does not allege that the Defendants entered "Baiting Orders" or "Executing Purchases," much less the timing, size, or price of those orders and purchases.  Nor does it provide any other relevant factual allegations, like the prevailing national best bid and offer prices, the Defendants' order book balance, or activity by other market participants.  Mullen simply states, without any elaboration, that the Defendants engaged in "Spoofing Episodes."  These conclusory allegations about unexplained "Spoofing Episodes" do not meet the demanding standard for pleading a securities fraud claim and should be rejected by this Court.  (*See* Section I.A*, supra*.)

In any event, Mullen fails to allege how the prices of its sales in its summary chart are connected to the alleged spoofing episodes.  Instead, Mullen makes the conclusory statement, without explanation and without alleging supporting facts, that the prices for its transactions are

"formulaically derived from secondary market closing prices on one or more days where those prices were artificially depressed by Defendants' manipulative spoofing." (Compl. ¶¶ 95–96.) Worse, for all but two of the alleged "Transaction Dates," the corresponding "Pricing Dates" are days, weeks, months, and in one instance, more than a year earlier. (*See id.*)[26] This Court has rejected nearly identical loss causation allegations because "the absence of an explanation" of the "formulaic connection" between "stock sales and the closing price(s) on these temporally distant 'Pricing Date(s)'" makes it "impossible to tell" if plaintiff suffered any losses from the alleged spoofing. *See Northwest Biotherapeutics*, 2023 WL 9102400 at *29.[27]

Accordingly, the Complaint fails to demonstrate that Mullen traded "so close in time to Defendants' spoofing" to "justify an inference that the market prices were artificial" when it traded. *See Gamma Trader*s, 41 F.4th at 80.

*     *     *

Without alleging facts demonstrating that Mullen sold shares at a price affected by Defendants' purported spoofing, Mullen has "not specifically pleaded a causal link between any single stock purchase or sale and a corresponding [spoofing episode] by [any specific Defendant]

---

[26] The unexplained "formulaic connection" in the summary chart is perplexing for several other reasons. For example, in two instances, the "Pricing Dates" are *after* the "Transaction Dates." (*See* Compl. ¶ 96.) Mullen does not explain how its stock sales could correspond to the closing price from some date in the future. Moreover, for the vast majority of the summary chart, the same "Pricing Dates" are connected to several "Transaction Dates." (*See id.*) Mullen again does not explain how a single "Pricing Date" could be connected to multiple "Transaction Dates."

[27] Most of the entries in Mullen's summary chart suffer from an additional, independent flaw. Some of the "Pricing Dates" in the summary chart include either (i) a single asterisk, which supposedly indicates that "at least one Spoofing Episode [occurred] after 3pm"; or (ii) a double asterisk, which supposedly indicates that "at least one Spoofing Episode [occurred] after 3:45pm." (Compl. ¶ 96 n.11.) However, the majority of the "Pricing Dates" in the summary chart (110 in total) do not have either asterisk. "By Plaintiff's own definition (as indicated by the fact that Plaintiff did not designate any of these entries on its chart with an asterisk), the alleged Spoofing Episodes connected to these sales did not take place in the final hour of trading." *Northwest Biotherapeutics*, 2023 WL 9102400, at *31. As this Court held in nearly identical circumstances, any claim based on these ***non***-asterisked "Pricing Dates" fails because those non-asterisked "Pricing Dates" are "too remote in time from alleged Spoofing Episodes to plead 'close proximity' under *Gamma Traders*." *Id.* at *31; *see also Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 343 (2005) (recognizing that there are a "tangle of factors affecting price" and the "the longer the time between" the wrongful act and the sale, "the more likely that other factors caused the loss").

or coordinated transactions by others." *Fezzani* v. *Bear, Stearns & Co. Inc.*, 777 F.3d 566, 572 (2d Cir. 2015) (affirming dismissal of market manipulation claim).  For this reason alone, the Complaint should be dismissed.

## II.    MULLEN FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD

The "elements of common-law fraud are essentially the same as those for a violation of Section 10(b) of the Exchange Act[]." *Cohen*, 722 F. Supp. 2d at 436.  Here, because Plaintiff's common law fraud claim "essentially track[s]" its Exchange Act claims, Plaintiff's claim for common law fraud fails for all the same reasons its Exchange Act claims fail. *See, e.g.*, *Cartwright* v. *D'Alleva*, 2018 WL 9343524, at *6 (S.D.N.Y. Aug. 27, 2018) (dismissing common law fraud claims that "essentially track[ed] [plaintiff's] Section 10(b) claims"), *aff'd*, 782 F. App'x 77 (2d Cir. 2019).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Complaint in its entirety with prejudice.

33

Dated: March 11, 2024
       New York, New York

**CAHILL GORDON & REINDEL LLP**

By: /s/ Herbert S. Washer
    Herbert S. Washer
    Tammy L. Roy
    32 Old Slip
    New York, NY 10005
    Telephone: (212) 701-3000
    Facsimile: (212) 269-5420
    hwasher@cahill.com
    troy@cahill.com

*Attorneys for UBS Securities LLC*

**MORRISON & FOERSTER LLP**

By: /s/ Anthony S. Fiotto
    Anthony S. Fiotto
    200 Clarendon Street
    Boston, MA 02116
    Telephone: (617) 648-4774
    Facsimile: (617) 830-0142
    afiotto@mofo.com

    Eric D. Lawson
    250 West 55th Street
    New York, NY 10019
    Telephone: (212) 336-4067
    Facsimile: (212) 468-7900
    elawson@mofo.com

*Attorneys for Clear Street Markets LLC*

**PAUL HASTINGS LLP**

By: /s/ Jennifer L. Conn
    Jennifer L. Conn
    Robert A. Silverstein
    200 Park Avenue
    New York, NY 10166
    Telephone: (212) 318-6004
    Facsimile: (212) 319-7004
    jenniferconn@paulhastings.com
    robertsilverstein@paulhastings.com

    Ryan P. Phair
    2050 M Street NW
    Washington, DC 20036
    Telephone: (202) 551-1751
    Facsimile: (202) 551-0251
    ryanphair@paulhastings.com

*Attorneys for IMC Financial Markets*