**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULLEN AUTOMOTIVE, INC., HYON CHA, and SHAYAN KHORRAMI,<br><br>              Plaintiffs,<br><br>      vs.<br><br>IMC FINANCIAL MARKETS, CLEAR STREET MARKETS LLC, CLEAR STREET LLC, UBS SECURITIES LLC, and JOHN DOES 1 THROUGH 10,<br><br>              Defendants. | No. 1:23-cv-10637 (LLS) |

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**
**FOR FAILURE TO STATE A CLAIM**

**CAHILL GORDON & REINDEL LLP**
Herbert S. Washer
Tammy L. Roy
32 Old Slip
New York, NY 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
troy@cahill.com

*Attorneys for UBS Securities LLC*

**MORRISON & FOERSTER LLP**
Anthony S. Fiotto
Mitchell Feldman (*pro hac vice* forthcoming)
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 648-4774
Facsimile: (617) 830-0142
afiotto@mofo.com

Eric D. Lawson
250 West 55th Street
New York, NY 10019
Telephone: (212) 336-4067
Facsimile: (212) 468-7900
elawson@mofo.com

*Attorneys for Clear Street Markets LLC and Clear Street LLC*

**PAUL HASTINGS LLP**
Jennifer L. Conn
Robert A. Silverstein
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6004
Facsimile: (212) 319-7004
jenniferconn@paulhastings.com
robertsilverstein@paulhastings.com

Ryan P. Phair
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1751
Facsimile: (202) 551-0251
ryanphair@paulhastings.com

*Attorneys for IMC Financial Markets*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 4

LEGAL STANDARD.............................................................................................................. 11

ARGUMENT .......................................................................................................................... 12

I.       PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE EXCHANGE ACT ............. 12

       A.      Plaintiffs Fail To Adequately Allege a Manipulative Act by Any Defendant...... 13

             1.     Plaintiffs Have Not Properly Plead a Manipulative Act By Merely Labelling Routine Market Activity as "Baiting Orders" .......................... 13

             2.     Plaintiffs Improperly Aggregate the Trading of Each Broker-Dealer and Its Many Customers ................................................................................... 15

             3.     Plaintiffs' Expansive "Probabilistic Imputation" Methodology Does Not Properly Plead a Manipulative Act ........................................................... 18

             4.     Plaintiffs' "Illustrative Examples" of Alleged Spoofing Episodes Do Not Properly Plead a Manipulative Act ........................................................... 25

       B.      Plaintiffs Fail To Adequately Allege a Strong Inference of Scienter .................. 26

             1.     Plaintiffs Have Not Alleged Facts Sufficient To Show Any Defendant Had Motive To Commit Fraud .......................................................................... 27

             2.     Plaintiffs Have Not Alleged Sufficient Facts To Support a Showing of Conscious Misbehavior or Recklessness ................................................... 31

       C.      Plaintiffs Do Not Adequately Allege Loss Causation ......................................... 36

             1.     Plaintiffs' New Allegations Affirmatively Undercut their Loss Causation Theory ....................................................................................................... 37

                   a.     The Alleged Lack of Price Reversion Is Inconsistent with Spoofing.................................................................................37

                   b.     Plaintiffs' Group Pleading Allegations Make Attributing Losses to the Defendants' Conduct Impossible .............................................39

             2.     Plaintiffs Cannot Meet the Second Circuit's Loss Causation Requirements for Spoofing Allegations.......................................................................... 40

       a.     Plaintiffs Do Not Sufficiently Allege a Long-Term Price Impact From the Supposed Spoofing............................................................40

       b.     Plaintiffs Do Not Allege That It Traded Sufficiently Close in Time to the Alleged Spoofing ................................................................43

II.     PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON LAW FRAUD............... 45

CONCLUSION.................................................................................................................... 46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adient*
*plc Sec. Litig.,* 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)......................................................36

*In re Aluminum Warehousing Antitrust Litig.,*
2015 WL 1344429 (S.D.N.Y. Mar. 23, 2015) ...........................................................................23

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,*
381 F. Supp. 2d 192 (S.D.N.Y. 2004).......................................................................................4

*Ashcroft* v. *Iqbal,*
556 U.S. 662 (2009)............................................................................................................11, 12

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007).............................................................................................. *passim*

*ATSI Communications, Inc.* v. *Shaar Fund, Ltd.,*
357 F. Supp. 2d 712 (S.D.N.Y. 2005).......................................................................................20

*Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse First Boston,*
853 F. Supp. 2d 181 (D. Mass. 2012) .......................................................................................39

*Cammer* v. *Bloom,*
711 F. Supp. 1264 (D.N.J. 1989) .............................................................................................37

*Cartwright* v. *D'Alleva,*
2018 WL 9343524 (S.D.N.Y. Aug. 27, 2018) ..........................................................................45

*CFTC* v. *Oystracher,*
203 F. Supp. 3d 934 (N.D. Ill. 2016) ........................................................................................35

*CFTC* v. *Wilson,*
2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ..........................................................................34

*In re Citigroup Auction Rate Sec. Litig.,*
700 F. Supp. 2d 294 (S.D.N.Y. 2009).......................................................................................36

*City of Brockton Ret. Sys.* v. *Avon Prod., Inc.,*
2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)...........................................................................32

*City of Pontiac Police & Fire Ret. Sys.* v. *BNP Paribas Sec. Corp.,*
92 F.4th 381 (2d Cir. 2024) .....................................................................................................12

*Cohen* v. *Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010)...............................................................12, 33, 36, 46

*Concord Assocs., L.P.* v. *Ent. Props. Tr.*,
    2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014)........................................................................23

*CP Stone Fort Holdings, LLC* v. *John*,
    2016 WL 5934096 (N.D. Ill. Oct. 11, 2016)........................................................................14

*DiMuro* v. *Clinique Labs., LLC*,
    572 F. App'x 27 (2d Cir. 2014) ..........................................................................................13

*In re Duane Reade Inc. Sec. Litig.*,
    2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ...................................................................30

*Dura Pharm., Inc.* v. *Broudo*,
    544 U.S. 336 (2005).............................................................................................................43

*Feiner Family Tr.* v. *Xcelera.com, Inc.*,
    2008 WL 5233605 (S.D.N.Y. Dec. 15, 2008) .....................................................................31

*Fezzani* v. *Bear, Stearns & Co. Inc.*,
    777 F.3d 566 (2d Cir. 2015)................................................................................................45

*Gabriel Cap., L.P.* v. *Natwest Fin., Inc.*,
    137 F. Supp. 2d 251 (S.D.N.Y. 2000).................................................................................32

*Gamma Traders - I LLC* v. *Merrill Lynch Commods., Inc.*,
    41 F.4th 71 (2d Cir. 2022) .......................................................................................... *passim*

*Geiger* v. *S.E.C.*,
    363 F.3d 481 (D.C. Cir. 2004)............................................................................................25

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................................................31

*Glaser* v. *The9 Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).....................................................................31, 33, 36

*Gruntal & Co.* v. *San Diego Bancorp*,
    901 F. Supp. 607 (S.D.N.Y. 1995) .....................................................................................38

*Harrington Global Opportunity Fund, Ltd.* v. *CIBC World Markets Corp.*,
    585 F. Supp. 3d 405 (S.D.N.Y. 2022).............................................................................17, 46

*Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l, Inc.*,
    309 F. Supp. 3d 100 (S.D.N.Y. 2018).................................................................................30

*In re Initial Public Offering Sec. Litig.*,
   383 F. Supp. 2d 566 (S.D.N.Y. 2005) ........................................................... 37

*Jackson* v. *Abernathy*,
   960 F.3d 94 (2d Cir. 2020) ............................................................................ 35

*Kalnit* v. *Eichler*,
   264 F.3d 131 (2d Cir. 2001) ........................................................... 26, 27, 30, 31

*Kessev Tov LLC* v. *Doe(s)*,
   2022 WL 2356626 (N.D. Ill. June 30, 2022) ............................................ 14, 33, 34

*Kessev Tov, LLC* v. *Doe(s)*,
   2023 WL 4825110 (N.D. Ill. July 27, 2023) ................................................... 35

*In re Livent, Inc. Noteholders Sec. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........................................................... 21

*In re London Silver Fixing Ltd. Antitrust Litig.*,
   2023 WL 3582198 (S.D.N.Y. May 22, 2023) ................................................... 41

*In re London Silver Fixing Ltd., Antitrust Litig.*,
   332 F. Supp. 3d 885 (S.D.N.Y. 2018) ........................................................... 37

*In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*,
   2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ............................................ 39, 40, 43

*In re Mexican Gov't Bonds Antitrust Litig.*,
   412 F. Supp. 3d 380 (S.D.N.Y. 2019) ........................................................... 33

*Meyer* v. *Greene*,
   710 F.3d 1189 (11th Cir. 2013) ................................................................... 39

*Mod. Settings, Inc.* v. *Prudential-Bache Sec., Inc.*,
   602 F. Supp. 511 (S.D.N.Y. 1984) ............................................................... 13

*In re MRU Holdings Sec. Litig.*,
   769 F. Supp. 2d 500 (S.D.N.Y. 2011) ........................................................... 34

*Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*,
   2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023) ......................................... *passim*

*Novak* v. *Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ....................................................................... 27

*Phunware, Inc.* v. *UBS Securities LLC*,
   2024 WL 1465244 (S.D.N.Y. Apr. 4, 2024) .......................................... *passim*

*Plumbers & Steamfitters Loc. 773 Pension Fund* v. *Canadian Imperial Bank of Com.*,
 694 F. Supp. 2d 287 (S.D.N.Y. 2010)......................................................................31

*Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90* v. *Intercept Pharms., Inc.*,
 2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) ...........................................................30

*Rothman* v. *Gregor*,
 220 F.3d 81 (2d Cir. 2000)........................................................................................7

*Seagrape Inv'rs LLC* v. *Tuzman*,
 2020 WL 5751232 (S.D.N.Y. Sept. 25, 2020).........................................................46

*Shields* v. *Citytrust Bancorp, Inc.*,
 25 F.3d 1124 (2d Cir. 1994).....................................................................................13

*Stone Family Trust* v. *Credit Suisse AG*,
 2022 WL 954743 (S.D.N.Y. Mar. 30, 2022) ...........................................................12

*In re Take-Two Interactive Sec. Litig.*,
 551 F. Supp. 2d 247 (S.D.N.Y. 2008)......................................................................12

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
 551 U.S. 308 (2007)............................................................................................27, 36

*Tyler* v. *Liz Claiborne, Inc.*,
 814 F. Supp. 2d 323 (S.D.N.Y. 2011)......................................................................28

*United States* v. *Coscia*,
 866 F.3d 782 (7th Cir. 2017) ...................................................................................35

*United States* v. *Lab'y Corp. of Am. Holdings*,
 2015 WL 7292774 (S.D.N.Y. Nov. 17, 2015).........................................................20

*Venkataraman* v. *Kandi Techs. Grp., Inc.*,
 2021 WL 4952260 (S.D.N.Y. Oct. 25, 2021) ..........................................................33

Defendants IMC Financial Markets ("IMC"), Clear Street Markets LLC ("Clear Street Markets"), Clear Street LLC (together with Clear Street Markets, "Clear Street"), and UBS Securities LLC ("UBS") (each a "Defendant" and together, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint (the "Amended Complaint" or "AC") of Mullen Automotive, Inc. ("Mullen"), Hyon Cha ("Cha") and Shayan Khorrami ("Khorrami") (each a "Plaintiff" and collectively, the "Plaintiffs"), with prejudice for failure to state a claim.[1]

## PRELIMINARY STATEMENT

In August 2023, facing the threatened delisting of its stock from Nasdaq, Mullen filed its first lawsuit seeking to blame others for the poor performance of its stock price.  In that suit, Mullen alleged that several financial institutions (none of the Defendants here) engaged in a convoluted short selling scheme that "devastated Mullen's share price and crippled its business."  Just a few months after making these claims, however, in December 2023, Mullen voluntarily dismissed all of its claims against those defendants and filed this action.

In this action, Plaintiffs allege that the real reason for Mullen's poor performance is that a completely different set of defendants engaged in a completely different market manipulation scheme called "spoofing."  On December 6, 2023, Mullen filed its first spoofing complaint (the "Original Complaint" or "Compl."), which Defendants moved to dismiss for failure to state a claim.  Defendants IMC and Clear Street Markets also served Rule 11 sanctions motions, which explained that the allegations in the Original Complaint were objectively and verifiably false.  On the last day of Rule 11's 21-day safe harbor, Mullen, now joined by two Mullen investors (Cha and Khorrami), filed the Amended Complaint.  While that pleading broadly alleges the

---

[1] Unless otherwise noted, emphasis is added and internal citations and quotations are omitted.  References to the "Roy Decl." refer to the May 1, 2024 Declaration of Tammy L. Roy in Support of Defendants' Joint Motion to Dismiss the First Amended Complaint for Failure to State a Claim, filed herewith.

same type of spoofing scheme as the Original Complaint, it abandons wholesale many of the original spoofing dates and adds in additional layers of speculation by asking this Court to assume that enormous volumes of anonymized trading—including the trading of nearly a dozen categories of unidentified third parties—is (or may be) attributable to one of the Defendants.

Plaintiffs' revised claims, like Mullen's original claims, are meritless.  Mullen's stock price has declined because of pervasive mismanagement by its officers and the massive dilution of its stock through Mullen's own issuance of ***billions*** of new shares.[2]  This action—Mullen's third attempt to distract and deflect from its own conduct that is devoid of any credible factual detail or a plausible legal theory—is precisely the kind of abusive litigation that courts should check by enforcing the exacting pleading requirements set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA").

In the Amended Complaint, Plaintiffs claim that all of the Defendants separately and simultaneously embarked upon identical spoofing schemes to drive down the price of Mullen's stock over the exact same twenty-four-month period, in concert with ten unidentified "John Doe" defendants, all without coordination or communication of any kind.  Plaintiffs allege that, over this two-year period, Defendants engaged in a "spoofing pattern" of trading by collectively placing "thousands of spoofing orders" that "create[d] the false impression that Mullen shares were declining" for the purpose of enabling Defendants to purchase Mullen shares at artificially deflated prices that saved Defendants fractions of a penny per share.  In support of their theory, Plaintiffs offer eight purported "illustrative examples" of spoofing across all of the Defendants

---

[2] These issues of potential corporate mismanagement and outright fraud are currently the subject of at least two lawsuits against Mullen currently pending in federal court.  *See* Order at 13–15, 20, ECF No. 68, *In re Mullen Auto. Inc. Sec. Litig.*, No. 2:22-cv-03026-DMG-AGR (C.D. Cal. Sept. 28, 2023) (denying motion to dismiss because the plaintiffs plausibly alleged that Mullen and its CEO's statements were "flat out lies" and "it is simply not plausible and would be absurd for Michery, the CEO, founder, and public face of a small EV company. . . not to be aware of such prominent facts") and *In re Mullen Auto., Inc. Derivative Litig.*, No. 2:22-cv-05336-DMG-AGR (C.D. Cal.).

and a self-invented and expansive "probabilistic imputation" methodology to plead that Defendants cancelled thousands of other unidentified orders to sell Mullen stock.  Plaintiffs' allegations fail to state a plausible claim for multiple independent reasons.

*First*, Plaintiffs fail to adequately allege any manipulative act by any of the Defendants. Instead, Plaintiffs rely on pejorative labels, conclusory legal assertions, and egregious group pleading, which are plainly insufficient under Rule 9(b) and the PSLRA.  Stripped of that rhetoric and impermissible pleading, the Amended Complaint provides no factual allegations to suggest anything other than ordinary market activity by the Defendants.  Further, Plaintiffs allege that the supposed trading at issue includes trades at the direction of each broker-dealer Defendant's clients and the anonymized trading activity of numerous additional market participants, including expansive groups of unidentified third parties.  But combining the alleged orders, trades, and cancellations of numerous independent market participants does not show a "pattern" of trading activity by anyone, and it certainly does not adequately plead a manipulative act.  If this pleading tactic were sufficient, anyone could state a market manipulation claim against any broker-dealer at any time based on cherry-picked market activity.

*Second*, Plaintiffs fail to plead any inference of scienter, let alone the "strong inference" required by the PSLRA.  Specifically, Plaintiffs fail to reconcile their motive allegations with their allegations that the Amended Complaint is based on the aggregation of the trading activity of numerous independent third-party market participants.  Further, Plaintiffs' own allegations illustrate that—even if Plaintiffs had accurately identified Defendants' transactions—the total "profit" Defendants could have earned from this alleged scheme would have been *de minimis* at best.  In fact, the total purported benefit to each Defendant ranged from approximately $800 to $1,600 in total for the two-year Relevant Period.  This is insufficient to plead a motive to commit

fraud.  Plaintiffs' attempt to plead conscious misbehavior or recklessness—through general group pleading and conclusory allegations—similarly fails.

**Finally**, Plaintiffs fail to allege loss causation, meaning a factual basis to connect, on the one hand, their own sales of Mullen shares at purportedly "deflated" prices, and on the other hand, the spoofing activity alleged in the Amended Complaint.  As Plaintiffs allege, and as courts in this District have held, a commonsense hallmark of spoofing is a "rebound" of the stock price after the cancellation of the alleged Baiting Orders.  However, Plaintiffs' new loss causation allegations—reflected in two charts in the Amended Complaint—demonstrate that there was **no rebound whatsoever**.  The only logical conclusion from those pricing allegations is that Mullen's share price decline was due to some other variable that was not spoofing.  This, alone, defeats any notion of loss causation.  Further, and in addition to the fatal group pleading allegations, Plaintiffs fail to provide (i) a specific factual basis to infer a longer-term price impact; or (ii) allegations that they traded sufficiently close in time to the alleged spoofing to justify an inference that the stock price was still deflated, as required by the Second Circuit.

For these reasons and those set out below, the Amended Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

### *The Parties*

All four named Defendants are SEC-registered broker-dealers and market makers.  (AC ¶¶ 10, 12, 18, 33, 34 n.11, 37, 43, 45, 48 n.25, 50, 81.)  A market maker is a "firm that stands ready to buy or sell a stock at publicly quoted prices."[3]  As such, market makers are required to

---

[3] *See* Roy Decl. Ex. A (U.S. Securities and Exchange Commission, "Market Centers: Buying and Selling Stock" (Oct. 15, 2012), https://www.sec.gov/answers/market.htm).  "News articles, press releases and SEC filings may be considered on a motion to dismiss."  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 210 n.10 (S.D.N.Y. 2004).

continuously quote on both sides of the market.

Mullen is an electric vehicle manufacturer based in Southern California.  (AC ¶ 6.)[4] Mullen's stock began trading publicly on the Nasdaq under the ticker "MULN" on November 5, 2021.[5]  Despite the initial hype surrounding the stock, however, Mullen failed to perform.  In both 2021 and 2022, Mullen reported *zero* revenue.[6]  Unsurprisingly, this failure to generate any revenue caused Mullen's stock to slide precipitously.  For example, since November 2021, Mullen's stock price has declined from a split adjusted peak of more than $357,000 per share to, now, roughly $4.91 per share.[7]

Mullen's financial difficulties and stock slide threatened the company's ability to continue to trade on the Nasdaq and thus its continued viability as a public company.  On September 7, 2022, Mullen received a letter from Nasdaq's Listing Qualifications Staff, indicating that the bid price of the company's common stock had closed below $1.00 per share for 30 consecutive days in violation of Nasdaq's Minimum Bid Requirement and, as a result, Mullen had 180 calendar days to regain compliance or face delisting.[8]  On March 7, 2023, the company was provided an additional 180 days to comply, but ultimately could not do so.

On September 7, 2023, Mullen announced that it received a letter from Nasdaq indicating that Mullen had failed to meet a September 5, 2023 deadline to regain compliance with Nasdaq

---

[4] Plaintiffs Cha and Khorrami are "individual investor[s] who sold Mullen shares during the Relevant Period."  (*Id.* ¶¶ 8–9.)

[5] *See* Roy Decl. Ex. B (Mullen Automotive, Inc., Current Report (Form 8-K/A) (Nov. 19, 2021)); *see also* Roy Decl. Ex. C (Press Release, Mullen Automotive, Inc., "Mullen Automotive Commences Trading on NASDAQ" (Nov. 5, 2021), https://news.mullenusa.com/mullen-automotive-commences-trading-on-nasdaq); Roy Decl. Ex. D (Press Release, Mullen Automotive, Inc., "Mullen Issues Letter to Shareholders on Merger Completion" (Nov. 9, 2021), https://news.mullenusa.com/mullen-issues-letter-to-shareholders-on-merger-completion).

[6] *See* Roy Decl. Ex. E, at 19, 45 (Mullen Automotive, Inc., Annual Report (Form 10-K) (Dec. 29, 2021)); Roy Decl. Ex. F, at 24, 50 (Mullen Automotive, Inc., Annual Report (Form 10-K/A) (Jan. 27, 2023)).

[7] *See* Roy Decl. Ex. G (Mullen Automotive, Inc. – Historical Data, Yahoo Finance, https://finance.yahoo.com/quote/MULN/history (last accessed on May 1, 2024)).

[8] *See* Roy Decl. Ex. H (Mullen Automotive, Inc., Current Report (Form 8-K) (Sept. 8, 2022)).

requirements and that Mullen faced delisting within 10 days.[9]  On October 25, 2023, Nasdaq granted the company an extension until January 22, 2024, to regain compliance.[10]

Faced with imminent delisting, Mullen engaged in a series of reverse stock splits, including three in 2023 alone, to try to regain Nasdaq compliance.  The company has also issued more than **5 billion** new shares since its initial public offering, thereby precipitating a massive dilution of its own shares.[11]  (AC ¶ 157.)  In an attempt to quell shareholder dissent, Mullen's CEO issued a Letter to Shareholders, saying the reverse stock splits were necessary to maintain Mullen's Nasdaq listing, which in turn was necessary to generate the capital needed to fund operations.[12]  Mullen also began to explore ways in which to shift blame for its own failures by filing baseless lawsuits accusing third parties for Mullen's stock price decline.

### _Mullen's First Lawsuit_

On August 29, 2023, as it faced a September 5, 2023 delisting compliance deadline with Nasdaq, Mullen filed an initial lawsuit against TD Ameritrade, Inc., Charles Schwab & Co., Inc., and National Financial Services, LLC—none of which are defendants here—for allegedly engaging in manipulative trading to affect the market price of Mullen's stock between May 4,

---

[9] _See_ Roy Decl. Ex. I (Press Release, Mullen Automotive, Inc., "Mullen Automotive Receives Delisting Determination from Nasdaq Staff for Failure to Maintain Minimum $1.00 Bid Requirement" (Sept. 7, 2023), https://news.mullenusa.com/mullen-automotive-receives-delisting-determination-from-nasdaq-staff-for-failure-to-maintain-minimum-1.00-bid-requirement).

[10] _See_ Roy Decl. Ex. J, at 24, F-62 (Mullen Automotive, Inc., Annual Report (Form 10-K) (Jan. 16, 2024)).  Mullen regained compliance with Nasdaq listing requirements on January 24, 2024.  _See_ Roy Decl. Ex. K (Press Release, Mullen Automotive, Inc., "Mullen Automotive Regains Compliance with Nasdaq Minimum Bid Price Requirement" (Jan. 24, 2024), https://news.mullenusa.com/mullen-automotive-regains-compliance-with-nasdaq-minimum-bid-price-requirement.).

[11] As detailed in Mullen's public filings, the company "had 23,383,202 shares of common stock outstanding as of December 27, 2021," which increased to **over 1.6 billion** shares of common stock outstanding as of January 6, 2023, reflecting an increase in the number of common shares outstanding of **more than 7100%**.  _Compare_ Roy Decl. Ex. E, at 1 (Mullen Automotive, Inc., Annual Report (Form 10-K) (Dec. 29, 2021)), _with_ Roy Decl Ex. F, at 1 (Mullen Automotive, Inc., Annual Report (Form 10-K/A) (Jan. 27, 2023)).

[12] _See_ Roy Decl. Ex. L (Mullen CEO David Michery Letter to Shareholders (Dec. 19, 2023)).

2023 and August 25, 2023 (the "Short Seller Action").[13]  Mullen alleged that these defendants engaged in a naked short selling scheme, whereby they sold fictitious Mullen shares and/or removed Mullen shares from customers' accounts to cover their own short positions until new shares were issued.  (Roy Decl. Ex. M at ¶ 1.)

Without identifying its alleged source, Mullen claimed to base these allegations on detailed trading data (*see, e.g.*, *id.* ¶¶ 32–33, 48, 54, 57) and contended that the defendants' short selling scheme "devastated Mullen's share price and crippled its business" (*id.* ¶ 1).  Mullen also issued a press release informing investors that the alleged scheme "inject[ed] false and misleading information about Mullen into the market" and "caused many shareholders to sell their investments in Mullen."[14]

Notwithstanding Mullen's public proclamations that this alleged short selling scheme caused its stock price to crash, just a few months later, on December 7, 2023, Mullen voluntarily dismissed the Short Selling Action with prejudice before the defendants filed a response.[15]

### *Mullen's Second Lawsuit (the Present Case)*

Similar to Mullen's filing of its Short Seller Action right before a threatened September delisting, on December 6, 2023—the day before withdrawing the Short Seller Action and weeks before Mullen's new delisting date of January 22, 2024—Mullen filed the instant action against IMC, Clear Street Markets, and UBS.  Mullen now claimed that all three firms and 10 unidentified "John Doe" defendants fraudulently manipulated Mullen's stock through a spoofing

---

[13] *See* Roy Decl. Ex. M (*Mullen Automotive, Inc. et al.* v. *TD Ameritrade, Inc. et al.*, No. 1:23-cv-07647, Dkt. 1 (S.D.N.Y. Aug. 29. 2023)).  This Court may take judicial notice of pleadings in other lawsuits attached to a motion to dismiss.  *See Rothman* v. *Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

[14] *See* Roy Decl. Ex. N (Press Release, Mullen Automotive, Inc., "Mullen Files Lawsuit Against Large Stock Brokerage Firms, Including TD Ameritrade, Charles Schwab, National Financial Services and Others" (Aug. 29, 2023), https://news.mullenusa.com/mullen-files-lawsuit-against-large-stock-brokerage-firms-including-td-ameritrade-charles-schwab-national-finance-services-and-others).

[15] *See* Roy Decl. Ex. O (Notice of Voluntary Dismissal, *Mullen Automotive, Inc. et al.* v. *TD Ameritrade, Inc. et al.*, No. 1:23-cv-07647, Dkt. 36 (S.D.N.Y. Dec. 7, 2023)).

scheme that began days after Mullen went public and persisted for two years, between November 9, 2021 and November 9, 2023.  (Original Complaint ¶¶ 1–4.)  This new lawsuit was also filed less than two weeks before Mullen broke the news to its shareholders that it needed to effect yet another reverse stock split to "bring the Company into compliance with the $1.00 minimum bid price requirement for maintaining its listing on Nasdaq."[16]

Plaintiffs alleged (and continue to allege in the Amended Complaint) that the spoofing scheme consisted of "three stages."  (Compl. ¶ 26.)  *First*, the spoofer "flood[s]" Nasdaq with "Baiting Orders" to sell to "deceive and mislead other market participants into believing that the market price of Mullen securities was moving downward."  (*Id.*)  "Baiting Orders," Plaintiffs explain, "are intended to 'bait' or 'trick' investors into entering their own sell orders."  (*Id.* ¶ 21.)  *Second*, the spoofer places "Executing Orders . . . to purchase Mullen shares at the lower stock prices."  (*Id.* ¶ 26.)  *Third*, "[i]mmediately after" completing the Executing Purchases, the spoofer "cancels" or "otherwise removes" all of their Baiting Orders from Nasdaq.  (*Id.*)  The cancellation of Baiting Orders allegedly "complet[es] the spoofing cycle."  (*Id.* ¶ 21.)

To support the claims in its Original Complaint, Mullen provided only four supposed spoofing "examples" occurring on October 25, 2022, December 15, 2022, June 6, 2023, and August 17, 2023.  (Compl. ¶¶ 61–81.)  Each followed the same general pattern outlined above. Based on only these four purported examples, Mullen alleged—without any supporting detail— that Defendants collectively spoofed on 359 of the 504 trading days during the Relevant Period (*see id.* ¶ 95), and presented a summary table of what it contended were additional "Spoofing Episodes" by the Defendants (*see id.* ¶ 96).  The summary table offered no information

---

[16] *See* Roy Decl. Ex. P (Press Release, Mullen Automotive, Inc., "Mullen Automotive Inc. Announces 1-for-100 Reverse Stock Split Effective December 21, 2023" (Dec. 19, 2023), https://news.mullenusa.com/mullen-automotive-inc.-announces-1-for-100-reverse-stock-split-effective-december-21-2023).

whatsoever as to the "three steps" Mullen itself claimed were required for the spoofing scheme it purported to allege, including the time, number, volume, or price ranges of any orders or trades for these alleged additional spoofing episodes. Nonetheless, Mullen asserted that each of these episodes created a "pile-on" effect that drove down Mullen's share prices. (*Id.* ¶¶ 28, 30.) Notably, Mullen failed to cite any source for its alleged trading data beyond general allusions to "publicly available" "deanonymized market data" from Nasdaq. (*See id.* ¶¶ 29 n.3, 95.)

On March 11, 2024, Defendants moved to dismiss Mullen's complaint (*see* ECF Nos. 26–28) on several grounds, including that Mullen had failed to allege with particularity any manipulative act by any of the Defendants, Mullen failed to adequately plead the required strong inference of scienter, and Mullen had failed to allege loss causation. (*See* ECF No. 27.)

On February 26, 2024, Clear Street Markets also served Mullen and its counsel with a separate motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. As explained more fully in that motion, Clear Street Markets investigated Mullen's allegations in the Original Complaint—which consisted of purported factual allegations about the times, sizes, and prices of Clear Street Market's orders and trades in Mullen stock—and determined that Mullen's factual contentions were objectively and verifiably false. Simply put, Clear Street Markets did not enter the orders and trades alleged in the Original Complaint. On March 11, 2024, IMC also served Mullen and its counsel with a similar motion for sanctions.[17]

Instead of opposing Defendants' motion to dismiss and faced with motions for sanctions, on March 18, 2024 (the last day of the 21-day safe harbor), Mullen—now joined by two

---

[17] On April 23, 2024, Clear Street sent Plaintiffs' counsel a letter attaching order and trading data from Clear Street's Consolidated Audit Trail, which undergoes a matching and validation process by the Financial Regulatory Authority on a daily basis, and accompanying sworn declarations from senior compliance officers. That data unequivocally shows, once again, that Clear Street did not enter the orders and trades alleged in the "example" spoofing episodes attributed to Clear Street in the Amended Complaint. Similarly, on May 1, 2024, IMC served Plaintiffs' counsel with a renewed motion for sanctions showing that again, Plaintiffs' allegations concerning IMC's trading activity are false.

purported Mullen investors, Cha and Khorrami—filed the Amended Complaint broadly alleging the same spoofing scheme as in Mullen's Original Complaint (*see* AC ¶¶ 54–55), but changing the alleged spoofing dates and the explanation for the source of its spoofing allegations. Whereas Mullen asserted in its Original Complaint that its allegations were only based on "publicly available" "deanonymized market data" from Nasdaq (*see* Compl. ¶¶ 29 n.3, 95), Plaintiffs now assert that their allegations are based on a "Methodology" that they employed using "probabilistic imputation" to attribute certain "anonymized activity" on Nasdaq to Defendants based purely on its temporal proximity to Defendants' allegedly identifiable trading data.  (*See* AC ¶¶ 32–51.)  According to Plaintiffs, the balances of Mullen shares in three of the Defendants' custodial accounts with the Depository Trust and Clearing Corporation (the "DTCC") bolster their "probabilistic imputations" (*see id.* ¶ 34), although they concede that DTCC custodial transfers occur for a variety of reasons and thus "do[] not" necessarily "evidence a purchase transaction."  (*Id.* ¶ 34 n.13.)  Further, as Plaintiffs admit, DTCC balances reflect ***all*** activity by ***all*** brokers and customers that clear with the DTCC entity, whether or not the activity from those brokers and customers is attributable in any way to a Defendant.  (*Id.*)[18] The DTCC balances also ***do not provide any information about the size, timing, or pricing of any of the Defendants' intra-day orders and trades***.

Plaintiffs also now append a chart to the Amended Complaint that purports to reflect "[a] complete list of Spoofing Episodes by each Known Defendant" based on their "Methodology." (*Id.* ¶ 62; *see also Id.*, Ex. 1.)  This chart provides a date and time, price, and share volume for each alleged Executing Purchase.  But like the summary chart in Mullen's Original Complaint,

---

[18] As explained in more detail below, Plaintiffs acknowledge that IMC "does not maintain an independent clearing account with DTCC" (AC ¶ 36 n.14), and instead "clear[s] through Goldman Sachs."  (*Id.* ¶ 37 n.15; *see also id.* ¶ 125.)  Plaintiffs concede that "other parties also clear[] through Goldman Sachs," yet nevertheless rely on the quantities of Mullen shares in Goldman Sachs' custodial account with DTCC to support their "probabilistic imputation" of anonymized trading data to IMC.  (*See id.* ¶¶ 37 n.15, 125.)

Plaintiffs' new chart fails to provide any placement times, prices, share volumes, or cancellation times for any individual Baiting Orders.  Instead, the chart provides only minimum and maximum prices of the alleged Baiting Orders from the four-minute purported spoofing window and the aggregate share volume of these alleged orders—a value reflecting "the lesser of the volume of sell-side orders cancelled in the two-minutes after the Executing Purchase and the volume of sell-side orders created in the two minutes prior to the Executing Purchase."  (*Id.*, Ex. 1, at 1 n.3.)  Notably, Plaintiffs' chart fails to include ***any sales*** of Mullen stock after these Executing Purchases that would have resulted in a profit to Defendants.  Nor do Plaintiffs provide any trading data that would permit Defendants or this Court to validate Plaintiffs' "probabilistic imputation" of these alleged Executing Purchases and Baiting Orders.

The Amended Complaint alleges that Defendants' purported Spoofing Episodes resulted in "both temporary and long-term adverse effects on the market price of Mullen shares" (AC ¶ 178), and attempts to establish Plaintiffs' losses by providing charts detailing their alleged sales of Mullen shares.[19]  (*See id.*, Ex. 2 (Sales by Mullen With Pricing Dates Having Spoofing Episodes); *id.*, Ex. 3 (Sales by Khorrami); *id.*, Ex. 4 (Sales by Cha).)

Plaintiffs bring their claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5(a) and (c) thereunder, Section 9(a)(2) of the Exchange Act, and New York common law fraud.  (*Id.* ¶¶ 193–216.)

## LEGAL STANDARD

A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  "A claim is facially plausible when it provides enough factual content to support the reasonable inference

---

[19] The Amended Complaint slightly extends the relevant time period that was alleged in the Original Complaint, purporting to include alleged spoofing events occurring "between November 5, 2021 and November 15, 2023" (the "Relevant Period").  (*See* AC ¶ 1.)

that the defendant is liable for the misconduct alleged, and presents more than a sheer possibility of liability." *City of Pontiac Police & Fire Ret. Sys.* v. *BNP Paribas Sec. Corp.*, 92 F.4th 381, 390 (2d Cir. 2024). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

Securities fraud claims are subject to the heightened pleading requirements of both Rule 9(b) and the PSLRA, which require plaintiffs to set forth "with particularity the circumstances constituting [the] fraud." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008); *see also ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) (Market manipulation claims "must be pled with particularity under Rule 9(b).").

## ARGUMENT

## I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE EXCHANGE ACT

To plead market manipulation under Section 10(b) of the Exchange Act, Plaintiffs must allege, *inter alia*, a manipulative act, scienter, and a sufficiently close causal connection between a defendant's conduct and plaintiffs' alleged damages. *ATSI*, 493 F.3d at 101. Similarly, to plead a claim under Section 9(a)(2), Plaintiffs must "identify transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security with the intent to deceive or defraud investors." *Cohen* v. *Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010). "The analysis of claims under Section 9(a) 'closely parallels' the analysis of claims under Section 10(b)." *Stone Family Trust* v. *Credit Suisse AG*, 2022 WL 954743, at *6 (S.D.N.Y. Mar. 30, 2022).

Plaintiffs' Exchange Act claims should be dismissed because Plaintiffs fail to adequately plead (i) a manipulative act; (ii) a strong inference of scienter; and (iii) a causal connection

between its purported losses and any alleged act by a Defendant.

### A.      Plaintiffs Fail To Adequately Allege a Manipulative Act by Any Defendant

To plead market manipulation, a plaintiff must "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants," including "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI*, 493 F.3d at 102.   "General allegations not tied to the defendants or resting upon speculation are insufficient." *Id.*  The Amended Complaint fails under these standards.

### 1.      Plaintiffs Have Not Properly Plead a Manipulative Act By Merely Labelling Routine Market Activity as "Baiting Orders"

The Amended Complaint's theory of market manipulation is largely based on Plaintiffs' labelling of certain cancelled orders as "Baiting Orders" and asserting—without supporting facts—that these orders were never "intended to be executed."  (AC ¶ 2.)  But merely labelling an order a "Baiting Order" is insufficient.  As a matter of law, conclusory labels do not meet the requirements of Rule 9(b).  *See, e.g.*, *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming dismissal of securities fraud claims where plaintiff's "pleading technique" "couple[d] a factual statement with a conclusory allegation of fraudulent intent"); *Mod. Settings, Inc.* v. *Prudential-Bache Sec., Inc.*, 602 F. Supp. 511, 514 (S.D.N.Y. 1984) (dismissing market manipulation claim as "speculative" where allegations "read more like factual hypotheses than like factual descriptions of events which have transpired"); *see also DiMuro* v. *Clinique Labs., LLC*, 572 F. App'x 27, 30 (2d Cir. 2014) (affirming dismissal of complaint "riddled with repeated conclusory labels," which "are not facts, and certainly not facts sufficient for Rule 9(b)").

Plaintiffs' labels are also circular.  Plaintiffs first define a "Baiting Order" as ***any*** order

cancelled within two minutes of an Executing Purchase.  (*See* AC ¶ 95 n.47.)  Plaintiffs then claim that each Defendant engaged in spoofing because it purportedly cancelled "all of its Baiting Orders" within two minutes of an Executing Purchase.  (*See, e.g.*, *id.* ¶ 99.)  But one cannot properly plead a manipulative act by labelling ***all*** cancelled orders as "Baiting Orders" and then emphasizing that ***all*** "Baiting Orders" were cancelled.[20]  This is especially true where Plaintiffs have broadly defined the terms "cancel" or "cancellation" to encompass situations where a trader cancels an order in order to replace it with a re-priced order for the exact same number of shares, as the market price fluctuates.  (*See, e.g.*, *id.* ¶ 54 n.30 (defining "cancel" or "cancellation" to include "any other action that removed the supply of shares represented by the Baiting Orders to sell (***however briefly***)")).)

Moreover, the mere existence of cancellations—even a cancellation made shortly after an order is placed—is not sufficient to plead a manipulative act.  *See CP Stone Fort Holdings, LLC* v. *John*, 2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) (dismissing claims where "plaintiff's theory boils down to an allegation that if a subset of orders was ultimately cancelled, those orders, in hindsight, must never have been intended to be executed"); *Kessev Tov LLC* v. *Doe(s)*, 2022 WL 2356626 (N.D. Ill. June 30, 2022) ("*Kessev Tov I*") (holding that "placing rapid orders and cancelling them does not necessarily evince illegal market activity" and recognizing "the ubiquity of rapid trading across securities platforms").  In fact, the cancellation of an order is an expected and common aspect of trading in modern equity markets—only a "few percent" of equity orders are executed, and the "majority" are cancelled.[21]

---

[20] According to Plaintiffs, not all of Defendants' orders during the so-called "Baiting Period" were "subsequently cancelled."  (*See, e.g.*, AC ¶ 112 & n.49 (citing to a price range of orders created by Defendants over a two-minute window and a separate price range of "Baiting Orders" that were "placed" during the same two-minute window and "subsequently cancelled").)  The creation of *bona fide* orders to sell during the Baiting Period is entirely inconsistent with a spoofing scheme.

[21] Roy Decl. Ex. Q (U.S. Securities and Exchange Commission, "*The Speed of the Equity Markets*" (Oct. 9, 2013),

Stripped of Plaintiffs' improper labels, the acts on which Plaintiffs base their claims—various orders, purchases, and cancellations of orders—are nothing more than routine market activity, which is "not, by itself, manipulative."  *ATSI*, 493 F.3d at 101.

### 2. Plaintiffs Improperly Aggregate the Trading of Each Broker-Dealer and Its Many Customers

Plaintiffs attempt to transform routine market activity into allegedly manipulative acts by claiming they have identified "distinctive pattern[s]" of trading that Plaintiffs argue is suggestive of spoofing.  (AC ¶ 67.)  According to Plaintiffs, "one of the clear signs of spoofing is a rapid reversal of trading direction—for example, where a market participant places many sell orders, followed by a buy order, followed by the cancellation of the sell orders.  This type of behavior strongly suggests that the original sell orders were not intended to be executed[.]"  (*Id.* ¶ 29.)

Plaintiffs allege that this type of "spoofing pattern" is present here for each of the Defendants in part by cherry-picking the aggregated trading activity in the proprietary accounts of each broker-dealer Defendant ***and*** the trading activity of all of that broker-dealer's numerous distinct customers.  (*See, e.g.*, AC ¶ 52 (alleging that "Defendants participated in spoofing schemes either by placing orders and/or executing trades for their own proprietary or principal accounts, ***or doing so on behalf of customers or clients***"), ¶ 54 (alleging that Defendants spoofing schemes were accomplished "***pursuant to the instructions of either their customers'*** or their own proprietary traders"); ¶¶ 10, 12, 18 (Defendants are "broker-dealer[s].").)[22]

In doing so, Plaintiffs necessarily ask this Court to speculate and unreasonably assume that ***all*** market activity attributable to a broker-dealer reflects the intent of a single decision-

---

https://www.sec.gov/marketstructure/data-highlight/speed-equity-markets).

[22] Although Plaintiffs generally allege that Defendants traded at the direction of their customers, Plaintiffs provide no factual support for those allegations.  In fact, and for example, IMC engages in only proprietary trading. Defendants must, however, accept all of Plaintiffs' allegations as true for the purposes of this motion, including the allegation that Defendants were acting "[p]ursuant to the instructions of . . . their customers." (AC ¶ 54(a).)

maker.  It is only by assuming (without basis) that the same actor made the decisions to place "many sell orders, followed by a buy order, followed by the cancellation of sell orders" (AC ¶ 29) that one could suggest—as Plaintiffs do here—that the trading identified in the Amended Complaint presents a "pattern" that is potentially suggestive of spoofing.  *See Gamma Traders - I LLC* v. *Merrill Lynch Commods., Inc.*, 41 F.4th 71, 75 (2d Cir. 2022) (observing that spoofing involves "suspicious trading activity of ***one trader*** placing both buy- and sell-side orders in the same market").

A simple example illustrates the flaw in Plaintiffs' speculative pleading tactic.  Assume a Defendant has three customers who seek to transact in Mullen shares.  Customer A places an order to sell 50 shares for $0.50 per share at 9:15 a.m.; it is not accepted by any other market participant, and Customer A ultimately cancels her sell order 15 minutes later at 9:30 a.m. Assume further that Customer B also places an order to sell 50 shares but offers a lower price, $0.48 per share, and does so at 9:25 a.m.  Customer C, who seeks to buy, naturally opts for the lower price offered by Customer B and buys his 50 shares at $0.48 per share at 9:28 a.m.  In this example, each customer is acting independently and in their own best interest, and shows nothing more than routine, legitimate market activity.  Yet Plaintiff would aggregate the trading of all three customers and dub it "spoofing" simply because Customer A cancelled his sell order within two minutes of Customer C's "Executing Purchase."  But where, as here, ***different actors—i.e., each of the separate Defendants and their numerous respective customers—***are admittedly doing the selling, buying, and cancelling, their aggregate trading activity suggests nothing about anyone's actions or intent, let alone anything fraudulent.[23]

---

[23] Plaintiffs' aggregated order, trade, and cancellation data is also utterly meaningless.  For example, many of the statistics and examples attributed to Clear Street and IMC are contrary to their spoofing theory.  (*See, e.g.*, AC ¶¶ 68 n.32, 78 n.39.)  For instance, in the purported IMC Spoofing Episode on March 10, 2023, Plaintiff alleges there was actually higher purchase activity than sales activity, which under Plaintiffs' theory would increase Mullen's stock

Similarly, without matching a **specific order** to a **specific cancellation**, there is simply no basis to assume that any order was cancelled "quickly."  Thus, in the example of Customers A, B, and C discussed above, because Plaintiffs aggregate the trading activity of multiple market participants, it would deem Customer A's cancelled order a "Baiting Order" even though it was cancelled **15 minutes** after it was placed.  Without differentiating between market participants, Plaintiffs have not pleaded a timeline for the cancellation of any order, let alone a factual basis to assert there was a "short time period between the . . . placement and cancellation of the Baiting Orders."  (AC ¶ 64.)

Defendants pointed out this flaw in their original motion to dismiss.  *See* ECF No. 27. Instead of attempting to remedy the issue, in their Amended Complaint, Plaintiffs openly admit that this mix-and-match pleading tactic was intentional.  (AC ¶ 50 (acknowledging that the spoofing activity alleged in the Amended Complaint "is not limited to situations in which the **same** customer, client or other beneficiary of the Defendant placed Baiting Orders and Executing Purchases").)  Plaintiffs also affirmatively plead that a portion of the trading at issue was in fact done "[p]ursuant to the instructions of [Defendants'] customers."  (AC ¶ 54.)[24]

---

price, not artificially deflate it.  (*Id.* ¶ 118 (alleging IMC's baiting orders left IMC with an imbalanced book order "consisting of **bids to purchase 900 shares**" compared with "**an offer to sell 100 shares**").)  Plaintiffs' data is also incomprehensible.  For example, in one chart, Plaintiffs allege that Clear Street entered a median of 8,800 shares of non-spoofing sell-side orders.  (*Id.* ¶ 68.)  In a second chart, Plaintiffs claim that Clear Street cancelled 97% of those non-spoofing sell-side orders, which should result in a median cancellation of 8,536 shares of non-spoofing sell-side orders (0.97 x 8,800 = 8,536).  (*Id.* ¶ 70.)  Perplexingly, in a third chart, Plaintiffs instead allege that Clear Street cancelled a median of just 7 shares of non-spoofing sell-side orders.  (*Id.* ¶ 72.)  Even Plaintiffs have apparently confused themselves in their effort to attribute substance to meaningless data—presenting the same statistics for two different propositions.  (*Id.* ¶¶ 75, 87.)  These types of errors are not isolated; they permeate the Amended Complaint and fatally undermine Plaintiffs' attempt to portray ordinary market activity as manipulative.

[24] Plaintiffs' allegations regarding the use of high-speed trading algorithms also diverge from the allegations in other recent spoofing cases.  *Compare* AC ¶ 79 (alleging that "each Defendant (**and/or their customers**) specifically designed and implemented algorithmic trading programs that routed orders, executed trades and otherwise carried out the spoofing schemes"), *with Phunware*, 2024 WL 1465244, at *4 ("[T]he thrust of the Complaint's allegations is that Defendant 'specifically designed and implemented algorithmic trading programs to execute its spoofing schemes' and substantively controlled the trading strategies alleged."), *Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*, 2023 WL 9102400, at *18 (S.D.N.Y. Dec. 29, 2023) ("[T]he FAC alleges that . . . it was Defendants' algorithms that controlled the trades."), *and Harrington Global Opportunity Fund, Ltd.* v. *CIBC World*

In this significant regard, the Amended Complaint stands in stark contrast to recent spoofing claims against other broker-dealers, including those cited by Plaintiffs in the Amended Complaint. For example, in *Phunware, Inc.* v. *UBS Securities LLC*, the Court found that it could not accept the defendant's argument concerning plaintiff's reliance on the aggregated trading of different actors where the plaintiff in that case had alleged only that trades "may have been executed" by the defendant broker-dealer "'for client accounts, for which [Defendant] acted as a broker,'" which the Court held was "distinct from executing the trades on a client's orders." 2024 WL 1465244, at *7 (S.D.N.Y. Apr. 4, 2024).[25]

Here, however, Plaintiffs specifically allege that some portion of the trading on which they base their claims was in fact directed by other market participants. This admitted aggregation of the trading and decision-making of numerous different actors simply does not plead a pattern of trading by anyone. All that Plaintiff has alleged is that ***someone*** cancelled an order to sell after ***someone*** purchased stock. Asking this Court to assume all such market activity is nonetheless attributable to, or reflects the intent of, a single actor or actors "relies, at best, on speculative inferences." *ATSI*, 493 F.3d at 103. The Second Circuit has made clear that "speculative inferences" do not adequately plead a claim for market manipulation. *Id*.

### 3. Plaintiffs' Expansive "Probabilistic Imputation" Methodology Does Not Properly Plead a Manipulative Act

In addition to Plaintiffs' improper aggregation of customer trading activity, Plaintiffs' Amended Complaint now concedes that it goes even further to sweep in ***even more*** trading activity by an ***even broader*** group of market participants—and attributing it all to the

---

*Markets Corp.*, 585 F. Supp. 3d 405, 416 (S.D.N.Y. 2022) (similar).

[25] *See also Northwest Biotherapeutics*, 2023 WL 9102400, at *18 (holding that court could not credit defendants' argument that clients decide whether and when to place orders and at what price based on allegation that the spoofing activity "may have been executed by Defendants . . . for client accounts").

Defendants.

Whereas in the Original Complaint, Mullen asserted that its allegations were only based on "publicly available" "deanonymized market data" from Nasdaq (*see* Compl. ¶¶ 29 n.3, 95), Plaintiffs now allege that their "assignment of Baiting Orders and Executing Purchases to a Defendant" is based on both deanonymized Nasdaq orders (as discussed above) ***and*** anonymized Nasdaq orders that Plaintiffs seek to impute to the Defendants under a "probabilistic imputation" "Methodology" invented by Plaintiffs.  (AC ¶ 45.)

Specifically, based solely on "information and belief," Plaintiffs seek to attribute large volumes of anonymized trading activity on Nasdaq to the Defendants based on nothing more than Plaintiffs' supposition that anonymized activity occurring close-in-time to the deanonymized activity of a Defendant should be attributed to the same Defendant.  Plaintiffs offer two different imputation theories.  ***First***, the Amended Complaint assumes that "all deanonymized and anonymized orders arriving within the same nanosecond" must have come from the same source.  (*Id.* ¶ 40.)  ***Second***, the Amended Complaint assumes that where a Defendant submitted a deanonymized order on one side of the trading book (*e.g.*, an attributed sell order), all anonymized activity on the opposite side of the trading book in the same millisecond can be attributed to that Defendant (*e.g.*, anonymous buy orders).  (*Id.* ¶¶ 42–43.)

Plaintiffs' fabricated "Methodology" does not come close to satisfying the pleading requirements in this Circuit.  A plaintiff must "plead ***with particularity*** . . .  what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."  *ATSI*, 493 F.3d at 102.  Allegations "resting upon speculation are insufficient."  *Id.*  Further, in spoofing cases, "pleading based on rote probabilities"—such as the use of a "statistical-probability style of

19

pleading"—is "disfavored."  *Gamma Traders*, 41 F.4th at 78–79.[26]  Plaintiffs also state that, "[u]nless otherwise indicated, ***all allegations*** in this First Amended Complaint regarding the Known Defendants' participation in spoofing schemes ***is on information and belief***."  (*See* AC ¶ 51 n.29.)  But "information and belief allegations [are generally not permitted under Rule 9(b)] except for matters that are peculiarly within the opposing party's knowledge."  *ATSI Communications, Inc.* v. *Shaar Fund, Ltd.*, 357 F. Supp. 2d 712, 716 (S.D.N.Y. 2005). Plaintiffs' use of "information and belief" allegations is categorically inappropriate where, as here, the relevant information is available from FINRA, the relevant exchanges, and publicly-available trading data.  (*See* AC ¶¶ 6, 51.)  Although "gathering the requisite details . . . may require investigation and research, such is the nature of Rule 9(b)."  *United States* v. *Lab'y Corp. of Am. Holdings*, 2015 WL 7292774, at *7 (S.D.N.Y. Nov. 17, 2015).  Plaintiffs' "Methodology" based on "information and belief" is precisely the kind of speculative "statistical-probability style of pleading" rejected by the Second Circuit in fraud cases.

Moreover, Plaintiffs' "Methodology" is not only improperly speculative, it is admittedly flawed.  Remarkably, the Amended Complaint concedes on its face that Plaintiffs' "Methodology" will inevitably result in incorrect imputations.  (*See, e.g.*, AC ¶ 44 (acknowledging that Plaintiffs' "Methodology" is not 100% accurate and calculating an "average daily likelihood" of falsely attributing an order to the wrong source of 14%); ¶ 42 (conceding that Plaintiffs' millisecond-imputation theory applies with even "lower certainty" than its

---

[26] Although Plaintiffs allege that "multiple courts in this district have denied motions to dismiss spoofing claims based on a plaintiff's use of an imputation methodology" (AC ¶ 38), Plaintiffs identify only one decision (*Northwest Biotherapeutics*), and Defendants are aware of no other.  Moreover, Plaintiffs misapprehend *Northwest Biotherapeutics*, which does not support the expansive "Methodology" that Plaintiffs urge here.  In *Northwest Biotherapeutics*, the Court accepted the plaintiff's approach of matching anonymized executed purchases to displayed order quotes where the executed purchase was followed by a change in the displayed quote, provided the change occurred "within five seconds" and was "equal in ***volume and price*** to that of the [anonymous] transaction." 2023 WL 9102400, at *16.  Here, Plaintiffs' "Methodology" relies on the far more speculative and baseless assumption that all orders placed within a particular window can be attributed to a Defendant, without matching the price, volume, or even direction of the anonymized and deanonymized trading activity.

nanosecond-imputation theory).)

Plaintiffs' conflicting allegations concerning their "Methodology" further confirms that it is unreliable and entitled to no weight.[27]  For example, the underlying premise of Plaintiffs' millisecond-imputation theory contradicts Plaintiffs' broader spoofing theory.  The spoofing scheme Plaintiffs allege is based on Defendants' allegedly failing to maintain a balance between their sell-side and buy-side orders.  (*See, e.g.*, AC ¶ 58).  According to Plaintiffs, this imbalance differentiates Defendants' supposed trading activity from that of "bona fide market making because a market maker ordinarily seeks to maintain a flat inventory position."  (*Id.* ¶ 77.)  Yet, Plaintiffs' millisecond-imputation theory assumes Defendants were in fact acting "to maintain a flat inventory position" at all times.  (*See id.* ¶ 43 (explaining that the basis for Plaintiffs' millisecond imputation theory is that:  "Because Defendants are Nasdaq-registered market makers, they are likely to place orders on both sides of the Limit Order Book.").)  Plaintiffs cannot reasonably ask this Court to assume that Defendants were ***not*** acting as *bona fide* market makers for purposes of certain allegations but nonetheless accept a "probabilistic imputation" theory based on Defendants acting in exactly the opposite way.

Plaintiffs' nanosecond-imputation theory is similarly based on conflicting allegations. Specifically, Plaintiffs first urge that the Court can accept the theory because, they claim, "for orders arriving in the same nanosecond, it is ***virtually impossible*** to originate from different sources."  (*Id.* ¶ 40, n.19.)  Yet, Plaintiffs later acknowledge that orders from different sources ***do*** arrive in the same nanosecond or millisecond but argue that, when this happens, the Court should just assume that those third-party sources are "acting on behalf of," "at the instruction of," or

---

[27] *See, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself . . . .").

"for the benefit of" one of the Defendants.  (*Id*. ¶ 49.)[28]

Indeed, Plaintiffs are quite clear that—in addition to its speculative imputation theories—some significant portion of the trading activity on which they base their claims was **not** executed by the Defendants, but should nonetheless be attributed to them.  Specifically, the Amended Complaint alleges that all references to a Defendant's conduct include conduct by any (1) of Defendants' "customers or clients," (2) "third part[ies] acting on behalf of or at the instruction of the Defendant," (3) "third part[ies] acting on behalf of or at the instruction of . . . Defendant's customers or clients," (4) "third part[ies] acting . . . for the benefit of the Defendant," (5) "third part[ies] acting . . . for the benefit of . . . Defendant's customers or clients"; (6) "corporate parent[s]," (7) "subsidiary[ies]," (8) "sibling[s]," (9) "affiliate[s]," (10) "collaborator[s]," and (11) "co-conspirator[s]."   (*Id*. ¶ 46.)   Pursuant to Plaintiffs' methodology, the conduct of all eleven of these groups of unidentified actors will **also** be attributed to a Defendant in a potentially infinite number of combinations where one of the third parties performed just one action in a series of actions and "a third party performed another action in that series for the benefit of that Defendant (or that Defendant's customers or clients)."  (*Id*. ¶ 47.)

---

[28] Plaintiffs also fail to account for "Pegged Orders," which is a common mechanism used by market makers and other market participants.   A "Pegged Order," as defined by the Nasdaq Equity Trading Rules, "allows an Order to have its price automatically set with reference to the NBBO."  Roy Decl. Ex. R (Equity Trading Rule 4703(d), SEC Release 34-53128, THE NASDAQ STOCK MARKET (Nov. 23, 2020), available at https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/ Nasdaq%20Equity%204.)  That is, "[b]y using the Pegging order types" a market maker "thereby let[s] the INET trading system automatically adjust the price of the Order based on changes in the visible best Bid or Offer Price."  Roy Decl. Ex. S (Pegged Orders, NASDAQ (last visited May 1, 2024), available at https://www.nasdaq.com/solutions/large-in-scale#:~:text=Pegged%20Orders,Large %2Din%2DScale&text=Pegging%20orders%20can%20be%20entered,Best%20Bid%20or%20Offer%20Price.)  Once the price of the pegged order is automatically adjusted, the pegged order will "receive a new timestamp."  Roy Decl. Ex. R (Equity Trading Rule 4702). Pegged Orders "help Market Makers meet their quoting obligations under Rule 4613(a)" because they "allow Market Makers to maintain attributable quotes within the thresholds set forth in Rule 4613(a) even as market prices fluctuate."  Roy Decl. Ex. T (Fact Sheet, Market Maker PEG Order, NASDAQTRADER.COM (last visited May 1, 2024), available at https://www.nasdaqtrader.com/content /productsservices/trading/MMPegOrder_factsheet.pdf.)  Accordingly, if multiple market makers—including the Defendants—place pegged orders, when the national best bid or offer price fluctuates, all of the market makers' applicable pegged orders will simultaneously and automatically change.   This also negates any notion, as Plaintiffs allege, that "it is **virtually impossible**" for "orders arriving in the same nanosecond" to "originate from different sources," and is fatal to Plaintiffs' "Methodology."  (AC ¶ 40, p. 20, n.19.)

"Group pleading" like this, "by which allegations are made against families of affiliated entities is simply insufficient to withstand review on a motion to dismiss." *Concord Assocs., L.P.* v. *Ent. Props. Tr.*, 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014). [29]   These allegations—sweeping in the trading activity of numerous undifferentiated and unidentified third parties—constitute plainly improper group pleading and further confirm that Plaintiffs' spoofing claims are works of fiction that cannot withstand a motion to dismiss.

Nonetheless Plaintiffs argue that their "probabilistic imputations" of anonymized data is bolstered by the balances of Mullen shares in three of the Defendants' custodial accounts with the DTCC.  (AC ¶ 34.)  Plaintiffs concede, however, that DTCC balances reflect ***all*** activity by ***all*** brokers and customers that clear with the DTCC entity, whether or not the activity from those brokers and customers is attributable in any way to a Defendant.  (*Id.* ¶ 35 n.13.)

Moreover, as to IMC, Plaintiffs admit that IMC "does not maintain an independent clearing account with DTCC."  (*Id.* ¶ 36 n.14.)  Instead, Plaintiffs purport to use DTCC data for Goldman Sachs, IMC's clearing broker and a major international financial institution, to infer IMC's trading activity.  According to Plaintiffs, because ***Goldman Sachs'*** total closing trading balance on March 14, 2023 showed a net increase of 825,944 shares, that somehow shows that ***IMC*** engaged in Spoofing Episodes on March 10, 2023.  (*Id.* ¶ 37 n.15.)  But Plaintiffs admit, as they must, that they lack ***any*** ability to distinguish IMC's trades from Goldman Sachs's own proprietary trading, or the trading of the many other market participants that clear through Goldman Sachs.  (*Id.*)  Instead, without any explanation whatsoever, Plaintiffs' summarily state

---

[29] Plaintiffs define Clear Street Markets and Clear Street LLC jointly as "Clear Street" and attribute the conduct of each of them, without supporting allegations, as "Clear Street spoofing."  (AC ¶ 17.)  Putting aside the specificity required by Rule 9(b), "[b]oth Rule 8 of the Federal Rules of Civil Procedure and *Twombly* require more than that— mere speculative generalizations as to a defendant are insufficient.  The fact that two separate legal entities may have a corporate affiliation does not alter this pleading requirement."  *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1344429, at *3 (S.D.N.Y. Mar. 23, 2015).

they "have no reason to conclude that the[ir] conclusions would differ for Defendant IMC" from the other Defendants.[30] (*Id.* ¶ 36 n.14.)

The purported justification that Plaintiffs offer for their imputation theories only further highlights the speculative and unreliable nature of the allegations of the Amended Complaint. Plaintiffs offer these imputation theories to fill an acknowledged data gap. This was a known flaw in Plaintiffs' Original Complaint. (*See* Compl. ¶ 29 (noting "the limited data available to Plaintiffs in the public domain" regarding Defendants' trading).) And, in the Amended Complaint, Plaintiffs again acknowledge that the deanonymized data on which Plaintiffs have based this entire alleged spoofing scheme is only a small snapshot of Defendants' trading activity in Mullen. (*See* AC ¶ 34 (alleging that "Defendants' market activity in Mullen shares was not limited solely to deanonymized orders" placed on Nasdaq).) But the absence of data is not an excuse to invent additional trading activity attributable to Defendants.[31]

Finally, while Defendants acknowledge that there are spoofing cases in this District that have survived the motion to dismiss stage, none of these cases have relied on the expansive imputation theories and group pleading that Plaintiffs rely on here. Plaintiffs' admission that these theories "serve[] as the basis of a material portion of Plaintiffs' claims" (AC ¶ 41) renders the entire Amended Complaint in this case far too speculative to plead a manipulative act.[32]

---

[30] As Plaintiffs maintain that their dubious "Methodology" is based upon DTCC data (*see* AC ¶ 34), and they admittedly have no such data for IMC (*see id.* ¶ 36 n.14), they have absolutely no basis for their claims against IMC.

[31] Moreover, in Defendants' original motion to dismiss, Defendants pointed out that this data limitation is in large part because Plaintiffs claim to have reviewed only the "limited data available" to Plaintiffs from a single exchange (Nasdaq) on which MULN trades. (ECF No. 27 (motion to dismiss); ECF No. 1 (Compl.) ¶ 29.) Yet, as both Complaints have affirmatively alleged, MULN trades on numerous other exchanges and off-exchange venues (*e.g.*, NYSE Arca, BATS, *etc.*), and each of the Defendants "route orders and execute trades of Mullen shares" on these multiple "exchanges." (*See* AC ¶¶ 6, 11, 13, 19.) Thus, while Plaintiffs use known data gaps to justify inventing more trading activity by Defendants on Nasdaq, Plaintiffs gloss over entirely the obvious (and far more plausible) possibility that relevant executions occurred on other platforms.

[32] Plaintiffs also take issue with information that Clear Street and IMC provided regarding the falsity of Plaintiffs' allegations. (*See* AC ¶ 37 n.15.) While Plaintiffs stridently claim that they have decided the information they received is not "credible," Plaintiffs' Amended Complaint makes plain that they are the ones fabricating fraud

4.      **Plaintiffs' "Illustrative Examples" of Alleged Spoofing Episodes Do Not Properly Plead a Manipulative Act**

Plaintiffs' eight alleged "illustrative examples" of "spoofing episodes" (AC ¶¶ 94–156) also fail under Second Circuit precedent because they fail to provide any meaningful detail.

Despite claiming to have sufficient underlying trading data to support their "illustrative examples," Plaintiffs omit any allegations concerning the number of alleged Baiting Orders involved or the timing, price, or volume of such orders, much less who made the decision to place each order and why.  Instead, Plaintiffs rely on allegations about the **_total sum_** of shares offered and **_a range_** of times and prices.  (*See, e.g.*, *id.* ¶ 95 (alleging "9,900 shares of Baiting Orders" across a range of prices over a two-minute interval).)  Plaintiffs' failure to plead with any specificity, and their reliance instead on vague ranges and sums, makes it impossible for Defendants or the Court to identify or evaluate the particular trading activity Plaintiffs are challenging.  This problem is only magnified by Plaintiffs' imputation theories and group pleading.  Indeed, Plaintiffs do not plead whether any of the "illustrative examples" are based on actual deanonymized data or are the result of Plaintiffs' speculative imputation theories.[33]

Exhibit 1 to the Amended Complaint, which purports to be "[a] complete list of Spoofing

---

allegations out of whole cloth.  For example, Plaintiffs take issue with representations by Clear Street and IMC that they did not trade in Mullen stock on the dates alleged.  According to Plaintiffs, a failure to trade on their purported "spoofing" dates is inconsistent with Nasdaq rules for market makers.  (*Id.*)  But market makers are not required to engage in constant transactions in any particular security, but rather must only **_stand ready_** to trade.  (*Id.* ¶ 33); *see also* Nasdaq Rulebook, Nasdaq Equity 2 Section 5(a)(1), https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/Nasdaq%20Equity%202 (a market maker "shall be willing to buy and sell such security for its own account on a continuous basis during regular market hours and shall enter and maintain a two-sided trading interest"); *Geiger* v. *S.E.C.*, 363 F.3d 481, 485 n.2 (D.C. Cir. 2004) ("A market maker continuously stands ready to buy or sell particular stocks at particular prices.").  Particularly in a "thinly traded security" like Mullen stock (AC ¶ 44 n.23), it would not be unusual for there to be no transactions by a market maker on a particular date.  Likewise, Plaintiffs' conclusory allegation, without any explanation, that they just do not agree with IMC's interpretation of ITCH data, should carry no weight, particularly where they concede that they cannot establish **_any_** IMC transactions through Goldman Sachs clearing data.  Most tellingly, Plaintiffs abandoned **_both_** of Clear Street Market's alleged "example" episodes from the Original Complaint and are obscuring their allegations concerning all Defendants with convoluted imputation theories and combined third party conduct.

[33] In Plaintiffs' "illustrative examples," Plaintiffs also do not allege that any of Defendants' orders to sell were "parked" behind lower-priced orders from other market participant—a factor some courts have relied on as suggestive of an intent not to execute an order.  *See Northwest Biotherapeutics*, 2023 WL 9102400, at *19.

Episodes by each Known Defendant" (AC ¶ 62), fares no better.  Providing only minimal information about each alleged "spoofing episode," Exhibit 1 omits any details as to the alleged price, share volume, or cancellation time for individual Baiting Orders.  Moreover, with respect to the vast majority of the alleged Executing Purchases, Plaintiffs do not even plead that the Defendant purchased at an allegedly depressed price.  In fact, **over 86%** of the Executing Purchases were purportedly made at the **same price** as the alleged Best Offer.  (*See* AC, Ex. 1.) For hundreds of the alleged spoofing episodes in Exhibit 1, the alleged Baiting Orders were also priced **better** than the alleged Best Offer, defeating any notion that they were "never intended to be executed."  (*See id.*)[34]  In other words, Exhibit 1 does not even attempt to plead the very elements that Plaintiffs themselves claim are the essential steps in the spoofing scheme alleged.

The PSLRA and Rule 9(b) demand that Plaintiffs provide more specificity to put Defendants on notice of the purportedly manipulative conduct on which Plaintiffs base their claims.  *See ATSI*, 493 F.3d at 102.  For these reasons, even with respect to their "illustrative examples" and the trading activity alleged in Plaintiffs' Exhibit 1, Plaintiffs simply have not identified, as they must, "what manipulative acts were performed" or "which defendants performed them."  *Id.*

### B.    Plaintiffs Fail To Adequately Allege a Strong Inference of Scienter

Plaintiffs' Amended Complaint should also be dismissed for the independent reason that it fails to adequately plead scienter.  Under the strict pleading requirements of the PSLRA, Plaintiffs must plead, as to each separate Defendant, particularized facts to support a strong inference of "an intent to deceive, manipulate or defraud."  *Kalnit* v. *Eichler*, 264 F.3d 131, 138

---

[34] The same is even true of the "example" episodes.  In fact, for half of the eight "example" episodes, some, if not **all** of the alleged Baiting Orders were priced equal to or **more competitively** than the alleged national best offer.  (*See* AC ¶¶ 95, 126, 133, 141.)

(2d Cir. 2001); 15 U.S.C.A. § 78u-4.  Plaintiffs fail to plead facts that give rise to a plausible inference of scienter as to any Defendant.

The requisite "strong inference" "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  In other words, the "court must consider plausible, nonculpable explanations for the defendant's conduct," and Plaintiffs' theory must be "***at least as likely as*** any plausible opposing inference" that could be drawn from the facts as alleged or supplemental facts.  *Id.* at 310–11 (emphasis in original).  "This pleading requirement is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation."  *ATSI*, 493 F.3d at 102.

In the Second Circuit, to sufficiently allege scienter, a plaintiff must plead facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.* at 99.  Plaintiffs have done neither.

**1.    Plaintiffs Have Not Alleged Facts Sufficient To Show Any Defendant Had Motive To Commit Fraud**

To adequately plead motive, a plaintiff must assert that "defendants benefitted in some concrete and personal way from the purported fraud."  *Novak* v. *Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000).  A "generalized motive" such as the desire for an entity to make a profit, "is not sufficiently concrete for purposes of inferring scienter."  *Kalnit*, 264 F.3d at 140.

Plaintiffs fail to allege any plausible motive for any of the four named Defendants to have engaged in the alleged scheme.  ***First***, the flaws in Plaintiffs' manipulative act allegations also doom their scienter allegations.  In short, Plaintiffs fail to reconcile their motive allegations with

their admissions that the Amended Complaint is based on the aggregation of the trading activity of numerous independent third parties.  (*See supra* pp. 15-24.)  This is plainly inadequate to plead motive.  *See Tyler* v. *Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 335 (S.D.N.Y. 2011) ("[T]he particular fraud alleged must specifically enable the schemes or business plans plaintiffs contend conferred concrete and personal benefits on the defendants.").

**Second**, as Plaintiffs' own allegations illustrate, even if Plaintiffs had accurately identified Defendants' transactions, the total of any supposed "profit" Defendants could have earned from this alleged scheme would have been *de minimis* at best.  Plaintiffs argue that despite the fact that "each spoofing episode might not yield large profits," Defendants still "had a strong profit motive."  (AC ¶ 197.)  Yet in each of Plaintiffs' eight highlighted examples, Defendants are alleged to have saved only ***fractions of a penny per share***, ranging from $0.0001 to $0.0028 per share.  (*Id.* ¶¶ 97, 106, 114, 120, 128, 135, 143, 152.)

For instance, in one of Plaintiffs' examples, they allege that Clear Street "executed Executing Purchases to buy a total of 100 shares, at a price of $0.1892 per share, which was below the prevailing best offer of $0.1893 per share"—a difference of $0.0001, which resulted in a total savings of ***one cent***.  (*See id.* ¶ 97.)[35]  Even when such purported "savings" are calculated

---

[35] Plaintiffs offer several inconsistent measures of Defendants' alleged profit.  First, Plaintiffs suggest that the alleged profit for each Spoofing Episode is the difference in price per share Defendants paid for their Executing Purchases and the price that they claim each Defendant "would have had to pay to purchase shares of MULN stock at that moment if it had not engaged in spoofing activity."  (*See, e.g.*, AC ¶ 97; AC, Ex. 1 (distinguishing between the best offer prior to the Executing Purchase and the price Defendants allegedly paid).)  But as explained above, those profits would have been *de minimis*.  (*See also* AC ¶ 106 (Clear Street's purchase of 698 shares, saving $0.0698); ¶ 114 (IMC's purchase of 283 shares, saving $0.3962); ¶ 120 (IMC's purchase of 300 shares, saving $0.06); ¶ 128 (UBS's purchase of 200 shares, saving $0.56); ¶ 135 (UBS's purchase of 1,000 shares, saving $0.10); ¶ 143 (UBS's purchase of 100 shares, saving $0.01); ¶ 152 (UBS's purchase of 213 shares, saving $0.426).)

Second, Plaintiffs suggest the actual profit is measured by the alleged savings in the price of the Executing Purchase compared to the price of MULN stock "two minutes prior to the Executing Purchases."  (*Id.* ¶ 98.)  But those purported profits would likewise have been *de minimis*.  (*See id.* ¶ 98 (Clear Street's purchase of 100 shares, saving $0.08); ¶ 107 (Clear Street's purchase of 698 shares, saving $0.5584); ¶ 115 (IMC's purchase of 283 shares, saving $3.5941); ¶ 121 (IMC's purchase of 300 shares, saving $0.48); ¶ 129 (UBS's purchase of 200 shares, saving $3.00); ¶ 136 (UBS's purchase of 1,000 shares, saving $23.70); ¶ 144 (UBS's purchase of 100 shares, saving $0.16.); ¶ 153 (UBS's purchase of 213 shares, saving $0.6603).)

across all of the alleged Executing Purchases in Plaintiffs' Exhibit 1, the total alleged benefit to each Defendant is miniscule.[36]  Based on Plaintiffs' allegations, the total purported benefit to each Defendant for the two-year Relevant Period ranges from approximately $800 to $1,600:[37]

| Defendant | Total Shares Allegedly Purchased | Total Alleged Benefit Over Two Years |
|---|---|---|
| IMC | 65,400 | $802.32 |
| Clear Street | 2,022,273 | $1,284.11 |
| UBS | 689,621 | $1,644.35 |

In light of these minimal alleged profits, Plaintiffs are forced to speculate, without any basis, that Defendants' "profit motive was not limited to the gains from spoofing in a single security but reflects the expected profit to spoofing through an algorithm *across the entire universe of securities* in which that algorithm trades." (*Id.* ¶ 92.)  Putting aside that Plaintiffs have no standing to assert claims for supposed spoofing in other securities, Defendants would have had to engage in constant spoofing transactions in hundreds of securities over a lengthy period of time to make a substantial profit.  (*Id.* ¶¶ 92, 178.)  Plaintiffs have not alleged (nor could they allege) any facts to support this fabricated claim.

---

Finally, Plaintiffs also vaguely claim that Defendants were driven to engage in fraud by "fees, commissions and other transactional revenue." (*Id.* ¶ 50.)  But Plaintiffs have not alleged the amount of any fees or commissions obtained in connection with these purported transactions.  Indeed, since Plaintiffs now apparently claim that each the elements of each Spoofing Episode may not even have been executed by the Defendants as opposed to some unnamed third parties, Defendants may not have received any fees for at least some of these transactions.

[36] Notably, the total profit alleged here is significantly less than the total profit alleged in other "spoofing cases" in this District.  Indeed, in *Northwest Biotherapeutics*, the court found an argument that a total of $94,485.68 in profits was insufficient to establish motive to be "not without force."  2023 WL 9102400 at *25.  Here, the combined purported profit of all four Defendants totaled $3,730.78, a tiny fraction of that amount.

[37] To calculate the alleged "profits," Defendants used the data provided in Exhibit 1 to the Amended Complaint.  For each alleged Spoofing Episode, Defendants calculated the difference between the "Best Offer" (*i.e.*, the "the best offer prior to the Executing Purchase") and the price of Defendants' alleged Executing Purchase, and multiplied that "savings" by the volume of Mullen shares allegedly purchased.  (AC, Ex. 1 at 1 n.2.)  The table above reflects the total purported "savings" from the total of all episodes alleged.  Again, for *over 86%* of the alleged Spoofing Episodes included in Exhibit 1, there is *no difference* in price between the Best Offer and Executing Purchase.  In addition, Plaintiffs fail to allege *any sales* by which Defendants realized any profits from the alleged episodes.

In short, it would "def[y] economic reason" to accept that Defendants—all reputable market makers—would be motivated by the small amounts of profit Plaintiffs have alleged to engage in fraudulent activity to drive down a stock price. *Kalnit*, 264 F.3d at 140–41.[38]

**Third**, Plaintiffs' motive allegations are also now based on their conclusory claim that after driving Mullen's stock price down, Defendants "were able to purchase millions of Mullen shares at depressed prices" and either "closed out a preexisting short position, yielding an immediate profit" or "converted these profits to cash by selling shares prior to the price decline or following a partial rebound." (AC ¶ 90.) Yet Plaintiffs have not alleged that engaging in short sales at some undefined time prior to a Spoofing Episode is part of their alleged spoofing scheme. (*See id.* ¶ 30 (stating that the alleged spoofing scheme involves entering Baiting Orders to sell, placing Executing Purchases on the opposite side of the Limit Order Book, and then cancelling the Baiting Orders.).) In any event, Plaintiffs have identified only a handful of purported instances of closing short positions and even those were for virtually no profit. (*See id.* ¶ 100 (alleging Clear Street shorted 100 shares for a total profit of $0.61); ¶ 109 (alleging Clear Street shorted 100 shares for total profit of $1.13); ¶ 123 (alleging IMC shorted 100 shares for a total profit of $2.76); ¶ 131 (alleging UBS shorted two shares for a total profit of $0.0546); ¶ 138 (alleging UBS shorted 200 shares for a total profit of $3.58); ¶ 146 (alleging UBS shorted 26,800 shares for a total profit of $278.72); ¶ 155 (alleging UBS shorted 1,900 shares for a total

---

[38] *See also Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90* v. *Intercept Pharms., Inc.*, 2022 WL 837114, at *20 (S.D.N.Y. Mar. 21, 2022) ("[P]rofits [that] totaled just under four and a half million dollars," were "not a sum sufficient to give rise to an inference of scienter."); *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *9 n.22 (S.D.N.Y. Nov. 25, 2003) ("plaintiff's theory of motive [was] 'belied by logic'" where fraudulent scheme would save money on acquisitions totaling $4.7 million, despite defendant having access to $79.3 million), *aff'd sub nom. Nadoff* v. *Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004); *Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 119 (S.D.N.Y. 2018) (allegations that defendant manipulated stock price "to access additional shares . . . at lower prices . . . fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit").

profit of $46.55).)[39]  And Plaintiffs only allege two instances of sales after Executing Purchases. (*See id.* ¶ 131 (alleging UBS sold 12,200 shares for a total profit of $17.08); ¶ 146 (alleging UBS sold 15,500 shares on March 21, 2023 for a total profit of $1.55).)

For all other alleged spoofing episodes, Plaintiffs do not identify ***any*** sale or other transaction that would have resulted in any profit.  Such speculative and sparse allegations are insufficient to plead a market manipulation claim.  *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 381 (E.D.N.Y. 2013) ("A plaintiff alleging motive and opportunity in connection with stock sales must allege not only the defendants' selling activity . . . but also the defendants' net profits rather than their gross proceeds . . . .").[40]

### 2.   Plaintiffs Have Not Alleged Sufficient Facts To Support a Showing of Conscious Misbehavior or Recklessness

Where, as here, sufficient motive and opportunity have not been adequately alleged, a plaintiff may alternatively plead scienter by "identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142.  Plaintiffs fail to meet this stringent standard.

Plaintiffs' circumstantial theory of scienter rests again on their "probabilistic imputation" "Methodology."  (AC ¶ 38.)  As described above (*see supra* p. 19), Plaintiffs speculate that

---

[39] Plaintiffs' allegations that certain purported Executing Purchases generated a profit because they closed out preexisting short positions are based entirely on guesswork.  (AC ¶ 90 n.40 (admitting that Plaintiffs imputed Nasdaq short sale transactional data even though "short sales are not publicly disclosed in the Nasdaq ITCH data" they claim to have used.)  These types of allegations are plainly insufficient as "[a] plaintiff cannot base securities fraud claims on speculation and conclusory allegations."  *Plumbers & Steamfitters Loc. 773 Pension Fund* v. *Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 297 (S.D.N.Y. 2010) (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).  For similar reasons, the court in *Northwest Biotherapeutics* did "not place weight" on plaintiff's "hypothetical short-selling allegation(s)."  2023 WL 9102400, at *5 n.9.

[40] *See also Glaser* v. *The9 Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (rejecting motive argument where "allegations demonstrate[d] only gross proceeds without identifying net profits"); *Feiner Family Tr.* v. *Xcelera.com, Inc.*, 2008 WL 5233605, at *5–6 (S.D.N.Y. Dec. 15, 2008) (declining to find motive where "[t]he alleged benefits to Defendants [were] speculative"); *cf. Northwest Biotherapeutics*, at *25 ("[T]he actual profit Defendants earned from a particular Executing Purchase is measured by the price at which those shares were subsequently *sold.*") (emphasis in original).

certain "anonymized" data must be attributable to Defendants because of the timing of transactions.  (*Id.* ¶ 37.)  Such conjecture on top of conjecture, with nothing more than a few statistics and citations to inapposite academic literature, is not even close to what the PSLRA demands.  *See City of Brockton Ret. Sys.* v. *Avon Prod., Inc.*, 2014 WL 4832321, at \*28 (S.D.N.Y. Sept. 29, 2014) ("Such speculation and conclusory allegations will not suffice to plead scienter.").  "It is well established that plaintiffs cannot plead scienter based on speculation and conclusory allegations."  *Gabriel Cap., L.P.* v. *Natwest Fin., Inc.*, 137 F. Supp. 2d 251, 261 (S.D.N.Y. 2000).

Putting aside their flawed "Methodology," Plaintiffs also fail to meaningfully distinguish the four Defendants and infer intent based on a comparison of certain "median" data to data for all other "market participants."  (*See, e.g.*, AC ¶ 68 (alleging Defendants submitted a median of 7,200 shares in new-sell side orders compared to a median of 500 for all other "market participants"); ¶ 69 (alleging Defendants cancelled a median of 11,800 shares in sell-side orders compared to a median of 100 for all other "market participants"); ¶ 72 (alleging Defendants submitted Baiting Orders for a median of 5,700 sell-side shares compared to a median of 18 for all other "market participants"); ¶ 73 (alleging Defendants purchased a median of 2,100 shares compared to a median of 13 for all other "market participants").)[41]  As courts in this Circuit have made clear, "[i]n a case involving multiple defendants, plaintiffs must plead circumstances

---

[41] Moreover, Plaintiffs' comparisons of Defendants' purported median metrics to that of all "market participants" is misleading.  As explained above (*see supra* pp. 4-5, n.32), as Plaintiffs themselves acknowledge, market makers play a unique role in providing liquidity to markets by "be[ing] 'willing to buy and sell [securities] for [their] own account[s] on a continuous basis'" and therefore engage in significantly more transactions and cancel many more orders in the ordinary course of trading than other market participants.  (AC ¶ 33.)  In addition, Plaintiffs conspicuously fail to define certain metrics they use for their comparisons, which also makes their "data" meaningless.  (*See, e.g., id.* ¶ 69 (comparing the amount of cancelled sell-side orders in a "Cancellation Period" that is undefined); ¶ 74 (comparing the median share volume of Executed Purchases to the share volume of sell-side orders during an undefined amount of time "[a]fter [p]urchases").)

providing a factual basis for scienter for ***each defendant***; guilt by association is impermissible."
*Venkataraman* v. *Kandi Techs. Grp., Inc.*, 2021 WL 4952260, at *3 (S.D.N.Y. Oct. 25, 2021).[42]

In addition, many of the purported "facts" Plaintiffs point to are nothing more than descriptions of common activities of broker-dealers.  For instance, Plaintiffs allege that "each Defendant . . . specifically designed and implemented algorithmic trading programs," (AC ¶ 79), that their "trading activities were approved by corporate officials," (*id.* ¶ 80), and that "Defendants were <u>required</u> to have internal policies, procedures and systems" in place "to monitor, detect, and prevent manipulative or fraudulent trading" (*id.* ¶ 82 (emphasis in original)). But such standard activities are insufficient to allege that those market makers engaged in market manipulation.  *See ATSI*, 493 F.3d at 104 (rejecting claims of scienter where allegations amounted to standard trading activity, including claims that trading volumes were uneven and defendants' varying reactions to stock prices); *Kessev Tov I*, 2022 WL 2356626, at *9 ("placing rapid orders and cancelling them does not necessarily evince illegal market activity" and "[o]ther courts have recognized the ubiquity of rapid trading across securities platforms"); *Glaser*, 772 F. Supp. 2d at 593 (inference of fraud was "not as strong as the inference of non-fraudulent activity drawn from the facts viewed collectively").

Moreover, Plaintiffs' reliance on the placement of "Baiting Orders" to establish scienter is circular.  (*See, e.g.*, AC ¶¶ 28, 72, 75, 83, 84, 85, 86.)  Plaintiffs define "Baiting Orders"— with no factual basis—as having "no legitimate financial purpose and were never intended to be executed."  (*Id.* ¶ 52.)  In other words, Plaintiffs claim without support that any time any order was cancelled, "regardless of whether the Defendant who placed it cancelled that specific Baiting

---

[42] *See also Cohen*, 722 F. Supp 2d at 428 ("Conclusory statements . . . or generalized allegations of scienter against groups of defendants will not state a claim for securities fraud."); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 389 (S.D.N.Y. 2019) (holding "the statistical analyses proffered by Plaintiffs are simply group pleading in another form" and concluding that median statistics among market makers failed to properly distinguish defendants).

Order," it was "never intended to be executed."  (*Id.* ¶¶ 95 n.47, 196.)[43]  Such flawed reasoning, where the evidence offered to support a claim is a repetition of the claim itself, cannot create a strong inference of scienter.  *See, e.g.*, *CFTC* v. *Wilson*, 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018) (dismissing Commodity Exchange Act market manipulation claim reliant on "circular" theory that prices were illegitimate because defendants intended to affect them); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) ("It is rather circular to say that the Individual Defendants committed fraud by concealing their intent to commit fraud.").  Without more, "Plaintiffs fail to allege sufficient facts underpinning their allegations that . . . the cancelled orders demonstrate a plan to deceive."  *Kessev Tov I*, 2022 WL 2356626, at *10.[44]

Plaintiffs' allegations are also inconsistent with their own theory of spoofing, which requires the immediate cancellation of a Baiting Order.  (AC ¶ 83.)[45]  In an effort to plead conduct consistent with what some courts have suggested may be indicative of market manipulation, Plaintiffs generally contend that "Defendants placed and then canceled the Baiting Orders within ***seconds and even milliseconds***."  (*Id.*; *see also id.* ¶ 84 (similar).)  But, as set out above, Plaintiffs admittedly have ***not matched*** orders and cancellations (*see id.* ¶ 95 n.47), and thus have not actually pleaded the length of time between the placement and cancellation of any particular order.  And even attributing all cancellations to the corresponding Baiting Orders, the

---

[43] Plaintiffs make that claim notwithstanding the fact that hundreds of the alleged Baiting Orders in Exhibit 1 were priced better than the alleged Best Offer.  (*See supra* n.34.)

[44] Plaintiffs also admit to including in their calculations cancelled orders that "were created ***prior*** to the Baiting Periods."  (*Id.* ¶ 70 n.34.)  In other words, Plaintiffs include cancellations for sell-side orders placed ***outside*** the spoofing window with those cancellations placed ***within*** the spoofing window.  In so doing, Plaintiffs artificially drive up the cancellation rate for the spoofing window and drive down the cancellation rate for the non-spoofing window.

[45] Tellingly, Plaintiffs are dismissive of several examples that do not fit neatly into their fraud theory.  (*See, e.g., id.* ¶ 68 n.32 (alleging Clear Street's cancelled sell-share volume is higher than the total new sell-side order volume in Spoofing Episodes); ¶ 78 n.39 (alleging that IMC's "level of aggressiveness following Executing Purchases" is the same between Spoofing and non-Spoofing Episodes).)

time period between the placement and the completion of cancellations was far longer than what Plaintiffs themselves contend is indicative of scienter.

While Plaintiffs allege Defendants "began to cancel" the alleged "Baiting Orders" within milliseconds, the time period between the placement and the ***completion*** of cancellations of those orders in all eight highlighted spoofing "examples" was not within milliseconds or even seconds, but rather two to four minutes later.  (*See id.* ¶¶ 94–156.)[46]  For instance, in one of Plaintiffs' examples, they allege that UBS began placing Baiting Orders at 15:53:27.173750 on August 17, 2023.  (*Id.* ¶ 126.)  But Plaintiffs claim that UBS did not ***complete*** making its Executed Purchases and cancelling its Baiting Orders until four minutes later, at 15:57:27.173750.  (*Id.* ¶¶ 126–28.)  This timing is significantly longer than allegations that courts have found may be indicative of spoofing activity.  *See, e.g.*, *United States* v. *Coscia*, 866 F.3d 782, 787 (7th Cir. 2017) (explaining that in spoofing episodes "large orders will be on the market for incredibly short periods of time (fractions of a second)").[47]

Lastly, Plaintiffs plead no facts showing that any agent's or employee's intent can be imputed to any of the Defendants.  *See Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020)

---

[46] (*See* AC ¶¶ 94–99 (episode beginning at 15:29:14.855865 and ending at 15:33:14.855865); ¶¶ 104–08 (episode beginning at 15:25:07.622750 and ending at 15:29:07.622750); ¶¶ 112–16 (episode beginning at 13:25:30.147521 and ending at 13:29:30.147521); ¶¶ 118–22 (episode beginning at 15:20:15.577845 and ending at 15:24:15.577845); ¶¶ 126–30 (episode beginning at 15:53:27.173750 and ending at 15:57:27.173750); ¶¶ 133–37 (episode beginning at 15:55:35.150059 and ending at 15:57:35.150059); ¶¶ 141–45 (episode beginning at 15:53:13.363960 and ending at 15:57:13.363960); ¶¶ 150–54 (episode beginning at 09:29:18.981766 and ending at 09:33:18.981766).)

[47] Even those courts that have considered cancellation speed as a relevant factor in analyzing intent have not relied ***solely*** on that factor.  *See, e.g.*, *CFTC* v. *Oystracher*, 203 F. Supp. 3d 934, 945 (N.D. Ill. 2016) (finding CTFC adequately alleged lack of intent to execute where trader's alleged "trading behavior in the aggregate"—*e.g.*, a "pattern of passive spoof order placement at or near the best bid or offer price shielded by existing orders, flips, aggressive order placement, avoid orders that cross tool usage, iceberg order usage, large order size" *etc.*—made it "clear that the CFTC relies on much more than solely . . . fast cancellations of large orders"); *Kessev Tov, LLC* v. *Doe(s)*, 2023 WL 4825110 (N.D. Ill. July 27, 2023) (holding manipulative act pled where complaint alleged that defendants "entered irrationally high bids that lasted for only milliseconds, thereby rendering them inexecutable" and "provided numerous exhibits plausibly suggesting that Defendants' actions were irrational and contradictory to ordinary market making behavior"); *Northwest Biotherapeutics*, 2023 WL 9102400, at *19 (finding manipulative acts, in part, based on allegations of "parking," which is not alleged here).  Plaintiffs have not properly pled any such additional indicia that might suggest a lack of intent to execute the Baiting Orders.

(plaintiff must plead a "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter" when defendant is an entity).  A lone conclusory allegation that "activities were approved by corporate officials" (AC ¶ 80) is insufficient without details of what was approved, when, and by whom.  *See, e.g.*, *Glaser*, 772 F. Supp. 2d at 591 ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient" to establish scienter.).  Without alleging a single fact about what any employee (much less executive) of any Defendant knew about this supposed "scheme," Plaintiffs cannot satisfy the high bar for pleading scienter.  *See, e.g.*, *In re Adient plc Sec. Litig.,* 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020) (dismissing for failure to plead scienter where plaintiff did not sufficiently allege executives had knowledge of, or reckless disregard for, falsity).

In sum, because Plaintiffs have failed to plead any inference of an intent to deceive as to any Defendant, let alone a strong and compelling one, the claims against Defendants should be dismissed.  *See Tellabs*, 551 U.S. at 314.

### C.      Plaintiffs Do Not Adequately Allege Loss Causation

To state a claim for market manipulation, Plaintiffs must plead facts showing a "legally cognizable loss" and a "causal connection between the alleged manipulation . . . and the loss." *Cohen*, 722 F. Supp. 2d at 430 (cleaned up).  This requires Plaintiffs to allege that they suffered "***specific*** economic harm as [a] result of Defendants' conduct."  *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009).[48]  In spoofing cases, plaintiffs must allege facts sufficient to "justify an inference that the market price was still artificial" when plaintiffs traded.  *Gamma Traders*, 41 F.4th at 80.   That causation requirement is crucial because

---

[48] Plaintiffs' loss causation allegations are subject to the heightened pleading standard under Rule 9(b), *see, e.g.*, *Cohen*, 722 F. Supp. 2d at 432 n.9, but likewise fail even under Rule 8's pleading standards.

"[m]anipulative trading strategies like 'spoofing' . . . depend for their profitability on a reversion of prices to the market-level, meaning that ***the period of artificiality may be brief***." *In re London Silver Fixing Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018).

Plaintiffs do not meet this pleading standard—in fact, the new allegations underpinning the Amended Complaint affirmatively undermine any inference of loss causation.

**1.**     **Plaintiffs' New Allegations Affirmatively Undercut their Loss Causation Theory**

**a.**     **The Alleged Lack of Price Reversion Is Inconsistent with Spoofing**

Plaintiffs' new loss causation allegations are fundamentally inconsistent with their spoofing theory.  According to Plaintiffs, Mullen's share price never rebounded following the alleged cancellation of the Baiting Orders.  But that is not how spoofing works.  In an efficient market, ***if*** the Baiting Orders caused a price decline, ***then*** the cancelation of those Baiting Orders should have resulted in a price reversion.  Because Plaintiffs allege that there was no price reversion, the Baiting Orders could not have been the cause of the alleged price declines that supposedly damaged Plaintiffs.

Plaintiffs allege that the market for Mullen shares was efficient during the Relevant Period.  (AC ¶ 201.)  In efficient markets, new information is "immediately incorporated into share prices," such that the market price of a stock is presumed to reflect its true value at any given time.  *See In re Initial Public Offering Sec. Litig.*, 383 F. Supp. 2d 566, 579 (S.D.N.Y. 2005); *see also Cammer* v. *Bloom*, 711 F. Supp. 1264, 1276 n.17 (D.N.J. 1989) ("An efficient market is one which rapidly reflects new information in price.").  Plaintiffs claim that Defendants took advantage of that efficient market by placing fictitious Baiting Orders to sell, which had the "immediate" impact of driving Mullen's share price downward.  (AC ¶ 158.)  Plaintiffs then allegedly sold "Mullen shares at manipulated prices, in reliance on an assumption of an efficient

market free of manipulation." (*Id.* ¶ 201.)  Plaintiffs allege that the Defendants then "cancelled the artificial supply injected by all of [their] Baiting Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market." (*E.g.*, *id.* ¶ 99.)  In an efficient market, any price impact from the Baiting Orders would have dissipated promptly after those orders were cancelled.  *See Gruntal & Co.* v. *San Diego Bancorp*, 901 F. Supp. 607, 617 (S.D.N.Y. 1995) (in efficient market, once manipulation ceases, "the market thereafter corrects the price of the shares"); *see also Northwest Biotherapeutics*, 2023 WL 9102400, at *32 ("Spoofing is a different form of market manipulation" where "virtually immediate cancellation of [Baiting Orders] . . . push[es] the price in the other direction.").  Plaintiffs appear to acknowledge this basic economic principle in the Amended Complaint when they reference a price "rebound" following the alleged spoofing episodes.  (*See, e.g.*, *id.* ¶¶ 90, 160.)

But Plaintiffs' new loss causation allegations—which are presented in two charts—show the exact opposite of a price reversion.  (AC ¶¶ 181, 188.)  The first chart shows the "percentage price change" across the alleged Spoofing Episodes "from thirty minutes prior to each Executing Purchase to the end of the trading day"—up to *6.5 hours later*.  (*Id.* ¶ 181.)  The second chart shows "the average change" in Mullen's "share price from the two minutes prior to Spoofing Episodes to the trading days thereafter"—up to *60 days later*.  (*Id.* ¶ 188.)  According to those charts, Mullen's share price *never* reverted to pre-spoofing levels—*or even to the Executing Purchase price levels*—following the alleged cancellation of the Baiting Orders.  Instead, the two charts show that, following the alleged cancellation of Baiting Orders, the share price *continued to decline* with *no rebound* at all.

Because the removal of the Baiting Orders—which supposedly eliminated the "false and misleading pricing signal[s]" (*id.* ¶ 57)—should have caused a rebound, the only logical

conclusion is that (i) Mullen's share price declined due to *some other variable* that was not spoofing, or (ii) the market for Mullen stock on Nasdaq was *not* efficient.   In either case, the absence of a price reversion, alone, defeats Plaintiffs' claim.   Simply put, Plaintiffs "cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation."   *Meyer* v. *Greene*, 710 F.3d 1189, 1198–99 (11th Cir. 2013).   "A plaintiff . . . must take the bitter with the sweet, and if he chooses to embrace the efficient market theory for purposes of proving one element of a § 10(b) claim, he cannot then turn around and contend that the market is not efficient for purposes of proving another element of the very same claim."   *Id.*; *see also Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse First Boston*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012) (similar), *aff'd*, 752 F.3d 82 (1st Cir. 2014).

### b.   Plaintiffs' Group Pleading Allegations Make Attributing Losses to the Defendants' Conduct Impossible

As explained above, the Amended Complaint improperly attempts to hold the Defendants liable for the conduct of an enormous group of unidentified third parties.   (*See supra* pp. 15-24.) And if the breadth of possible attributed third-party conduct were not enough, Plaintiffs admit that there is a *14% likelihood that their order and trade allegations are misattributed to the Defendants*.   (*See* AC ¶ 44.)   Plaintiffs' extreme group pleading allegations defeat any inference that any particular Defendant's conduct caused Plaintiffs' alleged losses.   That is, this Court cannot attribute losses that *may or may not have been* caused by a limitless number of third-party conduct to the Defendants.   "To infer otherwise would be to sustain a claim based on rank speculation prohibited by the Supreme Court's decisions in *Twombly* and *Iqbal*."   *In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021).

**2.      Plaintiffs Cannot Meet the Second Circuit's Loss Causation
Requirements for Spoofing Allegations**

Putting aside that Plaintiffs' new allegations are fundamentally at odds with their

spoofing theory, Plaintiffs also fail to meet the exacting Second Circuit standard for alleging loss

causation in spoofing cases.  Under Second Circuit precedent, Plaintiffs can only establish loss

causation in two circumstances: (1) where a plaintiff sets forth allegations showing a "***factual***

***basis***" indicating that the effects of the spoof lasted for a protracted period to "justify an

inference that the market price was still artificial" when plaintiff traded (*i.e.*, a long-term price

impact theory); or (2) where a plaintiff traded "so close in time to Defendants' spoofing" to

"permit [an inference] as a matter of common sense that the market prices were artificial" when

plaintiff traded (*i.e.*, a temporal proximity theory).  *Gamma Traders*, 41 F.4th at 80; *see also*

*Northwest Biotherapeutics*, 2023 WL 9102400, at *29.  Plaintiffs do not sufficiently plead loss

causation under either theory.

**a.      Plaintiffs Do Not Sufficiently Allege a Long-Term Price Impact
From the Supposed Spoofing**

Courts consistently reject claims of long-term price impact in spoofing cases, holding that

"even thousands of fraudulent spoofs whose effect lasted only a matter of seconds" cannot

support an inference of lasting market impacts throughout the relevant period.  *In re Merrill*,

2021 WL 827190, at *13; *see also Phunware,* 2024 WL 1465244, at *7; *Northwest*

*Biotherapeutics*, 2023 WL 9102400, at *31–32.  Nevertheless, Plaintiffs make conclusory and

wholly unsupported allegations that the "price impact of Defendants' spoofing activity was not

limited to the time period immediately following each individual Spoofing Episode" (AC ¶ 179),

that the effect was "cumulative" (*id.* ¶ 180), and that the "market neither immediately nor

fully rebounded from the manipulated prices once each of the spoofing events were completed"

(*id.* ¶ 160).

These allegations fail to support loss causation due to a long-term price impact.  In fact, in *Northwest Biotherapeutics*, the Court rejected identical allegations—that "the market neither immediately nor fully rebounded from the manipulated prices once each of the Spoofing Episodes was completed."  2023 WL 9102400, at *31.  According to the Court, this "conclusory" allegation fails to allege "facts sufficient to justify an inference that the impact of Defendants' spoofing extended to sales by [Plaintiff] not in close proximity to the spoofing."  *Id.* Likewise, in *Phunware*, this Court recently found that similar statements—that a defendant's "trading activities had both a temporary and [a] long-term adverse effect," that "[t]he impact of this spoofing activity extended beyond the specific spoofing cycle . . . because the market neither immediately nor fully rebounded from the manipulated prices," and that "the placement and cancellation of Baiting Orders throughout the Relevant Period had the cumulative effect of driving [Plaintiff's] share price down during the Relevant Period"—were "conclusory statements that are insufficient on a motion to dismiss."  2024 WL 1465244, at *7.

Plaintiffs' identical conclusory allegations here do "not justify a reasonable inference . . . that spoofed Baiting Orders continue to emit a false pricing signal to the market after they have been cancelled."  *Northwest Biotherapeutics*, 2023 WL 9102400, at *31; *see also In re London Silver Fixing Ltd. Antitrust Litig.*, 2023 WL 3582198, at *11 (S.D.N.Y. May 22, 2023) (allegation "that prices never fully recovered" was insufficient because complaint lacked facts that would permit court to infer "the endurance of artificial prices caused by manipulation").

Plaintiffs' remaining two long-term price impact allegations are equally unavailing. ***First***, as discussed, Plaintiffs' two new price change charts show that there was no price reversion.  (*See supra* pp. 37-39.)  This undermines any theory of loss causation because another variable must have caused the decline.  ***Second***, Plaintiffs rely heavily on an expert report in an

unrelated price-fixing case (the "Milgrom Report").  (AC ¶¶ 161–69.)  But multiple Courts have already explicitly held that the Milgrom Report is not relevant "in the context of spoofing" and does not support a long-term price impact theory.  *Phunware*, 2024 WL 1465244, at *7; *see also Northwest Biotherapeutics*, 2023 WL 9102400, at *31–32.

The common-sense explanation for Mullen's persistent price decline is not spoofing, but the fact that Mullen is a failing company, burdened with numerous reverse stock splits, the issuance of more than **5 billion** new shares, Nasdaq delisting notices, multiple years with **zero** revenue, federal lawsuits alleging corporate mismanagement and fraud, and specious attempts at blame shifting.  (*See supra* pp. 1-7.)  And despite Plaintiffs' conclusory contention that, "as a statistical matter," "other firm-specific events cannot explain these price declines" (AC ¶¶ 182, 187), on nearly all of the "Spoofing Example" dates, Mullen was the subject of negative press releases and SEC filings:  a stock split announcement at the Special Meeting of Stockholders (December 15, 2023);[49] Nasdaq 180-day delisting notice to cure and another reverse stock split warning (March 8, 2023);[50] notice of resignation of Company officers (March 10, 2023);[51] cancellation of millions in pre-funded warrants[52] and subsequent new financing moratorium (June 20 & 21, 2023);[53] and an open letter from the CEO, David Michery, discussing declining

---

[49] Roy Decl. Ex. U (*Mullen Automotive Inc. Adjourns Special Meeting to December 18, 2023* (Dec. 16, 2023), https://news.mullenusa.com/mullen-automotive-inc.-adjourns-special-meeting-to-december-18-2023).

[50] Roy Decl. Ex. V (*Nasdaq Approves 180-Day Extension for Mullen Automotive to Meet Minimum $1 Bid Price* (Mar. 8, 2023), https://news.mullenusa.com/nasdaq-approves-180-day-extension-for-mullen-automotive-to-meet-minimum-1-bid-price).

[51] Roy Decl. Ex. W (Mullen Automotive Inc., Current Report (Form 8-K) (Mar. 6, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001499961/000110465923031219/tm239112d1_8k.htm).

[52] Roy Decl. Ex. X (Mullen Automotive Inc., Exhibit 4.1 (Warrant) to Form 8-K Report (June 20, 2023), https://www.sec.gov/Archives/edgar/data/1499961/000110465923074533/tm2319524d1_ex4-1.htm).

[53] Roy Decl. Ex. Y (*Mullen Announces Moratorium on New Financings for Balance of 2023; Company Has Sufficient Capital for at Least the Next 12 Months* (June 21, 2023), https://news.mullenusa.com/mullen-announces-moratorium-on-new-financings-for-balance-of-2023-company-has-sufficient-capital-for-at-least-the-next-12-months).

stock values (August 23, 2023),[54] to name a few.[55]  These variables easily explain the persistent decline in Mullen's share price during the Relevant Period and defeat any notion of loss causation.  *See Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 343 (2005) (recognizing that there are a "tangle of factors affecting price" and "the longer the time between" the wrongful act and the sale, "the more likely that other factors caused the loss").

In sum, Plaintiffs utterly fail to "plead 'facts' sufficient to justify an inference that the impact of Defendants' spoofing extended to sales by [Mullen] not in close proximity to the spoofing."  *Northwest Biotherapeutics*, 2023 WL 9102400, at *31.

### b.     Plaintiffs Do Not Allege That It Traded Sufficiently Close in Time to the Alleged Spoofing

Under *Gamma Traders*, a spoofing plaintiff can plead loss causation on a "temporal proximity" theory by alleging it traded "so close in time to Defendants' spoofing" to permit the court to "infer as a matter of common sense that the market prices were artificial" when plaintiff traded.  41 F.4th at 80–81.  However, "[e]ven pleading same-day, post-spoof trades does not justify an inference of injury."  *Id.* at 80.  Again, spoofing is characterized by rapid reversions to fundamental market prices.  *See In re Merrill*, 2021 WL 827190, at *13; *Phunware*, 2024 WL 1465244, at *7; *Northwest Biotherapeutics*, 2023 WL 9102400, at *32.  This concept is especially salient on efficient markets like Nasdaq that involve electronic trading, where prices respond to new information within seconds or milliseconds.  (*See supra* pp. 37-38.)[56]  The

---

[54] Roy Decl. Ex. Z (*Mullen CEO David Michery Publishes Open Letter to Shareholders Addressing Declining Stock Values* (Aug. 23, 2023), https://news.mullenusa.com/mullen-ceo-david-michery-publishes-open-letter-to-shareholders-addressing-declining-stock-values).

[55] During the Relevant Period, Mullen issued nearly 150 press releases.  *See generally* Newsroom: Press Releases, Mullen Automotive Inc., https://news.mullenusa.com/tag/press-release  (last visited May 1, 2024, 7:57PM).

[56] *See, e.g.*, Roy Decl. Ex. AA (Chordia, Tarun, et al., "Rent Seeking by Low-Latency Traders: Evidence from Trading on Macroeconomic Announcements," 2018, *The Review of Financial Studies*, 31(12), pp. 4650 ("Prices . . . respond to macroeconomic announcement surprises within five milliseconds.")).

academic literature[57] and even government enforcement actions in spoofing cases[58] are in accord. In fact, economics journals indicate that markets react to an order (or the absence thereof) within *13 seconds* on average.[59]   However, in all of Plaintiffs' examples, their Mullen trades were priced minutes, hours, and sometimes days or weeks after the Defendants' supposed spoofing—a relative eternity in modern markets. [60]   Because the effects of spoofing last *mere seconds*, Plaintiffs' temporal proximity theory must fail.

As an initial matter, the majority of Plaintiffs' alleged sales of Mullen stock were priced more than an hour after an alleged spoofing episode.[61]   As this Court held in nearly identical circumstances, any claim based on these hour-plus "Pricing Dates" fail because those "Pricing Dates" are "too remote in time from alleged Spoofing Episodes to plead 'close proximity' under *Gamma Traders*."   *Northwest Biotherapeutics*, 2023 WL 9102400, at *31.

---

[57] *See, e.g.*, Roy Decl. Ex. BB (Merritt B. Fox et al., *Spoofing and Its Regulation*, 2021 COLUM. BUS. L. REV. 1244, 1288, 1318 (2021) (concluding that spoofing's price effects exist for "a very brief period of time" and "will be so brief as to have no real economic efficiency implications")).

[58] For example, government spoofing experts, such as Finance Professor Dr. Kumar Venkartaraman, take the view that restitution in spoofing cases is limited to only participants that transacted "*while Defendants' spoof orders were active*."   Roy Decl. Ex. CC (Declaration of Kumar Venkataraman, ECF 828-3 ¶ 13, *U.S.* v. *Smith*, No. 19-CR-000669 (N.D. Ill., Dec. 22, 2022)); *see also* Roy Decl. Ex. DD (Order at 21–23, ECF 734, *United States* v. *Bases*, 18-CR-48 (N.D. Ill. Mar. 6, 2023) (same)).   Dr. Venkartaraman has also explained that "approximately 99% of affected trades and 99% of the unadjusted market loss occurs within the first five seconds after the placement of the Spoof Order in the Spoofing Sequence, and practically all of the unadjusted market loss occurs within the first thirty seconds."   Order at 23, ECF 734, *United States* v. *Bases*.   In *Bases* and *Smith*, enforcers did not seek restitution for claims *after* the Baiting Orders were cancelled—much less minutes afterwards.

[59] *See, e.g.*, Roy Dec. Ex. EE (Nikolaus Hautsch & Ruihong Huang, *The market impact of a limit order*, 36 J. OF ECON. DYNAMICS & CONTROL 501, 511 (2012)).

[60] As to UBS, Plaintiffs offer only two dates on which any of the Plaintiffs allegedly sold shares within an hour of an alleged spoofing episode involving UBS: January 6, 2023 (Khorrami alleges selling shares at 10:19AM, roughly 49 minutes after UBS allegedly made Executing Purchases at 9:30:11AM (*see* AC, Ex. 3)) and March 17, 2023 (Mullen alleges having priced shares based on the closing date on March 17, 2023, which was approximately four and half minutes after UBS's allegedly made Executing Purchases between 15:55:13-15:55:32 (*see* AC, Ex. 2)).   In every other instance, Plaintiffs' sales are admittedly *hours* or *days* after the alleged spoofing activity.   Moreover, even as to these two dates, Plaintiffs' allegations are inconsistent with their own alleged spoofing theory.   On both dates, Plaintiffs allege that UBS's supposed Executing Purchase was at the *same price* as the prevailing Best Offer ($.41 on January 6, 2023; $.14 on March 17, 2023) (*see* AC, Ex. 1).

[61] Both of Plaintiff Cha's alleged Mullen trades were priced more than an hour after an alleged spoofing episode (*see* AC, Ex. 4); of Plaintiff Khorrami's 45 alleged sales, 34 were priced more than an hour after an alleged spoofing episode (*see* AC, Ex. 3); and of Plaintiff Mullen's 211 alleged sales, 109 were priced more than an hour after an alleged spoofing episode (*see* AC, Ex. 2).

The remaining alleged transactions are also too temporarily remote from any spoofing episode to support loss causation.  In fact, the closest "example" spoofing episode was complete a full ***two minutes and twenty-five seconds*** before that Plaintiff's next sale was allegedly priced. (AC ¶ 137.)   That is far too long—especially when compared to the contemporaneous government approach or the 13 second reaction window articulated in the academic literature— to support an inference of loss causation.  In an efficient market, Defendants' "Baiting Orders" would generate "misleading pricing signal[s]" for no more than a few seconds—not the minutes, hours, days, and even weeks that Plaintiffs allege.

Accordingly, the Amended Complaint fails to demonstrate that Plaintiffs traded "so close in time to Defendants' spoofing" to "permit [an inference] as a matter of common sense that the market prices were artificial" when it traded.  *See Gamma Traders*, 41 F.4th at 80.

*       *       *

Without alleging facts demonstrating that any of the Plaintiffs sold shares at a price affected by Defendants' purported spoofing, Plaintiffs have "not specifically pleaded a causal link between any single stock purchase or sale and a corresponding [spoofing episode] by [any specific Defendant] or coordinated transactions by others."  *Fezzani* v. *Bear, Stearns & Co. Inc.*, 777 F.3d 566, 572 (2d Cir. 2015) (affirming dismissal of market manipulation claim).  For this reason alone, the Amended Complaint should be dismissed.

## II.  PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON LAW FRAUD

Because the elements of common law fraud are essentially the same as those required to state a claim under Section 10(b), Plaintiffs' fraud claim, which "essentially track[s]" their Section 10(b) claim, must be dismissed for all of the reasons outlined above.  *See Cartwright* v. *D'Alleva*, 2018 WL 9343524, at *6 (S.D.N.Y. Aug. 27, 2018), *aff'd*, 782 F. App'x 77 (2d Cir.

2019); *Harrington*, 585 F. Supp. 3d at 424; *Seagrape Inv'rs LLC* v. *Tuzman*, 2020 WL 5751232, at *18 (S.D.N.Y. Sept. 25, 2020); *Cohen*, 722 F. Supp. 2d at 436–37.

Plaintiffs' common law fraud claim also fails because Plaintiffs have not alleged that Defendants made any material misstatements or omissions.   Plaintiffs allege only that Defendants "submitted fictitious Baiting Orders" that sent "false and misleading pricing signals to the marketplace."   (*See, e.g.*, AC ¶ 58.)   But trading activity is not a misrepresentation or omission and thus cannot support a claim for common law fraud under New York law.   *See Harrington*, 585 F. Supp. 3d at 423–24 (dismissing common law fraud claim for alleged "spoofing" activity where there were no alleged misstatements or omissions).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Amended Complaint in its entirety with prejudice.

Dated:  May 1, 2024
          New York, New York

**CAHILL GORDON & REINDEL LLP**

By: /s/ Herbert S. Washer
Herbert S. Washer
Tammy L. Roy
32 Old Slip
New York, NY 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
troy@cahill.com

*Attorneys for UBS Securities LLC*

**MORRISON & FOERSTER LLP**

By: /s/ Anthony S. Fiotto
Anthony S. Fiotto
Mitchell Feldman (*pro hac vice* forthcoming)
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 648-4774
Facsimile: (617) 830-0142
afiotto@mofo.com

Eric D. Lawson
250 West 55th Street
New York, NY 10019
Telephone: (212) 336-4067
Facsimile: (212) 468-7900
elawson@mofo.com

*Attorneys for Clear Street Markets LLC and Clear Street LLC*

**PAUL HASTINGS LLP**

By: /s/ Jennifer L. Conn
Jennifer L. Conn
Robert A. Silverstein
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6004
Facsimile: (212) 319-7004
jenniferconn@paulhastings.com
robertsilverstein@paulhastings.com

Ryan P. Phair
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1751
Facsimile: (202) 551-0251
ryanphair@paulhastings.com

*Attorneys for IMC Financial Markets*