## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MULLEN AUTOMOTIVE, INC., HYON
CHA, and SHAYAN KHORRAMI

                Plaintiffs,

       - against-

IMC FINANCIAL MARKETS, CLEAR
STREET MARKETS LLC, CLEAR STREET
LLC, UBS SECURITIES LLC and JOHN
DOES 1 THROUGH 10,

            Defendants.

Case No: 1:23-cv-10637 (LLS)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 3

    A.    The Mechanics Of Spoofing And High-Frequency Trading ................................. 3

    B.    The Spoofing Of Mullen Stock ................................................................................ 5

LEGAL STANDARD ............................................................................................................... 9

ARGUMENT .............................................................................................................................. 9

    I.    THE COMPLAINT ADEQUATELY ALLEGES MANIPULATIVE ACTS BY ALL DEFENDANTS ................................................................................................. 10

        A.    The Complaint Adequately Alleges Spoofing ........................................... 10

        B.    The Distinction Between A Market Maker And Their Customers Is Immaterial At This Stage Of The Litigation ............................................. 14

        C.    Plaintiffs' Imputation Methodology Has Been Accepted By The Courts And Sufficiently Alleges A Manipulative Act ........................................... 16

        D.    The Complaint's "Illustrative Examples" Of Spoofing Satisfy The Applicable Pleading Standard ................................................................... 23

    II.    THE COMPLAINT ADEQUATELY ALLEGES A STRONG INFERENCE OF DEFENDANTS' SCIENTER ................................................................................. 25

        A.    The Complaint Alleges Defendants' Motive To Defraud ........................ 26

        B.    The Complaint Adequately Alleges Conscious Misbehavior And Recklessness .............................................................................................. 29

    III.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ............. 32

        A.    The Complaint Satisfies The Applicable Pleading Standards ................. 33

            1.    The Complaint Alleges A Long-Term Impact On MULN's Price 34

            2.    The Complaint Sufficiently Alleges Temporal Proximity ............ 37

        B.    The Complaint Need Not Allege "Price Reversion" ................................. 38

C.      The Complaint Does Not Utilize Group Pleading .................................... 39

IV.     THE COMPLAINT PLEADS A CLAIM FOR COMMON LAW FRAUD........ 40

CONCLUSION................................................................................................................. 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*,
  623 F. Supp. 3d 470 (E.D. Pa. 2022) .......................................................................39

*In re American Bank Note Holographics, Inc. Sec. Litig.*,
  93 F. Supp. 2d 424 (S.D.N.Y. 2000) .........................................................................6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  357 F. Supp. 2d 712 (S.D.N.Y. 2005),
  *aff'd*, 493 F.3d 87 (2d Cir. 2007) ...........................................................................21

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)........................................................................................19

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*,
  853 F. Supp. 2d 181 (D. Mass. 2012),
  *aff'd*, 752 F.3d 82 (1st Cir. 2014) ...........................................................5, 11, 26, 39

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................21

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)......................................................................................35

*In re Citigroup Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010)........................................................................33

*CP Stone Fort Holdings, LLC v. John*,
  2016 WL 5934096 (N.D. Ill. Oct. 11, 2016).............................................................14

*DiMuro v. Clinique Lab'ys, LLC*,
  572 F. App'x 27 (2d Cir. 2014) .................................................................................13

*DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*,
  413 F. Supp. 3d 187 (S.D.N.Y. 2019).....................................................................3, 33

*Dover Ltd. v. A.B. Watley, Inc.*,
  423 F. Supp. 2d 303 (S.D.N.Y. 2006)....................................................................10, 40

*In re Duane Reade Inc. Sec. Litig.*,
  2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003).........................................................27

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................................36

*Faulkner v. Beer*,
   463 F.3d 130 (2d Cir. 2006) ...............................................................................23

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
   41 F.4th 71 (2d Cir. 2022) ........................................................................ *passim*

*Garcia v. 2390 Creston Realty LLC*,
   2024 WL 2959254 (S.D.N.Y. June 11, 2024) .....................................................41

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................................26

*Glaser v. The9 Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ...............................................................26

*Goel v. Bunge, Ltd.*,
   820 F.3d 554 (2d Cir. 2016) ...............................................................................23

*Gruber v. Gilbertson*,
   628 F. Supp. 3d 472 (S.D.N.Y. 2022) ...............................................................34

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*,
   2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023) ................................................ *passim*

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*,
   585 F. Supp. 3d 405, (S.D.N.Y. 2022),
   *reconsideration denied*, 2022 WL 580787 (S.D.N.Y. Feb. 25, 2022) .......................... *passim*

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
   309 F. Supp. 3d 100 (S.D.N.Y. 2018) ...............................................................27

*In Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v.*
   *Intercept Pharms., Inc.*,
   2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) .....................................................27

*Kessev Tov, LLC v. Doe(s)*,
   2023 WL 4825110 (N.D. Ill. July 27, 2023) ...........................................7, 13, 14

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .........................................................................39

*Mod. Settings, Inc. v. Prudential-Bache Sec., Inc.*,
   602 F. Supp. 511 (S.D.N.Y. 1984) ....................................................................13

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
  2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023),
  *report and recommendation adopted*, 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024) ....... *passim*

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017)................................................................................21

*Phunware, Inc. v. UBS Sec. LLC*,
  2024 WL 1465244 (S.D.N.Y. Apr. 4, 2024).................................................. *passim*

*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)............................................................................10, 25

*Sharette v. Credit Suisse Int'l*,
  127 F. Supp. 3d 60 (S.D.N.Y. 2015)..................................................15, 17, 32, 33

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994).............................................................................13

*Stanley Black & Decker, Inc. v. Gulian*,
  70 F. Supp. 3d 719 (D. Del. 2014)....................................................................36

*In re Sterling Foster & Co., Inc., Sec. Litig.*,
  222 F. Supp. 2d 216 (E.D.N.Y. 2002) ...............................................................17

*U.S. v. Gushlak*,
  728 F.3d 184 (2d Cir. 2013)..............................................................................34

*United States v. Coscia*,
  866 F.3d 782 (7th Cir. 2017) ......................................................................14, 31

*In re Wells Fargo & Co. Sec. Litig.*,
  2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021).....................................................9

## Other Authorities

69 Fed. Reg. 48,015 (Aug. 6, 2004).........................................................................7

73 Fed. Reg. 61,699 (Oct 17, 2008).........................................................................7

Plaintiffs Mullen Automotive, Inc. ("Mullen" or the "Company"), Hyon Cha, and Shayan Khorrami (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss [ECF No. 37] (the "Motion") the First Amended Complaint [ECF No. 30] (the "Complaint").[1]

## PRELIMINARY STATEMENT

Mullen is an innovative company that is working to create clean and scalable commercial energy solutions and electric vehicles.  Mullen trades on the NASDAQ under the ticker "MULN."  Over the last few years, it has met several key milestones—including manufacturing achievements, the announcements of multiple large orders for commercial vehicles in the United States and abroad, and approval of state and federal tax rebates.  Yet, despite these achievements, between November 9, 2021 and November 9, 2023 (the "Relevant Period"), Mullen's stock price has been repeatedly manipulated—and artificially depressed—as a direct result of Defendants' illegal spoofing of Mullen's publicly traded shares.

This case arises out of a scheme by Defendants, a group of market makers and broker-dealers that use sophisticated high-frequency trading algorithms, to repeatedly manipulate Mullen's stock ("MULN") through "spoofing."  Throughout the Relevant Period, Defendants spoofed MULN shares on 359 of 504 trading days by placing high volumes of orders to sell MULN that they never intended to execute (often called "Baiting Orders"), which were immediately canceled thereafter.  These illegal Baiting Orders materially depressed the price of

---

[1] "Defendants" refers to IMC Financial Markets, Clear Street Markets LLC, Clear Street LLC, and UBS Securities LLC.  Citations to "¶ __" and "Ex. __" refer to Plaintiffs' Complaint [ECF No. 30] and the Exhibits attached thereto. Citations to "MTD at __" refer to Defendants' Joint Memorandum of Law in Support of Their Motion to Dismiss [ECF No. 38].

MULN stock, and caused significant losses to Plaintiffs, including through Mullen's sales of over 5 billion shares at artificially depressed prices throughout the Relevant Period.

The Complaint sets forth highly particularized allegations of Defendants' unscrupulous trading activity.  The Complaint includes, among other things, particularized factual allegations, quantitative analyses, and specific examples (the "Illustrative Examples") demonstrating the highly suspicious nature of: (i) the timing of Defendants' orders; (ii) the placement, and subsequent cancellation, of those orders; and (iii) the percentage of orders executed within certain time periods.  All of these well-pled allegations flatly contradict Defendants' suggestions that their trades in MULN were normal trading activity.

Faced with the imminent exposure of their illegal trading activities, Defendants now resort to personal attacks, baseless (and repeated) Rule 11 threats, and recycled arguments that have been rejected by many courts in this District.  Indeed, as detailed herein, in several recent spoofing cases—some of which involve the same defense counsel as in this action—judges in this District have expressly rejected the same arguments raised by Defendants here, including that Plaintiffs purportedly "rely on pejorative labels, conclusory legal allegations, and egregious group pleading."  *See Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, 2023 WL 9102400, at *13 (S.D.N.Y. Dec. 29, 2023), *report and recommendation adopted*, 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024).  Nor have courts in this District credited Defendants' baseless argument that the financial stakes of spoofing are "*de minimis*" and somehow fall short of demonstrating Defendants' motive to commit fraud.  *See id*.

Defendants also misdirect the Court with respect to the standard for pleading loss causation, claiming that the Second Circuit imposes an "exacting standard" for spoofing cases. To the contrary, this Court has recognized that the "burden in alleging loss causation 'is not a

heavy one'" and the Complaint "must simply give Defendants some indication of the actual loss

suffered and of a plausible causal link between the loss and the alleged representations."

*DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.,* 413 F. Supp. 3d 187, 212

(S.D.N.Y. 2019). Defendants try to obfuscate this straightforward analysis further by claiming

that a "commonsense hallmark of spoofing is a 'rebound' of the stock price." MTD at 4. While

this argument may have held weight in certain circumstances, the Complaint explains why their

"commonsense hallmark" is inapplicable here. Indeed, the Complaint plainly alleges that

Defendants profited not only from selling MULN stock at a rebounded price, but also from

closing out short positions which allowed them to profit immediately after spoofing MULN's

shares. Moreover, as detailed herein, the Complaint specifically details how this deliberate

misconduct depressed Mullen's stock price and caused Plaintiffs to suffer significant economic

losses from their sales of MULN stock at artificially depressed prices.

Accordingly, for the reasons detailed herein, Defendants' motion to dismiss should be

denied in its entirety.

## FACTUAL BACKGROUND

**A.    The Mechanics Of Spoofing And High-Frequency Trading**

In an efficient stock market, the share price of a publicly traded company is determined

by supply and demand. ¶ 26. A trader buys when they believe the price of a security is likely to

go up, and sells when they believe it is likely to go down. ¶ 29. A market participant "spoofs" a

company's shares by deliberately interfering with the natural forces of supply and demand by

using high-frequency trading algorithms to place false 'buy' or 'sell' orders, referred to as

Baiting Orders, without intending to execute the orders. ¶¶ 28-30. Simply put, Baiting Orders

create the illusion of supply or demand—*i.e.*, an artificial hype for other investors to buy or a

panic to sell—and lack any legitimate economic purpose. ¶¶ 27-28.

Specifically, as relevant here, if a spoofer wishes to drive the price of a security down (so they can buy the security at an artificially deflated price, including to cover a previous short sale), they will:

1. **Create a Rush to the Exit**: In the relevant securities exchange's publicly displayed Limit Order Book,[2] the spoofer enters one or more Baiting Orders to sell, tricking other market participants (*i.e.*, baiting them) into believing that the market for the security is trending downwards, and causing them to enter their own sell orders. ¶ 30.

2. **Buy the Dip**: The influx of sell orders causes the market price of the security to decrease, and the spoofer places orders to buy the same security at the artificially lower price. ¶¶ 30, 57. The spoofer actually executes these orders. ¶ 30.

3. **Cancel the Initial Order**: Once the spoofer successfully buys the security at an artificially lower price through "executing purchases," the spoofer cancels the initial Baiting Orders to sell or substantially decrease the number of shares to be sold.[3] *Id.* As a result, the spoofer has purchased shares of a target security for an artificially depressed price (and has grown its overall position) as compared to the intrinsic value of the security.

Having successfully purchased the subject stock at an artificially deflated price, a spoofer can profit from this trade by capitalizing on existing short sale positions, selling the shares following a partial rebound, or selling shares before the price decline. ¶ 90.[4]

By utilizing these self-executing algorithms, a spoofing strategy is often used multiple times during a trading day and repeated throughout a protracted trading period. ¶ 31. And while each individual spoofing event may only manipulate the market by a few pennies (or less), the

---

[2] In connection with the securities markets, the "Limit Order Book" is "an electronic list of buy and sell orders for specific securities and other financial instruments that . . . lists the number of shares being bid or offered at each price point." *Nw. Biotherapeutics*, 2023 WL 9102400, at *2 n.1. It reflects the direction in which the market price for a security is moving and "is visible to every trader on the exchange." *Id.*

[3] The market impact of a Baiting Order is the same regardless of whether the Defendant who placed it cancelled that specific Baiting Order, cancelled an equivalent order placed by that Defendant on Nasdaq, or modified downwards the volume of a sell order. *See* ¶ 95 n. 47,

[4] Spoofing also can be executed in the opposite direction to artificially increase the price of a security up: the spoofer places 'buy' Baiting Orders to drive the stock up, executes sales at the artificially higher price, and then cancels the initial 'buy' orders before the purchases are effectuated. ¶ 31, n. 7.

cumulative and sustained effect can result in hundreds of millions of dollars in profit for the spoofer and significant losses for investors and the target company. *Id.*

**B.**    **The Spoofing Of Mullen Stock**

Defendants are highly sophisticated market participants that employ cutting edge trading algorithms to place, cancel, and rout orders, and execute trades—in a large number of securities—within milliseconds. ¶¶ 3, 11, 13, 16, 19, 22, 79, 92. As alleged in the Complaint, throughout the Relevant Period, Defendants used these algorithms to spoof MULN shares on 359 of 504 trading days—generating trading patterns that involved the placement and cancellation of ***tens of millions*** of Baiting Orders to sell that were never intended to be executed. ¶¶ 79, 171.

Throughout the Relevant Period—often multiple times a day and within nano- or milliseconds—Defendants placed these Baiting Orders which, as designed, sent a false selloff signal causing Mullen shares to decline. *E.g.*, ¶¶ 1, 3, 45, 53. As detailed in Exhibit 1 to the Complaint, their spoofing tracked the three step process outlined above (¶¶ 52-53, 58-65):[5] (i) Defendants flooded the market with 'sell' Baiting Orders meant to trick market participants into placing their own orders to sell; (ii) Defendants placed and executed 'buy' orders at prices artificially deflated by the reaction to their Baiting Orders; and (iii) Defendants cancelled the Baiting Orders. ¶ 54. This activity created a pile-on effect that materially depressed Mullen's share price to the detriment of Plaintiffs. ¶ 57.

Although spoofing is inherently concealed from the public, there are several observable indicators of Defendants' manipulative conduct. ***First***, Defendants repeatedly made and

---

[5] While the steps outlined here represent the most common permutation of Defendants' spoofing schemes, Defendants also carried out their scheme in various other forms of trading with the same spoofing effect, including by "adding shares to an existing sell order and then removing that same volume from a different sell order after the Executing Purchase, or by creating one sell order and cancelling another that had been placed earlier." ¶ 55.

reversed their trading directions in less than seconds—placing a large volume of sell orders, followed by buy orders, followed by the cancellation of sell orders—indicating that the sell orders were merely a ploy to drive the price down to buy low.  ¶ 67.  The repetition of this pattern reflects an intention to manipulate the market. ¶ 88.[6]

      *Second*, the Baiting Orders placed by Defendants were notably dissimilar when compared to Defendants' behavior during non-spoofing episodes and the behavior of other, non-spoofing market participants.  Those myriad differences include:

- Defendants placed sell orders (*i.e.*, Baiting Orders) for, on median, 7,200 shares during the two-minutes prior to executed buy orders; the median of shares placed in "sell" orders prior to purchases by other non-spoofing market participants was drastically lower (500 shares).  ¶¶ 68, 70.

- Defendants cancelled vastly more "sell" orders during spoofing episodes (a median of 11,800 shares in sell-side orders, or 163.89% of the created Baiting Orders), compared with cancelled "sell" orders during the same period in non-spoofing episodes (20% of the created volume of sell orders).  ¶¶ 69, 70.

- Defendants, on median, canceled "sell" orders for 5,700 shares per subsequent executed purchase, while other market participants cancelled, on median, orders for 18 shares—a difference of 32,458%.  ¶ 72.

- Defendants purchased a median of 2,100 shares following the cancellation of Baiting Orders and the resulting price decline as compared to other market participants' purchases of, on median, 13 shares.  ¶ 73.

      *Third*, Defendants' actions on either side of their spoof, even without comparison to other market participants, also indicate Defendants' intent to manipulate the market and drive down the price of Mullen stock.  For example:

- Defendants executed no sell orders following their executed buy orders.  ¶¶ 74, 87.

---

[6] *See Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*, 2023 WL 6316252, at *8 (S.D.N.Y. Sept. 28, 2023) ("*Harrington II*") (rejecting defendants' argument that plaintiff only alleged ordinary market activity as "implausible against the frequent pattern of spoofing alleged in the [complaint]"); *Nw. Biotheraputics*, 2023 WL 9102400, at *15 (noting among spoofing indicia that plaintiff "allege[d] a pattern of such activity, occurring on thousands of different occasions"); *In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 447 (S.D.N.Y. 2000) (crediting for scienter "the length of time (covering several years)" of the scheme).

- Defendants placed Baiting Orders for a median of 5,700 shares and executed purchases for a median of 200 shares. ¶ 75.

- Defendants placed and cancelled Baiting Orders in an incredibly short period of time—often seconds or milliseconds—on ***thousands*** of occasions.  ¶ 83.

***Fourth***, Defendants' behavior was inconsistent with that of *bona fide* market makers. Unlike *bona fide* market makers, who execute roughly comparable amounts of purchases and sales to provide liquidity to customers and other broker-dealers, Defendants cancelled a much higher percentage of sell-side orders (88%) than buy-side orders (63%) created during the Relevant Period.  ¶ 76.[7]  Additionally, unlike *bona fide* market makers, which aggressively price sell-side orders following the purchase of a stock, to flatten their inventory (and be ready to provide liquidity), Defendants were *less* likely to aggressively price sell orders after they completed a spoofing purchase as compared to non-spoofed purchases.  ¶¶ 77-78.[8]

***Fifth***, Defendants specifically designed and implemented high-speed algorithmic trading programs to generate spoofing patterns on behalf of Defendants' own proprietary trading desk and/or customers, and Defendants closely monitored, modeled, and analyzed the performance,

---

[7] *See, e.g.,* 73 Fed. Reg. 61,699 (Oct 17, 2008) ("In fulfilling its obligations as a market maker, a market maker engaged in bona-fide market making may provide liquidity to a security's market, take the other side of trades when there are short-term buy-and-sell-side imbalances in customer orders, or attempt to prevent excess volatility . . . A pattern of trading that includes both purchases and sales in roughly comparable amounts to provide liquidity to customers or other broker-dealers would generally be an indication that a market maker is engaged in bona-fide market making activity."); 69 Fed. Reg. 48,015 (Aug. 6, 2004) ("Bona-fide market making does not include activity that is related to speculative selling strategies or investment purposes of the broker-dealer and is disproportionate to the usual market making patterns or practices of the broker-dealer in that security.").

[8] *Phunware, Inc. v. UBS Sec. LLC*, 2024 WL 1465244, at *5 (S.D.N.Y. Apr. 4, 2024) (defendant's behavior "departed from that of a *bona fide* market maker [because it] placed orders creating a large imbalance in its order book, rather than taking advantage of the spread"); *Nw. Biotherapeutics*, 2023 WL 9102400, at *15 (among indicia "imbalances in the Defendants' order books around Spoofing Episodes—heavily tilted to the sell-side when the Baiting Orders were placed, then quickly reversed to favor the buy-side—and much higher cancellation rates for the sell-side orders than for the buy-side orders . . . inconsistent with *bona fide* market making activity"); *Kessev Tov, LLC v. Doe(s)*, 2023 WL 4825110, at *4 (N.D. Ill. July 27, 2023) ("Defendants' actions were irrational and contradictory to ordinary market making behavior").

impact, and effects—including the spoofing effects—of those programs. ¶ 79.[9]  Corporate officials approved these activities knowing enough about Defendants' trading practices—including the practices and effects of the algorithms—such that Defendants knew about, or were recklessly ignorant of, the spoofing.  ¶ 80.

**Sixth**, as registered broker-dealers, Defendants knew or should have known that it was unlawful to place Baiting Orders to sell that were never intended to be executed.  ¶ 81. Defendants participated in these schemes either to benefit their own proprietary accounts and/or on behalf of their clients.  ¶ 82.  And although they were required by industry rules and regulations (and their own corporate policies) to protect the integrity of the marketplace, Defendants failed to monitor, detect, and prevent the manipulative trading activity that was deployed by the trading algorithms for themselves and/or their clients.  ¶ 82.

These factors, independently and in totality demonstrate Defendants' knowledge (or, at the very least, their recklessness) of their spoofing schemes.  Defendants also had a strong motive to engage in this type of manipulative activity.  Not only could Defendants profit after a spoofing episode by selling the shares acquired in an executed purchase after a price rebound, but Defendants also profited immediately by closing out their short positions.  ¶ 90.  By repeating this cycle—across a universe of securities, including MULN—Defendants accumulated tremendous profits, demonstrating their motive to participate in this deliberately manipulative trading activity.  ¶ 91.

---

[9] *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.* ("*Harrington I*"), 585 F. Supp. 3d 405, 416 (S.D.N.Y. 2022) (noting as indicia that defendants' "spoofing scheme operated through algorithmic trading programs designed and implemented by each of the[m]"), *reconsideration denied*, 2022 WL 580787 (S.D.N.Y. Feb. 25, 2022); *see also Phunware*, 2024 WL 1465244, at *4; *Nw. Biotherapeutics*, 2023 WL 9102400, at *18.

In reliance on an efficient market, Plaintiffs sold MULN shares at prices that were artificially deflated by Defendants' scheme, including Mullen's sales of over 5 billion shares and Plaintiffs Khorrami's and Cha's sales of over 3 million shares and over 3,000 shares, respectively. ¶¶ 4, 198, 173-90, 201; Exs. 2, 3, 4.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *8 (S.D.N.Y. Sept. 30, 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Even when allegations are considered under the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), "[t]he court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Wells Fargo*, at *8 (citing *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008).

## ARGUMENT

To state a claim for market manipulation under Section 10(b), a complaint must allege: "'(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange.'" *Harrington II*, 2023 WL 6316252, at *5 (*quoting Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022)).

"The analysis of [market manipulation] claims under Section 9(a) . . . closely parallels the analysis of claims under Section 10(b)." *Nw. Biotherapeutics*, 2023 WL 9102400, at *13.  "A complaint must allege (1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter and

(3) for the purpose of inducing the security's sale or purchase by others.'" *Harrington II*, 2023 WL 6316252, at *5 (quoting *Xu v. Direxion Shares ETF Tr.*, No. 22 Civ. 5090, 2023 WL 5509151, at *6 (S.D.N.Y. Aug. 25, 2023)).

With respect to Plaintiffs' common-law fraud claim, "[t]he elements . . . [are] essentially the same as those which must be alleged in order to establish a claim under Section 10(b) and Rule 10b–5." *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006).

## I.    THE COMPLAINT ADEQUATELY ALLEGES MANIPULATIVE ACTS BY ALL DEFENDANTS

"In assessing the existence of manipulative conduct, the critical question [] becomes what activity 'artificially' affects a security's price in a deceptive manner." *Harrington II*, 2023 WL 6316252 at *5 (*citing ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007)). Spoofing—"bidding or offering with the intent to cancel the bid or offer before execution"—is such a manipulative activity. *Nw. Biotherapeutics*, 2023 WL 9102400, at *14. While "rapidly placing and cancelling orders, by itself, does not amount to market manipulation," *id.*, conduct which is otherwise legal "may constitute manipulative activity when accompanied by manipulative intent." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021).

### A.    The Complaint Adequately Alleges Spoofing

Defendants argue that Plaintiffs fail to plead a manipulative act because the Complaint "merely labels" cancelled orders as Baiting Orders, "without supporting facts." MTD at 13. Defendants, however, ignore recent precedent in this District that rejects exactly that argument. Likewise, Defendants ignore Plaintiffs' allegations of numerous spoofing "indicia" that raise a strong inference that Defendants engaged in a repeated pattern of spoofing MULN.

To distinguish an illegal and manipulative spoofing scheme from ordinary market activity, courts look to several "indicia" of spoofing, including (but not limited to): (i) placing large orders on one side of the market—so-called "Baiting Orders"—opposite smaller orders on the other side; (ii) cancelling the Baiting Orders after the spoofer's legitimate smaller orders are filled, (iii) a very brief passage of time between the placement and cancellation of the Baiting Orders (usually milliseconds or seconds), and (iv) conduct that is contradictory to that of ordinary market making behavior. *Nw. Biotherapeutics*, 2023 WL 9102400, at *15.

For example, in *Harrington II*, similar to the facts alleged here, defendants were alleged to have "placed hundreds of baiting orders . . . on behalf of themselves or their customers" which "were not intended to be executed." *Harrington II*, 2023 WL 6316252 at *1.  And, like here, this improper trading activity sent a "false and misleading price signal" to drive down the price of the shares, and the defendants then executed their "orders to buy [those] shares at these artificially diminished prices . . . [and] cancelled all of the fictitious Baiting Orders." *Harrington II*, 2023 WL 6316252 at *1.  Judge Schofield held that these indicia allegations—and that defendants "designed and implemented algorithmic trading programs that executed the spoofing schemes,"—were "sufficient to plead the manipulative acts prong of a Section 10(b) claim for market manipulation." *Id*. at *5; *see also Nw. Biotherapeutics*, 2023 WL 9102400 at *15 (analyzing "various indicia" of spoofing in finding plaintiffs sufficiently alleged market manipulation).

Like in *Harrington II*, the Complaint adequately alleges multiple indicia of Defendants' manipulative conduct.  ***First***, Defendants engaged in a distinctive pattern of irregular trading activity exhibiting "a rapid, unnatural reversal of trading direction," ¶ 67, including through:

- the irregular amount of shares in cancelled Baiting Orders relative to Executed Purchases, ¶¶ 68, 70, 72, 73, 75;

- the high concentration of Defendants' cancelled sell orders during Spoofing Episodes, ¶¶ 69, 70;

- the stark contrast between median Executed Purchases (200) and median executed sell orders (0), ¶¶ 74, 87; and

- the stark contrast between the size of cancelled Baiting Orders (a median of 5,700 shares) and executed sell-orders (0), ¶¶ 85-86.

**Second**, the placement and cancellation of Baiting Orders on tens of thousands of occasions took place within a "very brief passage of time," *Nw. Biotherapeutics*, 2023 WL 9102400, at *15—often within seconds or milliseconds. ¶ 83. For example, each Defendant placed and then canceled Baiting Orders on at least one occasion in less than 0.00007 seconds (with the fastest cancellation being made in 0.000000822 seconds by IMC). Other examples include:

- on December 15, 2022, Defendant IMC began canceling Baiting Orders for 1,100 MULN shares within 3.145169 seconds of placing them, ¶¶ 112-16;

- on March 8, 2023, Defendant Clear Street began canceling Baiting Orders for 9,900 MULN shares within 3.338891 seconds of placing them, ¶¶ 94-99; and

- on August 23, 2023, Defendant UBS began cancelling Baiting Orders for 24,140 MULN shares within 7.65998 seconds of placing them, ¶¶ 133-37.

**Third**, Defendants exhibited behavior inconsistent with that of normal market-making activity. Defendants did not, like most market makers, execute roughly the same amounts of purchases and sales (indicative of efforts to provide liquidity to customers and other broker-dealers). ¶ 76. Nor did Defendants aggressively sell shares after spoofing purchases, indicating that, unlike other market makers, Defendants did not flatten their inventory, but instead used the Baiting Orders to cover existing short positions and otherwise buy Mullen stock at artificially depressed prices. ¶¶ 77-78.[10]

---

[10] That the Complaint does not specifically allege that Defendants "parked" Baiting Orders behind orders from other market participants in no way takes away from the multitude of spoofing indicia it does allege. "While 'layering' or

Notwithstanding these detailed allegations, Defendants claim that Plaintiffs' labeling of Baiting Orders is "conclusory" and "circular," and that Plaintiffs incorrectly assume that just because orders were canceled, they were always intended to be canceled.  MTD at 13-15, 33-34. Defendants are wrong.  In *Harrington II*, for example, Judge Schofield held that the plaintiffs' identification of a Baiting Order was sufficient—and not merely a "pejorative" label—where, with far less detailed allegations than here, the plaintiff simply "distinguish[ed] [B]aiting [O]rders from other sell orders by the fact that none of the sell orders in the illustrative examples were ever executed, and instead functioned to manipulate the market to enable Defendants' purchase of [the] securities at lower prices."  2023 WL 6316252, at *6.  Similarly, in *Phunware*, Judge Ho held that plaintiffs' characterization of Baiting Orders was not "arbitrary," where, like here, plaintiffs included specific allegations about the anomalous timing and size of the orders to "distinguish between legitimate market activity and manipulation."  2024 WL 1465244, at *5.

Defendants' cases on this point are particularly inapposite.  In each case, the plaintiffs, in attempting to plead misrepresentations or fraud, alleged, without supporting facts, that defendants "concealed" or were "reckless in not knowing," pertinent information, made "false, misleading, and/or deceptive" claims, or "fraudulently expos[ed] the [plaintiff] to further losses." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (cited at MTD at 13); *DiMuro v. Clinique Lab'ys, LLC*, 572 F. App'x 27, 30 (2d Cir. 2014) (same); *Mod. Settings, Inc. v. Prudential-Bache Sec., Inc.*, 602 F. Supp. 511, 515 (S.D.N.Y. 1984) (same).  None contain the detailed factual indicia reflecting a widespread spoofing scheme like the Complaint here.

---

'parking' bids may be one way of proving spoofing, there is no case law that holds it is the only way to do so." *Kessev Tov*, 2023 WL 4825110, at *4.

Moreover, courts have repeatedly rejected Defendants' argument that allegations of rapid trading and cancelling is routine market activity, and that the "majority" of market orders are canceled.  MTD at 14.  For example, in *Harrington I*, Judge Schofield recognized that the fact of routine cancellations "does nothing to explain the frequent pattern of spoofing alleged in the Complaint" and observed that even if "95% of placed orders are canceled in the market [it] does not mean spoofing was absent here."  585 F. Supp. 3d at 418; *see also Nw. Biotherapeutics*, 2023 WL 9102400 at *18 (similar); *Kessev Tov*, 2023 WL 4825110, at *5 (rejecting defendants' argument "that offering two-sided quotes and cancelling high volumes of previously made orders . . . is typical market making activity").[11]

### B.  The Distinction Between A Market Maker And Their Customers Is Immaterial At This Stage Of The Litigation

Defendants argue that Plaintiffs "improperly aggregate" the trading of Defendants and their customers, and claim that Plaintiffs are asking the Court to "speculate" that all activity by a Defendant reflects the intent of one decision-maker to place "many sell orders, followed by a buy order, followed by the cancellation of sell orders."  MTD at 15-16.  This argument again ignores recent case law from this District in other spoofing cases.

As an initial matter, even if a client or customer directed the spoofing rather than Defendants' algorithm, it would raise a question of fact that is wholly inappropriate for

---

[11] Defendants cite an earlier decision in *Kessev Tov* for the proposition that "placing rapid orders and cancelling them does not necessarily evince illegal market activity" in dismissing the plaintiff's claim that the defendants' spoofing constituted a manipulative act.  *See* MTD at 14 (citing *Kessev Tov LLC v. Doe(s)*, 2022 WL 2356626 (N.D. Ill. June 30, 2022)).  But, the court there later denied dismissal of an amended complaint that, like the Complaint here, included "charts, tables, and a declaration from a market making expert to bolster their claims that Defendants' conduct led to irrational prices and evinced a plan to deceive."  *Kessev Tov*, 2023 WL 4825110, at *2.  Likewise, *CP Stone Fort Holdings, LLC v. John*, 2016 WL 5934096 (N.D. Ill. Oct. 11, 2016), purportedly standing for the same point, was distinguished in *United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017) because it did not "involve[], as did this case, the development of a specific program to create the illusion of artificial market movement that included the use of large orders to inflate the price while also taking steps to avoid transactions in the large orders."  866 F.3d at 797 n. 64.

resolution at the motion to dismiss stage.  *See Nw. Biotherapeutics*, 2023 WL 9102400, at \*18 ("Defendants' argument that their clients 'set the terms of those orders' [] is Defendants' version of the facts and raises a dispute that cannot be resolved on a motion to dismiss."); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 83 (S.D.N.Y. 2015) (information about a manipulation claim is "likely to be in the exclusive control of the [] Defendants *and their clients*, and that may be resolved only through discovery") (emphasis added).  Indeed, the suggestion that Defendants' sweeping spoofing operation worked on behalf of themselves and/or a combination of clients, customers and their own proprietary trading desk would only bolster Plaintiffs' claim by identifying a motive and opportunity for Defendants' spoofing schemes.  *Harrington II*, 2023 WL 6316252, at \*5.[12]  ("[U]se of 'and/or' language [referring to the defendant facilitating a trade on behalf of itself 'and/or' client accounts] does not cause [a complaint] to fall short of Rule 9(b)'s particularity requirement, but instead functions to demonstrate the breadth of Defendants alleged conduct.").  *Harrington II*, 2023 WL 6316252, at \*5.[13]

    Additionally, this argument fails on the merits and completely misapprehends Plaintiffs' "theory of the case, which focuses on Defendants' control over the high-speed trading algorithms

---

[12] Putting aside the fatal legal infirmity of their arguments, Defendants boldly misconstrue the Complaint's allegations, stating that "Plaintiffs also affirmatively plead that a portion of the trading at issue was in fact done '[p]ursuant to the instructions of [Defendants'] customers.' (AC ¶ 54.)."  MTD at 17.  The allegation in fact reads: "Pursuant to the instructions of either their customers' *or their own proprietary traders*, Defendants flooded the Limit Order Book . . . ."  ¶ 54(a) (emphasis added).  This allegation describes, consistent with this Court's recent decisions, a wide-ranging scheme through algorithmic trading that, as discovery will reveal, could very well have involved not only the proprietary trading desks, but also customers.  *See, e.g.*, *Nw. Biotherapeutics*, 2023 WL 9102400, at \*18 (alleged spoofs "may have been executed by Defendants . . . for client accounts"), and *Phunware*, 2024 WL 1465244, at \*4 (spoofs "may have been executed by Defendant . . . for client accounts, for which [Defendant] acted as a broker").

[13] Ignoring *Harrington II*'s more recent endorsement of "and/or" language to encompass the full scope of possible misconduct, Defendants cite the earlier *Harrington I* decision for the proposition that Plaintiffs' allegation that "each Defendant (and/or their customers) specifically designed and implemented algorithmic trading programs that routed orders, executed trades and otherwise carried out the spoofing schemes" somehow "diverge[s] from the allegations in other recent spoofing cases."  MTD at 17 n. 24 (*citing Harrington I*, 585 F. Supp. 3d at 416).

and Defendants' responsibility to monitor such algorithms." *Nw. Biotherapeutics,* 2023 WL 9102400 at *18 ("[Plaintiffs] need not allege that Baiting Orders were placed and cancelled by clients, let alone the same client, for its theory to survive.").  Plaintiffs do not ask the Court to "speculate" who the specific decisionmaker behind the spoof was, they merely ask the Court to recognize that Defendants knowingly or recklessly allowed their computer algorithms to undertake frequent and damaging spoofing activity which served to benefit them, and which damaged Plaintiffs.  This conclusion is no different from that reached by multiple other judges in this District when confronted with similar spoofing allegations.  *See, e.g.*, *Harrington I*, 585 F. Supp. 3d at 416. ("That the Complaint mentions that Defendants trade for their own proprietary accounts and the accounts of their customers does not undercut the Complaint's numerous allegations that Defendants designed and operated the algorithms that spoofed Concordia stock."); *Phunware*, 2024 WL 1465244 ("[T]he thrust of the Complaint's allegations is that Defendant 'specifically designed and implemented algorithmic trading programs to execute its spoofing schemes' and substantively controlled the trading strategies alleged.  Courts in this District have held that claims based on similar allegations adequately state a claim[.]").[14]

### C.    Plaintiffs' Imputation Methodology Has Been Accepted By The Courts And Sufficiently Alleges A Manipulative Act

The Complaint explains in exhausting detail how Plaintiffs utilized an imputation methodology to analyze trading activity and identify the defendants that are named in this lawsuit.  ¶¶ 38-45 (the "Methodology").  Defendants downplay these allegations as mere "supposition" and "speculation."  MTD at 13, 18-19.  But as the Complaint explains, the

---

[14] The *Phunware* court specifically rejected the defendant's argument that the complaint "improperly combine[d] the conduct of different market participants, namely Defendant and its clients, and that no pattern of behavior can be inferred from Defendant's trades, as they were placed by different actors."  2024 WL 1465244, at *4.

Methodology is in fact a meticulous and conservative implementation of a well-established method of imputing anonymized activity to market participants. *See* ¶ 38 n. 16; *Nw. Biotherapeutics*, 2023 WL 9102400, at *4 n. 7, 16 (accepting allegations based on "match[ing] anonymized transactions from FINRA to changes in displayed OTC Link quotes: if a transaction is followed by a change in a market participant's bid within five seconds that is equal in volume and price to that of the transaction, the Executing Purchase is attributed to that market participant").

As Defendants recognize, even under the heightened pleading standards of Rule 9(b), "information and belief allegations" are permitted "for matters that are peculiarly within the opposing party's knowledge," which anonymized orders, by definition, are.  MTD at 20.  *See, e.g.*, *In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216, 279 (E.D.N.Y. 2002) ("Where the fraudulent scheme alleged is one of market manipulation, the exact mechanism of the scheme is likely to be unknown to the plaintiffs."); *Sharette*, 127 F. Supp. 3d at 83 ("[A] manipulation claim need not be pleaded to the same degree of specificity as a misrepresentation claim when relevant information is likely to be solely within the defendant's knowledge.").[15]  Yet despite the informational imbalance, the Complaint goes far beyond information and belief. Where the allegations are not based on fully deanonymized orders, the Methodology uses

---

[15] Defendants assure the Court that "here, the relevant information" for Plaintiffs to allege a spoofing scheme "is available from FINRA, the relevant exchanges, and publicly-available trading data."  MTD at 20.  But Defendants do not explain how Plaintiffs could possibly access the ***anonymized*** trading information essential to many of their claims, if not for information and belief allegations and the imputation methodologies used by plaintiffs in similar cases allowing them to get to discovery and see it for themselves.  Additionally, while Defendants argue that the Plaintiffs improperly "invent" a Methodology where there exists a possibility that they executed trades in MULN on other exchanges or off-market, MTD at 24 n. 31, they offer no evidence of such trades, and ignore that courts routinely accept spoofing allegations based on trading activity in a primary market in which the defendants and the relevant security are active.  *See, e.g.*, *Phunware*, 2024 WL 1465244 at *4 (finding complaint "adequately plead[ed] a manipulative act" where it "derive[d] its factual allegations from the complete stream of deanonymized order book messages on the Nasdaq market, which represent[ed] only a fraction of order flow in PHUN's shares").

probabilistic imputation—a standard methodology accepted by other courts in this District—to link anonymized market activity to deanonymized orders made by Defendants.  ¶¶ 38-48.  *Nw. Biotherapeutics*, 2023 WL 9102400, at *4 n. 7, 16; *Harrington II*. ECF No. 210 (trades occurring within the same millisecond were relevant "evidence of coordination").

The Methodology works as follows.  Market makers such as Defendants are obligated to post deanonymized buy and sell orders under the Nasdaq "Two-Sided Obligation."  ¶ 33 (quoting Nasdaq Rulebook, Nasdaq Equity 2 Section 5).  However, aside from the deanonymized orders they are required to make, market makers also often transact anonymously.  ¶¶ 34-37.  Because a market maker's order messages are sent in data "packets" containing the market maker's close-in-time orders—and the probability of two orders *otherwise* arriving within the same nanosecond or millisecond is extremely low—Plaintiffs were able to use the Methodology to match anonymized orders to deanonymized orders.  ¶¶ 40-43.  As set forth in the Complaint, by using publicly available Nasdaq TotalView ITCH data ("ITCH"), Plaintiffs matched anonymized orders (ITCH message type "A") to a Nasdaq market maker sending a deanonymized order (ITCH message type "F")—but **only** where both orders were sent in the **exact same nanosecond or millisecond** of each other.  ¶¶ 38-48.[16]

Plaintiffs confirmed the veracity of the Methodology by testing it on fully deanonymized orders.  In that test, the Methodology exhibited an extremely high success rate (an average of

---

[16] Specifically, there is a ***one-in-a-billion chance*** of two orders arriving within the same nanosecond, and a one-in-a-thousand chance of two orders arriving within the same millisecond.  ¶ 40.  The Methodology pairs any anonymized and deanonymized orders that occur in the same nanosecond (*i.e.*, one one-billionth of a second), because the probability of two orders arriving from different participants in the same nanosecond is infinitesimal. ¶¶ 40-42.  Where anonymized and deanonymized orders arrive in the same millisecond (*i.e.*, one one-thousandth of a second), the Methodology is even more conservative, only pairing orders where there are orders on opposite sides of the Limit Order Book (*i.e.*, a buy and sell order matched), as would be typical only of a Nasdaq market maker such as Defendants.  ¶¶ 40, 43.

86% and median of 90%), even for millisecond matching.  ¶ 44.[17]  And because the 86/90%

conservative baseline certainty rate was only the "average *daily* likelihood," it essentially is

impossible that Defendants *did not* spoof on those dates.  As explained in the Complaint and

herein, the probability of one of these daily imputations being correct "crosses the 99% (average)

threshold with only three imputations."  *Id*.; *see infra* Section III.C. n. 46.[18]  This "particularity,"

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007), is more than

sufficient to satisfy Plaintiffs' pleading burden.[19]

Now faced with the reality that the Methodology has unmasked their manipulative

trading activity, Defendants attempt to argue that all "statistical-probability" pleading is

"disfavored" in spoofing cases and should be ignored by the Court wholesale.  MTD at 19-20

(quoting *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 77-78 (2d

Cir. 2022).  But *Gamma Traders* is inapposite.  There, plaintiffs alleged nothing more than a

generalized likelihood of having traded on the day the defendants spoofed, which meant that the

---

[17] Defendants say this success rate demonstrates that the Methodology is "admittedly flawed" and that Plaintiffs acknowledge that it is "not 100% accurate."  MTD at 20. But even under the heightened pleading standards, Defendants point to no authority—as they obviously cannot—for the absurd proposition that a plaintiff must, at the pleading stage, divine with "100% accura[cy]" all of a defendant's secretive, manipulative conduct.  On the contrary, plaintiffs must only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft*, 556 U.S. at 678.

[18] To calculate the probability of the Methodology being incorrect, take one minus a conservative estimate of the success rate (86%) to calculate the probability a match is incorrect (14%).  Assuming independence, repetitively carrying out this exercise generates the joint likelihood that the matches for all events are incorrect.  Thus, for two events, the likelihood both matches are incorrect is $(1-0.86)^2 = 1.96\%$.  With three events, the probability all three matches are incorrect is $(1-0.86)^3 = 0.2744\%$.  Therefore, in the case of three events, the probability at least one of the matches is correct is $100\% - 0.2744\% = 99.7256\%$.  As the number of imputations increases, the likelihood that all of the imputations are incorrect approaches zero.

[19] Though Defendants contend that the imputation methodology accepted in *Nw. Biotherapeutics* was different than the one used here, nowhere do they explain why the methodology here is more "expansive" than the one in *Nw. Biotherapeutics*.  MTD at 20 n. 26.  Although that case matched orders that were "equal in volume and price," 2023 WL 9102400, at *16, it used a far longer timeframe—five seconds—between the anonymized executed orders and deanonymized order quotes.  In fact, in terms of sheer probabilities, it is the methodology in *Nw. Biotherapeutics* that is the more expansive one.  Simply put, it is far more likely that over five seconds there will be an inadvertent and false "match," even on price and volume, than over the course of a single nanosecond or millisecond.

plaintiff "ha[d] no idea" whether any particular trade it made "came out on the net losing end of [the d]efendants' market manipulation." 41 F.4th at 78-79.  In light of that uncertainty, the Court noted that "even if there were a 99.9% probability that any given trade was free of fraudulent influence, after enough trades, it could be argued as a mathematical matter that the frequent trader will have bought or sold at a spoof-influenced price simply because the volume of trades is sufficiently large." *Id.* at 79.  Thus, the *Gamma Traders* court rejected the statistical pleading alleged there since "*these* probabilistic allegations" raised the obvious absurdity that, if accepted, "any person who traded with even modest frequency could state a [Commodities Exchange Act] claim against a market-manipulating defendant, without ever plausibly alleging that she suffered a loss as a result of the defendant's conduct."  *Id.* (emphasis in original)**.**

None of these concerns are present here.[20]  Plaintiffs do not use probabilistic imputation to allege that their trade prices were affected by spoofing, as the *Gamma Traders* plaintiff did. Instead, the Complaint employs probabilistic imputation only to attribute the identity of an order to a Defendant when that order arrived in the same nanosecond or millisecond as a deanonymized order, and only when a very specific sequence of manipulative behavior gives rise

---

[20] Defendants claim that the assumption that Defendants worked to maintain a flat inventory position contradicts the spoofing indicia alleged by plaintiffs, including that Defendants diverged from *bona fide* market making because their spoofing caused substantial sell-side imbalances.  MTD at 21.  But contrary to Defendants' baseless assumption that wherever a market maker spoofs, it abandons standard market maker activity completely, Plaintiffs recognize that a Defendant, even where undertaking manipulative conduct, may still wish to place at least *some* orders on the opposite side of the Limit Order Book in order to "to provide liquidity to customers or other broker-dealers," as is required of market makers and to hide the scope of their potential misconduct.  ¶ 43.  Thus, while Plaintiffs' millisecond imputation theory imputes activity only in "milliseconds where orders"—of any amount— "were placed on opposite sides of the Limit Order Book," it also identifies indicia of spoofing where those orders were so imbalanced as to be ultimately "inconsistent with bona fide market making." ¶¶ 43, 76-77.  Defendants make the parallel argument that the nanosecond-imputation theory conflicts with Plaintiffs' "acknowledge[ment] that orders from different sources do arrive in the same nanosecond or millisecond."  MTD at 21.  However, this too fails because Plaintiffs acknowledge no such thing.  All Plaintiffs "acknowledge" is that *if it were to happen* that "a third-party anonymized order arrives within the same nanosecond or millisecond as a Defendant's deanonymized order," the "near-impossibility of this occurring by random chance alone" indicates that the third party likely is acting on behalf of or at the instruction of the [Defendant and/or their clients]."  ¶ 49.

to an inference of spoofing.[21]  To the extent Defendants argue that *Gamma Traders* imposed a bar on statistical pleading generally, that also is not true.  The Court of Appeals in *Gamma Traders* noted only that the use of "rote probabilities" in pleading "*injury in fact*" under Article III or the Commodities Exchange Act is "generally disfavored."  *Id*. at 78 (emphasis added).[22] But here, Plaintiffs allege injury-in-fact with detailed timestamped trading records.  *See* ¶ 172; Exs. 1-4.  And courts regularly uphold the use of statistical evidence in securities cases.[23]

Defendants also attack the Methodology for not differentiating between Defendants' proprietary trades and those placed by other entities such as clients, customers, or third parties. In doing so, Defendants accuse Plaintiffs of engaging in improper "[g]roup pleading."  MTD at 22-23.  As explained above, Defendants once again ignore Plaintiffs' "theory of the case, which focuses on Defendants' control over the high-speed trading algorithms and Defendants' responsibility to monitor such algorithms."  *Nw. Biotherapeutics,* 2023 WL 9102400 at *18. Importantly, the Methodology itself raises a strong inference of Defendants' "systematic" involvement—through their algorithms—in suspect trades, whether or not a third party is involved.  ¶ 49.  As Plaintiffs allege, where there is a high frequency of spoofing patterns (executed within nanoseconds or milliseconds), it is virtually impossible that entirely

---

[21] Even if probabilistic imputation were to impute a very large volume of activity to any Defendant, that would not inherently yield any of the indicia of scienter outlined in the Complaint, which turn on specific sequences of imbalances in order and trading activity between sell- and buy-side activity by each Defendant.

[22] The court did not apply the same standard to the pleading of the *Gamma Traders* defendant's manipulative acts, which, in this case, due to the anonymization of trading data, "are peculiarly within the opposing party's knowledge."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 357 F. Supp. 2d 712, 716 (S.D.N.Y. 2005), *aff'd*, 493 F.3d 87 (2d Cir. 2007).

[23] *See, e.g.*, *In re Petrobras Sec.*, 862 F.3d 250, 277 (2d Cir. 2017) (upholding district court's finding that "a statistically significant showing that statistically significant price returns are more likely to occur on event dates is sufficient as direct evidence of market efficiency"); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 (S.D.N.Y. 2015) (denying Daubert motion to disqualify event study that found "statistically significant price reactions at the five percent level or better on five event days").

independent market participants are undertaking each leg of the spoofing episode. *Id*.[24]  That Defendant's algorithm spoofed the same stock over an extended period of time, also indicates that it was done at the direction of, or being facilitated by, the algorithm of a single decisionmaker. *See* ¶ 50.[25]

Defendants' related argument that Plaintiffs cannot rely on DTCC balances at all to infer that a Defendant traded in MULN shares is nonsensical. *See* MTD at 23  Specifically, Defendants suggest that Plaintiffs "concede" that DTCC balances "reflect all activity by all brokers and customers . . . whether or not the activity from those brokers and customers is attributable in any way to a Defendant." *Id*.  This is not the case.  Changes in DTCC account balances are "attributable . . . to a Defendant" because, as the Complaint explains, an increase in a DTCC account balance reflects transactions by the Defendant in Mullen's shares.  ¶ 34 n.12-

---

[24] Defendants complain that the Methodology fails to account for "pegged orders" because "if multiple market makers—including the Defendants—place pegged orders, when the national best bid or offer price fluctuates, all of the market makers' applicable pegged orders will simultaneously and automatically change." MTD at 22 n. 28. This is an obvious red herring because if *all* market makers' pegged orders were to change, no market maker would differ from any other.  But the Complaint identifies multiple indicia of scienter where Defendants' activity differed markedly from other market participants. *E.g.,* ¶ 69 (163.89% of shares created in sell-side orders cancelled by Defendants vs. 20% cancelled by other market participants).  Moreover, while pegged orders are not identified as such in the ITCH data, the Methodology only attributes the market participant identifier for a new deanonymized *sell* order to a new anonymized *buy* order (or a new deanonymized *buy* order to a new anonymized *sell* order) if they were sent in the same millisecond. ¶ 44.  A change in the best offer (or bid) would produce a change in pegged sell (or buy) orders only, which is insufficient for attribution.  Defendants' theory requires that the best bid *and* best offer change *simultaneously* in the *same millisecond*, causing pegged orders on both sides of the market to simultaneously update in that very same millisecond.  Not only is this theory highly improbable, it is inconsistent with the Complaint's detailed allegations of sell-side *asymmetry* in order cancellation rates. *E.g.,* ¶ 76 (Defendants IMC, UBS and Clear Street cancelled 99%, 26% and 39% more sell-side orders than buy-side orders).

[25] Defendants also argue that the Complaint improperly groups Defendants Clear Street LLC and its wholly owned subsidiary Clear Street Markets LLC as one actor.  However, publicly available information, and the allegations in the Complaint, make clear why it is appropriate to treat these two entities as one.  First, Clear Street Markets is under common control with Clear Street LLC.  FINRA, *BrokerCheck: Clear Street Markets LLC*, at *15, attached as Exhibit 2 to the Tountas Declaration.  While Clear Street Markets is the Nasdaq market making entity for whom Plaintiffs can identify from deanonymized order data, Clear Street LLC transacted in Mullen stock throughout the Relevant Period.  ¶¶ 34, 35.  Additionally, Clear Street Markets "maintains accounts, funds and securities at Clear Street LLC," and Clear Street LLC is the *only* entity at which Clear Street Markets maintains its accounts, funds, and securities.  FINRA, *BrokerCheck: Clear Street Markets LLC*, at *12.  The evidence available to Plaintiffs at this stage makes clear that Clear Street and Clear Street Markets function as a unified whole and are incentivized to spoof together to benefit their collective stock positions.

13. In other words, changes in a Defendant's DTCC daily positions provide Plaintiffs with a reasonable basis to infer that on the days on which the reports demonstrate a change in a Defendant's trading position, the same Defendant transacted in shares of MULN on that day. *See* ¶ 35 n.13.[26]

### D.    The Complaint's "Illustrative Examples" Of Spoofing Satisfy The Applicable Pleading Standard

Plaintiffs have listed comprehensively all of the trading activity they now believe to exhibit manipulative spoofing acts. *See* Ex. 1. And, in addition to the exhibit describing all such instances, Plaintiffs provide Illustrative Examples in the Complaint by detailing, for example, the date and time of the Spoofing Episode, the national best bid and offer, the timing and price range of Baiting Orders, the prices of Executed Purchases, and the change in DTCC balance of a Defendant before and after the Spoofing Episode. ¶¶ 94-156.

By combining the Complaint's detailed chart in Exhibit 1, with several Illustrative Examples that are discussed in the narrative of the Complaint, Plaintiffs have more than satisfied the applicable pleading standard. While Defendants complain that these detailed allegations "fail to provide any meaningful detail," they ignore the fact that numerous courts in this District have recognized otherwise. For example, in *Harrington II,* Judge Schofield recognized that "[i]t

---

[26] Defendants take particular issue with allegations relating to IMC because IMC "does not maintain an independent clearing account with DTCC" and plaintiffs use DTCC data for Goldman Sachs, IMC's clearing broker to infer IMC's trading activity. MTD at 23. As a result, Defendants claim that Plaintiffs "have absolutely no basis for their claims against IMC." MTD at 24 n. 30. Defendants misread the allegations, which are based not upon the DTCC data alone, but upon public Nasdaq TotalView ITCH data that shows unequivocally that IMC placed deanonymized orders in Mullen shares. Additionally, it is supported by the Methodology, which imputes anonymized orders to IMC. ¶¶ 33, 38-45. The DTCC data is used as further evidence that Defendants placed anonymized trades on spoofing dates (and to preempt any argument that Defendants "did not trade any shares of MULN," ¶ 37 n. 15) but is not the main "basis for [Plaintiffs'] claims." Similarly, Defendants' reference to data they provided to allegedly "disprove" Plaintiffs' spoofing claims is of no moment. *See* MTD at 24 n.32. The Complaint puts the veracity of that data in question. *See* ¶ 37 n.15. And, in any event, the data cannot contradict Plaintiffs' allegations at this stage since it is extraneous, not "integral," to the Complaint and a dispute exists regarding its accuracy and completeness. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016); *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir. 2006).

would be both unwieldy and unreasonable to require Plaintiff to proffer detailed descriptions of each alleged [spoofing] episode in order to plead a sufficient claim.  For this purpose, . . . illustrative examples and [an accompanying] chart are sufficient."  *Harrington II*, 2023 WL 6316252, at *6.

Indeed, as Judge Schofield explained, a complaint need only allege—precisely as the Complaint does here—"what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."  *Id*. at *6.  Numerous other courts are in accord.  *See, e.g.*, *Nw. Biotherapeutics*, 2023 WL 9102400, at *20 (finding "more than sufficient" examples "which detail[ed] . . . the date and time of the Spoofing Episode, the timing and price range of the Baiting Orders, the make-up of the Defendant's order book after the Baiting Orders, the timing and price of an Executing Purchase, and the amount of time that elapsed between the Executing Purchase and the cancellation of the Baiting Orders"); *Phunware*, 2024 WL 1465244, at *4 ("[The complaint] satisfies the requirement of pleading the scheme with particularity, by providing specific examples of six episodes of Defendant engaging in spoofing behavior, as described above.  Together, these allegations are sufficient to set forth, to the extent possible the conduct constituting market manipulation in light of the stage of proceedings." (citations and quotation marks omitted)).[27]

_____

[27]  Defendants claim that "[w]ith respect to a vast majority of Executing Purchases, Plaintiffs do not plead that Defendants purchased at an allegedly deflated price" and that "over 86% of the Executing Purchases were purportedly made at the same price as the alleged Best Offer."  MTD at 26.  This is not true.  The appearance of Defendants' trades being executed at the same price as the "Best Offer" occurs throughout Exhibit 1 to the Complaint where Mullen's share price was below $1.00.  This was a clerical error in the formatting of Exhibit 1.  At prices below $1.00, the prices were quoted in sub-penny increments, but when the amounts were printed in Exhibit 1, the third and fourth decimal places were inadvertently truncated.  A corrected copy of Exhibit 1 is attached to the Tountas Declaration filed herewith.  Likewise, Defendants' claim that "[f]or hundreds of alleged spoofing episodes in Exhibit 1, the alleged Baiting Orders were also priced *better* than the alleged Best Offer" misunderstands how markets work.  MTD at 26.  Because the price can (and often does) move around during the time constituting the spoofing episode (from Baiting Order through executed purchases), Baiting Orders may be placed at prices below

II.    **THE COMPLAINT ADEQUATELY ALLEGES A STRONG INFERENCE OF DEFENDANTS' SCIENTER**

"To establish scienter, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021) (citation omitted).  Courts "evaluate the sufficiency of a complaint's allegations of scienter 'holistically,' considering all of the facts alleged, taken collectively," to determine if the inference of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (citation omitted).

The burden of establishing scienter is lower in market manipulation cases "[b]ecause 'a claim of manipulation . . . involve[s] facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.'" *Harrington I*, 585 F. Supp. 3d at 418 (*citing ATSI*, 493 F.3d at 102) (reasoning that it would be "hard to fathom how any plaintiff could plead a market manipulation claim based on spoofing through high-frequency trading algorithms" if plaintiffs were held to a higher burden at this stage).

Here, the Complaint alleges that Defendants not only had a motive to commit fraud in order to accrue profits through their manipulation of MULN shares, but also that Defendants themselves consciously or recklessly (through their high-frequency trading algorithms) spoofed MULN shares throughout the Relevant Period.

---

the best offer that applied immediately before the executing purchase.  If such price movements occurred, the "Best Offer" price reported may appear worse than the executed trade price through only random chance.

### A.    The Complaint Alleges Defendants' Motive To Defraud

Motive and opportunity allegations typically require only "a concrete and personal benefit [] resulting from the fraud." *Nw. Biotherapeutics*, 2023 WL 9102400, at *24.  Plaintiffs in spoofing cases can adequately allege scienter by pleading that a defendant sought to take advantage of artificially depressed prices and thus had a pecuniary motive. *Id*.[28]  As detailed in the Complaint, Defendants profited from their spoofing scheme, which included **at least** the deployment of over 10,000 Baiting Orders.[29]  None of Defendants' arguments raise a more "compelling" "opposing inference[.]" *Id*. at *23.

**First,** Defendants contend that Plaintiffs cannot reconcile their motive allegations with their allegations that Defendants may have engaged in spoofing on behalf of their clients.  MTD at 27-28.  But it is irrelevant whether Defendants were directly profiting through their own accounts or indirectly through their clients.  And this same argument was rejected in *Nw. Biotherapeutics*, where the court recognized that "the possibility that Defendants may have traded for clients does not 'undercut the [FAC's] numerous allegations that Defendants designed and operated the algorithms that spoofed [Plaintiffs'] stock.'"  2023 WL 9102400, at *26

---

[28] In *Nw. Biotherapeutics*, the court found that by pleading such a scheme, Plaintiffs met their burden to plead "a concrete and personal benefit," that is more than a "generic profit motivation."  2023 WL 9102400, at *24. Defendants' claim that these allegations are "speculative and sparse" should be disregarded, as it fails to account for the reality (and established case law) of high-speed spoofing.  MTD at 31, 31 n. 40.  As Defendants' cases themselves demonstrate, the requirement for a plaintiff to allege "net profits," as opposed to proceeds, in establishing motive attaches only where such information is readily ascertainable for the plaintiffs, such as with regard to insider stock sales. *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 381 (E.D.N.Y. 2013); *Glaser v. The9 Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011).  Here, it is impossible to glean the amount of profits until discovery.  And, although the Defendants attempt to cite *Nw. Biotherapeutics* to support the proposition that profit is "measured by the price at which those shares were subsequently sold," the court there was not addressing whether the plaintiff was required to allege exact profits; indeed, it was not. 2023 WL 9102400, at *25.  Instead, the court rejected the defendant's own calculated profits, because, like here, "the true measure of the profitability of the alleged spoofing schemes" was "not at all clear" before discovery. *Id.*

[29] Though all Plaintiffs must plead is the motive to "take advantage of depressed prices," which is satisfied by alleging that Defendants wished to purchase MULN at artificially deflated prices, Plaintiffs go further, explaining how purchasing at depressed prices also allowed Defendants to close out short positions in MULN, yielding an immediate profit. ¶¶ 100, 109, 123, 138, 146, 155.

(quoting *Harrington I*, 585 F. Supp. 3d at 416); *see also Harrington II*, 2023 6316252, at *8

("Contrary to Defendants' representations, Plaintiff has offered a plausible economic rationale

for the alleged misconduct.  The SAC alleges that Defendants derived economic gain from the

spoofing scheme through 'paid transaction fees for completed customer trades,' hundreds of

thousands of dollars in saved execution costs for the baiting orders that were cancelled and 'at

least millions of dollars in ill-gotten gains.'").

    ***Second***, Defendants argue that the alleged profits already identified are "*de minimis*."

MTD at 28.  But, *Nw. Biotherapeutics* also rejected this argument, since it was the "very nature

of high frequency trading" that a market making defendant would have its algorithm spoof to

"'shav[e] off fractions of a cent in profit each time.'"  2023 WL 9102400, at *25 (quoting *Lim v.

Charles Schwab & Co.*, No. 15-CV-02074-RS, 2015 WL 7996475, at *2 (N.D. Cal. Dec. 7,

2015), *aff'd sub nom. Fleming v. Charles Schwab Corp.*, 878 F.3d 1146 (9th Cir. 2017)) ("While

profits from any single episode may be miniscule, spoofers can generate substantial returns by

repeating the scheme thousands of times across the same and different issuers' securities.").[30]

---

[30] In particular, the Court found that arguments that Defendants only made "de minimis" profits were unpersuasive since: (i) the "profits" that were calculated and proffered by defendants were generated from only a fraction of the alleged transactions; and (ii) the true price at which defendants sold the shares is unknown. *Nw. Biotherapeutics*, 2023 WL 9102400, at *25. Similarly, here, Defendants' calculations are incorrect because Defendants calculate profit only from the subset of *spoofing* activity that is alleged in the Complaint, rather than the entirety of Defendants' trading activity, which is known only to Defendants.  Further, the price at which Defendants began shorting MULN stock is unknown, and, therefore, the true profit from each trade is unknown at this stage of the litigation.  The cases Defendants cite where courts found no profit motive bear no resemblance to the profits alleged here due to Defendants' high-frequency trading.  Defendants string-cite several irrelevant fraud cases that bear no relationship to the profit motive of high-frequency trading relevant to this case.  *See* MTD at 30 n.38.  For example, in *In Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, 2022 WL 837114, at *20 (S.D.N.Y. Mar. 21, 2022), the court found no motive from the fact of a "four and a half million dollar[]" profit from a securities fraud scheme, but noted that its holding was "in context" of the overall facts, in which the defendant "lost far more on the shares he retained during the remainder" of the relevant period.  Similarly, in *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *9 n.22 (S.D.N.Y. Nov. 25, 2003), the Court found motive lacking where the alleged fraudulent scheme was to save $4.7 million in the defendant's efforts to buy pharmacies, when the defendant had access to "$79.3 million under its revolving credit facility" to do exactly that. *Id*.  Finally, *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 119 (S.D.N.Y. 2018) is a case regarding the short selling of a single stock with only a "general business motive to make a profit," in contrast to the sustained and widespread scheme made possible and intended by the high-frequency trading systems at issue here.

***Third***, Defendants claim that Plaintiffs' allegations do not support the "market-wide" profit motive—*i.e.*, that Plaintiffs do not allege that Defendants engaged in "constant spoofing transactions in hundreds of securities over a lengthy period of time" such that they could realize a profit.  MTD at 29.  To the contrary, the Complaint specifically alleges that Defendants' high-frequency trading algorithms facilitated spoofing across the market in hundreds of securities in order to aggregate smaller profits into larger ones.  ¶¶ 91-92.[31]  As courts in this District have recognized, this is a sufficient profit motivation to allege scienter, since even where the spoof of an individual security would not be very profitable, the overall strategy would *guarantee* that a market maker is increasing its profits across its global trading activity.  *Harrington I*, 585 F. Supp. 3d at 418 ("their profits would be increased, or losses decreased, by the difference of the price they paid versus the price they would have paid had they not engaged in spoofing").  Moreover, because the Methodology only permits attributing a subset of anonymized order flow to Defendants (namely, those orders submitted at the same nanosecond or millisecond as deanonymized orders), only discovery will reveal the full extent to which Defendants' high-frequency algorithms engaged in spoofing—which is likely to show far greater profits.

***Fourth***, while the Complaint adequately alleges that Defendants profited from closing out preexisting short positions, Defendants claim it was not alleged as part of the spoofing episodes.  MTD at 30.  That is because closing short positions on artificially deflated shares is not part of the spoofing activity itself but, instead, provides a *motive* to engage in that spoofing.

---

[31] Notably, Defendants try to differentiate *Nw. Biotherapeutics* on the grounds that the argued *de minimis* total profit there was $94,485.68, whereas here, it would be (according to Defendants' self-serving calculations) "$3,730.78, a tiny fraction of that amount."  MTD at 29 n.36.  Once again, Defendants hide the ball: In *Nw. Biotherapeutics*, the total was "$94,485.68, total between the seven Defendants, over a five-year period" or "less than $3000 per year" per defendant.  2023 WL 9102400, at *24.  Here it is three defendants over less than two years, so the total per Defendant, even by Defendants' math, is an average of $1,243.59—not a "tiny fraction" of the amount in *Nw. Biotherapeutics*.

¶ 30.  *See*, *e.g.*, *Harrington II*, 2023 WL 6316252, at *5 (describing as spoofing scheme that defendants placed baiting orders, "effected near-simultaneous executing orders," and immediately cancelled the baiting orders).  In any event, at this stage of the litigation, Plaintiffs need not plead more than a "plausible economic rationale"; whether it was "ultimately economically rational is a matter to be explored at summary judgment or trial."  *Harrington II*, 2023 WL 6316252 at *8.[32]

### B.    The Complaint Adequately Alleges Conscious Misbehavior And Recklessness

The Complaint also adequately alleges scienter through Defendants' conscious misbehavior or recklessness, which should be viewed "holistically and together with the allegations of motive and opportunity."  *Harrington II*, 2023 WL 6316252, at *6.  "In a market manipulation case, the scienter and manipulative acts inquiries overlap[,]" such that courts consider "the same 'indicia' or 'hallmarks' of spoofing analyzed above in relation to the manipulative act element."  *Nw. Biotherapeutics*, 2023 WL 9102400, at *26 (*citing Harrington II*, 2023 WL 6316252, at *6-7) (finding scienter plead based on the indicia); *see*, *e.g.*, *Harrington I*, 585 F. Supp. 3d at 417 (same); *Phunware*, 2024 WL 1465244, at *5 (same).

As explained above, Plaintiffs allege that Defendants flooded the market with over 10,000 Baiting Orders, placed and executed orders on the buy side of the Limit Order Book at artificially deflated prices, and subsequently cancelled the Baiting Orders.  ¶ 54.  This irregular

---

[32] Defendants also take issue with the "handful" of examples of closing out short positions and the purportedly small profits in those examples, continuing to ignore the irrelevance of these arguments at this stage of the litigation.  *See* MTD at 30-31.  Defendants contend that the court should ignore the short-selling allegations in the Complaint because *Nw. Biotherapeutics* did not place weight on "hypothetical" short-selling allegations.  MTD at 31 n. 39 (citing 2023 WL 9102400, at *5 n.9.).  They are wrong.  In *Nw. Biotherapeutics*, the allegations were actually "hypothetical," since the complaint only calculated what a return could be "if" there had been a short position.  2023 WL 9102400, at *5 n.9.  Unlike this case, the plaintiff "never allege[d] that Defendants engaged in such short sales[.]"  *Id.*

trading activity exhibited "a rapid, unnatural reversal of trading direction," and a divergence

from normal market making, including through:

- the irregular amount of shares in cancelled Baiting Orders relative to Executed Purchases, ¶¶ 67-68, 70, 72, 73, 75;

- the high concentration of cancelled sell orders during Spoofing Episodes, ¶¶ 69-70;

- the stark contrast between executed purchases and median executed sell orders and the stark contrast between the size of cancelled Baiting Orders and executed sell-orders, ¶¶ 74, 85-87;

- the brief time period between placement and cancellation of Baiting Orders, ¶ 83;

- the fact that Defendants did not execute roughly comparable amounts of purchases and sales, ¶ 76; and

- the fact that Defendants were less likely to aggressively price sell orders after Executing Purchases, ¶¶ 77-78.

"Taken together, this is enough to raise a strong inference that Defendant[s] w[ere]

consciously engaging in spoofing, rather than legitimate market activity, satisfying the element

of scienter."[33]  *Phunware*, 2024 WL 1465244 at *5.  Additionally, as Judge Ho reasoned in

*Phunware*:

> The Complaint's allegation regarding the use of algorithmic trading
> practices goes to the overall context of Defendant's behavior.  Their
> use may suggest either consciousness (*i.e.*, the programs were
> designed to engage in spoofing strategies, *see* [*Harrington I*], 585 F.
> Supp. 3d at 416) or recklessness (*i.e.*, the programs were designed
> highly unreasonably and in an extreme departure from the
> applicable standards of care to avoid spoofing, to the extent the risk

---

[33] Defendants claim that Plaintiffs' allegations "are nothing more than descriptions of common activities of broker-dealers." MTD at 33.  This exact argument was rejected in *Phunware*, where, as here, the Plaintiffs alleged myriad ways in which the "Defendants' behavior trading [MULN] departed from that of a *bona fide* market maker."  2024 WL 1465244, at *5-6.  For the same reason, Defendants' argument that "reliance on the placement of 'Baiting Orders' to establish scienter is circular," MTD at 33 (which they also recycle from their futile manipulative act argument, MTD at 13-14), fails.  As in *Phunware*, which rejected an identical argument, the identification of Baiting Orders is not circular where "the Complaint includes allegations beyond the mere placement of orders that were later cancelled . . .[and specifically,] that the spoofing episodes it describes were anomalous, based on, among other things, the timing and large increase in the number of overall sell-side orders and cancelled sell-side orders per executed purchase, and Defendant['s] behavior following the episodes, in which it did not aggressively price sell-side orders to flatten its inventory."  2024 WL 1465244, at *5; *see supra* Section I.A.

> of spoofing was known to Defendant or so obvious Defendant
> should have known, *see In re Carter-Wallace, Inc., Sec. Litig.*, 220
> F.3d 36, 39 (2d Cir. 2000)) with respect to the misbehavior alleged.
> *Id.* at *6; *see also United States v. Coscia*, 866 F.3d 782, 797 (7th
> Cir. 2017) (describing algorithm designed to spoof as "substantial"
> "evidence supporting the existence of a fraudulent intent").
> Accordingly, Defendants rehash many of the same failing
> arguments they used to challenge the indicia, which are equally
> unavailing here.

*Id.* at *7.

Nevertheless, Defendants try to distance themselves from this precedent by baselessly protesting that the Methodology is "conjecture on top of conjecture" and complain that Plaintiffs fail to "provid[e] a factual basis for scienter for each defendant." MTD at 32-33. This is untrue—the Complaint sets forth a series of highly particularized indicia of spoofing, as described above, and ties those indicia to each Defendant, including in the charts and in the Illustrative Examples described therein. ¶¶ 94-156

Defendants also argue that because the cancellations of Baiting Orders described in the Illustrative Examples only began within milliseconds, but were only completed "two to four minutes later," the allegations describe cancellations "significantly longer than allegations that courts have found may be indicative of spoofing activity."[34]  MTD at 35 (citing *Coscia*, 866 F.3d at 787). On this point, Defendants only cite the Seventh Circuit's hypothetical example of spoofing in the *commodities* market, rather than the securities market as is the case here. *See Coscia*, 866 F.3d at 786-87. Indeed, the *Phunware* court flatly rejected the defendant's argument

---

[34] Defendants also claim incorrectly that "Plaintiffs admittedly have not matched orders and cancellations, and thus have not actually pleaded the length of time between the placement and cancellation of any particular order." MTD at 34. Because the economic impact is the same, there is no need for the cancellation to be of the same exact order in order for there to be a spoof. ¶ 95 n. 47 ("The market impact of a Baiting Order is the same regardless of whether the Defendant who placed it cancelled that specific Baiting Order or an equivalent order placed by that Defendant on Nasdaq."); *see Nw. Biotherapeutics*, 2023 WL 9102400, at *16 n.17 ("courts have viewed order modifications as manipulative conduct in spoofing cases").

that a spoofing episode in its entirety cannot last as long two minutes.  2024 WL 1465244 at *6 ("[A]lthough many spoofers cancel their orders within fractions of a second of placing them, Defendant identifies no authority that a claim based on spoofing must allege cancellations of the baiting orders within milliseconds.").[35]

Lastly, Defendants argue that Plaintiffs fail to show "that any agent's or employee's intent can be imputed to any of the Defendants," MTD at 35-36, but, yet again, this exact argument was rejected (twice) in *Harrington.  See Harrington I*, 585 F. Supp. 3d at 418 ("Defendants argue that the Complaint needs to plead additional facts regarding Defendants' algorithmic trading programs and the corporate officials who designed or oversaw those programs. Defendants' argument is unfounded . . . If Defendants' argument were correct, it is hard to fathom how any plaintiff could plead a market manipulation claim based on spoofing through high-frequency trading algorithms."); *Harrington II*, 2023 WL 6316252 at *8 (finding the same argument "unfounded once again" for the same reasons).  The Court should not accept Defendants' third bite at creating unsubstantiated case law in spoofing cases.

## III.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

"[C]ourts in this District have historically evaluated loss causation under the notice pleading standard of Rule 8 . . . In keeping with the prevailing practice of this District, a short and plain statement that provides the defendant with notice of the loss and its causal connection to the alleged misconduct is therefore sufficient to assert loss causation[.]"  *Sharette*, 127 F. Supp. 3d at 80.  This burden is "not a heavy one," and Plaintiffs easily satisfy it here.

---

[35] Defendants curiously assert that even if "cancellation speed [were] a relevant factor in analyzing intent[,] [courts] have not relied **solely** on that factor" and fault the Plaintiffs for "hav[ing] not properly pled any such additional indicia that might suggest a lack of intent to execute the Baiting Orders." MTD at 35 n. 47 (citing cases).  It is not clear what Defendants are referring to as Plaintiffs have alleged a multitude of other indicia of spoofing.  *See supra* Section I.A.

*DoubleLine Cap.*, 413 F. Supp. 3d at 212. Defendants argue the Complaint: (i) fails to satisfy the applicable pleading standards; (ii) fails to allege a "price reversion" in MULN stock; and (iii) purportedly relies upon "group pleading." Each of these arguments fails.

### A.      The Complaint Satisfies The Applicable Pleading Standards

Only notice pleading is required for loss causation. *See Sharette*, 127 F. Supp. 3d at 80 ("[A] short and plain statement that provides the defendant with notice of the loss and its causal connection to the alleged misconduct is therefore sufficient to assert loss causation; pleading the elements with particularity is not required."); *In re Citigroup Sec. Litig.*, 753 F. Supp. 2d 206, 234 (S.D.N.Y. 2010) ("Loss causation need not be pled with particularity. A short and plain statement in accordance with Rule 8 of the Federal Rules of Civil Procedure is sufficient."). The Complaint alleges loss causation in two independently adequate ways: (i) by pleading a strong "factual basis that would justify an inference that the market price was still artificial by the time [Plaintiffs] traded" (the "long-term impact" theory, *infra* Section III.A.1), and (ii) by pleading that Plaintiffs traded "so close in time to Defendants' spoofing as to permit [the Court] to infer as a matter of common sense that the market prices were artificial when [Plaintiffs] traded" (the "temporal proximity" theory, *infra* Section III.A.2). *Gamma Traders*, 41 F.4th at 80.

Defendants do not argue that they have not been put on notice of the alleged loss and its causal connection to the alleged misconduct. Instead, Defendants claim that Plaintiffs fail to meet a higher "exacting Second Circuit standard for alleging loss causation in spoofing cases." MTD at 40. Defendants' argument stems from a misreading of *Gamma Traders*. For one, *Gamma Traders* involved spoofing in commodities, not securities. Moreover, there, the court faulted the plaintiff for failing to "plead, even in general terms" any "facts that support an inference of actual injury," including "when its own trades took place." *Gamma Traders*, 41 F.4th at 81. These faults are not present here, as the Complaint alleges the *exact dates and times*

when each Plaintiff sold shares at a market price artificially depressed by Defendants' spoofing. These allegations support an inference of loss causation under both *Gamma Traders* theories.

### 1.    The Complaint Alleges A Long-Term Impact On MULN's Price

Plaintiffs have sufficiently alleged a long-term impact on Mullen's stock price. The data outlined in the Complaint shows how "the placement and cancellation of Baiting Orders throughout the Relevant Period had the cumulative effect of driving [MULN] down during the Relevant Period." ¶ 180; *see also* ¶¶ 159-69. The Complaint presents a detailed quantitative analysis of intraday share-price changes after Defendants' spoofing episodes, which shows how "the average price impact of the Spoofing Episodes persist[ed] up to and even beyond an entire trading day and d[id] not revert within that time." ¶¶ 181-86. This analysis specifically shows that "[t]he sustained, repetitive, and continuous stream of Defendants' spoofing had a persistent long-term negative impact on the price of Mullen shares." ¶¶ 188-89.[36]

In demonstrating the long-term price impact through this detailed quantitative analysis, the Complaint explains, in-depth, why spoofing can, and did, "have a lingering impact on the price of [MULN]," including by referencing the scholarship of Professor Paul Milgrom (the "Milgrom Report"). ¶¶ 159, 161-69.[37] Defendants criticize the Milgrom Report as "irrelevant"

---

[36] While Defendants state that these are "identical conclusory allegations" to those in *Nw. Biotherapeutics* and *Phunware*, they are nowhere close. As explained below, *infra* Section III.B, *Nw. Biotherapeutics* was distinguishable because the plaintiff in that case relied on a theory of spoofing in which the defendants relied on a full "reversion of prices to the market level." 2023 WL 9102400, at *32. Specifically, the plaintiff relied on this theory to support their allegations that the defendants "placed lopsided buy orders" to profit off the spoof. *Id.* at *33. Further, in that matter, the plaintiff's share price had, in fact, "more than doubled over the Relevant Period," rather than sustained a long-term decrease. *Id.* at *32-33. *Phunware* similarly involved a long-term impact "at odds with the Complaint's allegations of how Defendant profited from its spoofing activity" and several actually "conclusory" statements, by which the plaintiffs merely alleged "cumulative effect" without supporting factual information like that alleged here. 2024 WL 1465244 at *7.

[37] Courts consistently credit such statistical scholarship in the context of loss causation. *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 488 (S.D.N.Y. 2022) (upholding expert testimony on loss causation which examined whether industry factors had a "statistically significant impact on movements in [the] stock price"); *U.S. v. Gushlak*, 728

and, citing *Phunware* and *Nw. Biotherapeutics*, urge the Court to disregard it.  In those cases, however, the Milgrom Report was not considered because it was not attached for the court to "review it for itself."  *E.g.*, *Nw. Biotherapeutics*, 2023 WL 9102400, at *31-32, n. 31.[38]  The Complaint here not only attaches it, but explains in detail the logic underlying the Milgrom Report (and other supporting scholarship), and explains why such logic applies equally to spoofing.  ¶¶ 161-169; *see* Ex. 5.  These detailed allegations explain why market manipulation, including the spoofing alleged in the Complaint, can have a long-term price impact.[39]

The lingering impacts of spoofing are not a novel allegation.  Judge Schofield, in *Harrington I* for example, recognized that "[t]he Complaint actually alleges that each spoofing event had a lingering effect over the Relevant Period," and explicitly held that "[i]t would not be proper to draw the inference sought by Defendants—that individual spoofing events cannot have a long-term cumulative effect on the price of a stock—at the motion to dismiss stage."  585 F. Supp.3d at 419.[40]  *See also Harrington II*, 2023 WL 6316252, at *8  ("[W]hen spoofing events

---

F.3d 184, 199 (2d Cir. 2013) (upholding loss analysis which evaluated industry control by examining statistical significance).

[38] *See Nw. Biotherapeutics*, 2023 WL 9102400 at *31-32, *32 n. 31 (questioning the relevance of the complaint's "quotes" from the Milgrom Report given that "it was an antitrust action" and declining to consider it because it was not attached for the Court "review it for itself") and *Phunware*, 2024 WL 1465244 at *7 (relying on *Nw. Biotherapeutics*' reasoning).

[39] Reasons for long-term price impact of manipulative trades include because:  (i) "manipulative trades are viewed by the market participants as potentially informed, and potentially informed trades can result in permanent price impact;" (ii) market participants would treat the trades of Defendants—among the "largest market participants," with "powerful incentives to be well-informed"—as "potentially informed;" (iii) there is "no symmetry in the manipulative trade and its unwinding," and "the upward effect can be expected to exceed the downward effect from unwinding," and the "difference between the sell-side and buy-side pressure yields a persistent and 'permanent' price impact;" (iv) manipulators have an incentive "to conceal their intent;" and (v) as "extensive economic literature" shows that "order cancellations drive the price up by less than new orders drive the price down" and spoofing causes actual trading because the Baiting Orders "induce other market participants to sell shares at artificially depressed" prices, and that this effect is not limited to "same-day effects."  ¶¶ 161-69.

[40] In fact, in a non-spoofing case, even the Second Circuit has recognized that, without discovery, it would be improper to conclude that any artificial inflation would necessarily be resolved, over time, by an efficient market.  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 234 (2d Cir. 2014) ("We cannot conclude, as a matter of law and without discovery, that any artificial inflation . . . was resolved by an efficient

occur continuously throughout the day and continue without interruption over a protracted period of time, the price of a spoofed security will generally not fully recover to the price that existed prior to the spoofing events.  Over time, Defendants' placement of baiting orders caused the collapse of Concordia's share price[.]").[41]

Lastly, in an attempt to deflect, Defendants blast Mullen and its management team as "failing," citing cherry-picked negative coverage that can be found on the internet for any company.  MTD at 42-43.  Defendants' mudslinging fails.  Though Defendants cite *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (cited at MTD at 43), noting a "tangle of factors affecting price," they ignore that courts have recognized this language as limited to "transactions involving allegations of inflated share prices" as a result of a misrepresentation. *See Stanley Black & Decker, Inc. v. Gulian*, 70 F. Supp. 3d 719, 729 (D. Del. 2014).  That is not Plaintiffs' allegation here.  As the Complaint makes clear through graphical evidence of the decline in the price of MULN, "news about Mullen or other firm-specific events cannot explain these price declines," because such events "would need to occur at exactly the same time as the Spoofing Episodes."  ¶¶ 182-84 (emphasis added).

---

market[.] . . . The efficient market hypothesis, premised upon the speed (efficiency) with which new information is incorporated into the price of a stock, does not tell us how long the inflationary effects of an uncorrected misrepresentation remain reflected in the price of a security. . . in general, so long as the falsehood remains uncorrected, it will continue to taint the total mix of available public information, and the market will continue to attribute the artificial inflation to the stock, day after day.").

[41] Though the court in *Nw. Biotherapeutics* distinguished *Harrington II*'s relevance to the plaintiff's long-term loss causation arguments, it based its distinction in large part on the fact that in *Harrington* (like here, but unlike *Nw. Biotherapeutics*) the price of the spoofed stock declined continuously over the relevant period.  2023 WL 9102400 at *34. Additionally, the Court held that plaintiffs could not rely on *Harrington II* (which was decided without benefit of *Gamma Traders*) where they failed, unlike here, to reconcile their long-term price impact allegations with allegations of a full "reversion of prices to the market level" and the fact that their stock price "more than doubled." *Id*. at *33; *see infra* Section III.B.

### 2.    The Complaint Sufficiently Alleges Temporal Proximity

Beyond the Complaint's adequate allegations regarding the long-term price impact of Defendants' spoofing, loss causation is also adequately alleged because, per the Complaint, Defendants traded "so close in time to Defendants' spoofing as to permit us to infer as a matter of common sense that the market prices were artificial when [Plaintiffs] traded." *Gamma Traders*, 41 F.4th at 80.

Defendants contend, with no support, that "[b]ecause the effects of spoofing last mere seconds, Plaintiffs temporal proximity must fail." MTD at 43-44.[42]  In *Gamma Traders*, the Second Circuit reasoned that "pleading same-day, post-spoof trades does not justify an inference of injury without any factual allegations to support the inference that the effects of the spoof linger for the remainder of the trading day." 41 F.4th at 80.  But as *Nw. Biotherapeutics* recognized, *Gamma Traders* never went so far as to require that Plaintiffs have traded within "mere seconds" of the Spoofing Episode, as Defendants argue here.  2023 WL 9102400, at *30 ("According to Defendants, the sale must have occurred within, 'at most, one to two minutes' of the Spoofing Episode for the requisite causal connection to exist . . . But *Gamma Traders* does not go that far, nor do Defendants cite to any authority supporting their proposed bright-line rule. Indeed, the court in *Gamma Traders* recognized that ordinarily 'the effects of spoofing pose questions of fact.'") (citing 41 F.4th at 80).  Rather, the *Nw. Biotherapeutics* court only

---

[42] Defendants argue that "economics journals indicate that markets react to an order (or the absence thereof) within **13 seconds** on average." MTD at 44.  The only "economic journal" they cite is Nikolaus Hautsch & Ruihong Huang, *The market impact of a limit order*, 36 J. OF ECON. DYNAMICS & CONTROL 501, 511 (2012).  But that article is not a study of spoofing, and it refers only in passing to a prior 2009 study on spoofing from the Korean markets. In any event, Defendants have the article's conclusion backward.  The study finds that limit orders have a "highly persistent" effect on prices.  In particular, the article explains that "both ask and bid tend to significantly increase (decrease) after the arrival of a buy (sell) limit order" and "quotes converge to a (new) **permanent** level at which the information content of the incoming limit order is completely incorporated."  *Id.* at 511.  The study further emphasizes that the "significant **permanent** impact induced by an incoming limit order indicates that it contributes to price discovery." *Id.* at 512 (emphasis added).

dismissed certain Spoofing Episodes that were "from four to more than six hours before the end of the trading day."[43]  *Id*. at *31.

Here, however, the Complaint includes specific allegations of sales of shares at prices determined within minutes of Defendants' spoofing activity—well within the range recognized by the court in *Nw. Biotherapeutics*.  Ex. 2 (listing numerous sales by Plaintiff Mullen at closing prices on days where Spoofing Episodes occurred one hour before close of trading (single stars) and 15 minutes before the close of trading (double stars)); Exs. 3-4 (listing numerous sales by Plaintiffs Khorrami and Cha in open-market transactions within hours and minutes of Spoofing Episodes).  Furthermore, unlike *Nw. Biotherapeutics,* the Complaint here specifies the exact pricing formula for Plaintiff Mullen's sales: "at the closing price of Mullen shares on the Pricing Date." ¶ 175.

## B.    The Complaint Need Not Allege "Price Reversion"

According to Defendants, to allege spoofing, Plaintiffs must plead a full "price reversion," such that "any price impact from the Baiting Orders would have dissipated promptly after those orders were cancelled."  MTD at 37-38.  Yet, this is not the spoofing theory alleged by Plaintiffs and is not always the economic reality caused by spoofing.[44]

In *Nw. Biotherapeutics*—the sole spoofing case Defendants cite for their argument—the plaintiffs alleged a full "reversion of prices to the market-level," which the Court found

---

[43] The court in *Nw. Biotherapeutics* ruled that the plaintiff's sales which occurred somewhere beyond "four to more than six hours" after the spoofing episode were too far away in time to allege an effect from the spoofing episode, not any sale "more than an hour after" the spoof, as Defendants incorrectly argue.  2023 WL 9102400, at *31; *see* MTD at 44.

[44] The effect of spoofing on a stock like MULN can be compared to dribbling a basketball.  When the basketball is removed from the box, it has a healthy and consistent bounce, returning to the height of the player's hand with *almost* as much speed as it left.  (Even then, if not dribbled with force, but merely dropped, the basketball will rebound, but not all the way back up.)  After a period of time of continued dribbling, the air slowly leaks out, causing the ball to lose bounce, and the rebound to lose speed and velocity with every continued bounce.  When a completely deflated ball is dropped to the ground, it stops rebounding entirely.

inconsistent with the allegation that the stock price was permanently damaged.  2023 WL 9102400, at *32-34.  But here, Plaintiffs do not make any similar allegations and, instead demonstrate that Defendants' spoofing had a long-term negative impact on the price.  Similarly, Plaintiffs do not allege, as the *Nw. Biotherapeutics* plaintiff did, only a "typical" spoofing-and-profit pattern, *see id.*, in which Defendants profited only from a price reversion.  Instead, as set out above, Plaintiffs allege a broader range of profits from the spoofing scheme, including that by closing out short positions in MULN, Defendants netted a profit immediately upon executing the Executed Purchases at a deflated price, regardless of any potential rebound.  ¶¶ 90, 100, 109, 123, 131, 138, 146, 155.[45]

Indeed, "price reversion" is not guaranteed with spoofing.  As alleged in the Complaint, peer-reviewed research has found that order cancellations drive the price up by less than new orders drive the price down.  ¶ 168.  As a result, the impact of Baiting Orders is not likely to dissipate merely because those orders were subsequently cancelled.  *Id.*

### C.    *The Complaint Does Not Utilize Group Pleading*

Defendants also claim that "extreme group pleading allegations," make it "impossible" to attribute Plaintiffs' losses to Defendants.  MTD at 39.  This recycled argument has been rejected

---

[45] Defendants rely on two out-of-circuit cases to argue that Plaintiffs "cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation."  MTD at 39 (citing *Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014)).  Neither is relevant to this case.  As other courts have noted, *Meyer* is "far from clear" and discussed the narrow "fact that seemingly quantitative information in a power point presentation on which the plaintiffs placed great significance was already known to the market from public sources."  *Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 488 n.6 (E.D. Pa. 2022).  Accordingly, *Meyer* proves nothing, as the "determination of the relevant window [of market impact] depends upon the specific evidence" in each case.  *Id.* at 488.  *Bricklayers* also is entirely distinguishable.  A summary judgment decision, the District of Massachusetts found that evidence in the form of an event study relied upon by the plaintiffs ignored the efficient market theory entirely in attributing losses to analyst reports reporting negative information, even though the negative information was known to the market many "days earlier [than the reports' publication] without any corresponding impact."  853 F. Supp. 2d at 189-90.  This case, at this stage, is not similar.

by other courts in this District in other spoofing cases.  In *Harrington I*, for instance, the Court rejected as "unconvincing" the defendants' argument that "the Complaint engage[d] in impermissible group pleading as to loss causation."  585 F. Supp. 3d at 419.  Similar to the Complaint here, "the [*Harrington I*] case [was] one of market manipulation and not misstatements, and the misconduct allegedly committed by each Defendant [was] of such a like character and so frequent that it would be improper to infer, at this stage of the litigation, that one Defendant contributed disproportionally to the damages alleged."  *Id.*  Precisely like the Complaint here, Judge Schofield recognized that this "is particularly true [where] the Complaint alleges a cumulative effect, in part, because spoofing events by different Spoofing Defendants occurred continuously throughout the day and . . . without interruption over a protracted period of time."  *Id.*; *see also Harrington II*, WL 6316252 at *8 (rejecting defendants' argument "that Plaintiff engages in impermissible group pleading as to loss causation").[46]

## IV.    THE COMPLAINT PLEADS A CLAIM FOR COMMON LAW FRAUD

For the same reasons outline above, Plaintiffs adequately plead a claim for common law fraud.  *Dover Ltd.*, 423 F. Supp. 2d at 327 ("The elements of common law fraud are [] essentially the same as those which must be alleged in order to establish a claim under Section 10(b) and Rule 10b–5.").

---

[46] In rehashing the argument that "Plaintiffs admit that there is a 14% likelihood that their order and trade allegations are misattributed to the Defendants," Defendants betray their misunderstanding of the Methodology.  In fact, because the 86% conservative baseline certainty rate reached by Plaintiffs was only the "average *daily* likelihood," sequential imputation over the course of many dates identifying Defendants would render it impossible that Defendants *did not* spoof.  ¶ 44 ("[T]he high certainty rate among deanonymized orders indicates that the Methodology is reliably inferring the market participants behind anonymized orders.  Indeed, with accuracy rates this high**, the likelihood that at least one of the imputations will be correct crosses the 99% (average) threshold with only three imputations**.").  *See supra* Section I.C.

As an initial matter, Defendants cite *Harrington I* in support of their argument to dismiss Plaintiffs' common law fraud claim.  There, however, the plaintiff "fail[ed] to respond to Defendants' argument," resulting in dismissal of the claim.  585 F. Supp. 3d at 424.

Defendants here argue that Plaintiffs do not allege any "material misstatements or omissions" because "trading activity is not a misrepresentation or omission."  MTD at 46.  But Plaintiffs detail how the Baiting Orders were used to "send false and misleading pricing signals"—*i.e.*, a misrepresentation—to other market participants.  ¶ 58.  This is sufficient for the Court to reject Defendants' bid for dismissal of the common law fraud claim.

## CONCLUSION

The Court should deny Defendants' motion to dismiss in its entirety.[47]

Dated:   New York, New York
         August 2, 2024

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: _____

Stephen W. Tountas
Andrew L. Schwartz
Andrew W. Breland
William W. Taub
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
stountas@kasowitz.com
aschwartz@kasowitz.com
abreland@kasowitz.com
wtaub@kasowitz.com

*Attorneys for Plaintiffs*

---

[47] In the event the Court grants any part of Defendants' motion, Plaintiffs seek leave to re-plead their claims. *Garcia v. 2390 Creston Realty LLC*, 2024 WL 2959254, at *6 (S.D.N.Y. June 11, 2024) ("Given that this is the first pleading for which motion practice occurred, the Court grants Plaintiff leave to file a Second Amended Complaint.")