# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MULLEN AUTOMOTIVE, INC., HYON CHA, and SHAYAN KHORRAMI,

        Plaintiffs,

vs.

IMC FINANCIAL MARKETS, CLEAR STREET MARKETS LLC, CLEAR STREET LLC, UBS SECURITIES LLC, and JOHN DOES 1 THROUGH 10,

        Defendants.

No. 1:23-cv-10637 (LLS)

---

## DEFENDANTS' JOINT REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

**CAHILL GORDON & REINDEL LLP**
Herbert S. Washer
Tammy L. Roy
32 Old Slip
New York, NY 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
troy@cahill.com

*Attorneys for UBS Securities LLC*

**MORRISON & FOERSTER LLP**
Anthony S. Fiotto
Mitchell Feldman (*pro hac vice* forthcoming)
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 648-4774
Facsimile: (617) 830-0142
afiotto@mofo.com

Eric D. Lawson
250 West 55th Street
New York, NY 10019
Telephone: (212) 336-4067
Facsimile: (212) 468-7900
elawson@mofo.com

*Attorneys for Clear Street Markets LLC and Clear Street LLC*

**PAUL HASTINGS LLP**
Jennifer L. Conn
Zachary Melvin
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6004
Facsimile: (212) 319-7004
jenniferconn@paulhastings.com
zacharymelvin@paulhastings.com

Ryan P. Phair
Robert A. Silverstein
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1751
Facsimile: (202) 551-0251
ryanphair@paulhastings.com
robertsilverstein@paulhastings.com

*Attorneys for IMC Financial Markets*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 2

I.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE EXCHANGE ACT .............. 2

      A.      Plaintiffs Fail To Adequately Allege a Manipulative Act by Any Defendant........ 2

            1.      Plaintiffs Have Not Adequately Alleged Purported "Spoofing Indicia" .... 3

            2.      Plaintiffs' Aggregation of the Trading of Each Defendant, and Many
                Others, Does Not Properly Plead a Pattern of Trading.............................. 7

            3.      Plaintiffs' "Probabilistic Imputation" Methodology Has Not Been
                Accepted By Any Court and Is Highly Speculative ................................. 10

            4.      Plaintiffs' "Illustrative Examples" of Alleged Spoofing Episodes Do Not
                Properly Plead a Manipulative Act ........................................................ 14

      B.      Plaintiffs Have Failed To Adequately Allege a Strong Inference of Scienter ...... 15

            1.      Plaintiffs Have Not Adequately Alleged Any Motive to Defraud............ 16

            2.      Plaintiffs Have Not Adequately Alleged Conscious Misbehavior or
                Recklessness ...................................................................................... 20

      C.      Plaintiffs Fail to Adequately Allege Loss Causation............................................ 22

            1.      Plaintiffs' Loss Causation Allegations Are Fundamentally Inconsistent
                With Their Spoofing Claims.................................................................. 23

            2.      Plaintiffs Fail to Address the Egregious Group Pleading in the Amended
                Complaint............................................................................................ 25

            3.      The Opposition Confirms that Plaintiffs Have Failed to Meet the Second
                Circuit's Loss Causation Requirements for Spoofing Cases ................... 26

                  a.      Plaintiffs Fail to Allege Long-Term Price Impact ........................27

                b.      Plaintiffs Fail to Allege Temporal Proximity ...............................29

II.     THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE ...... 31

CONCLUSION..................................................................................................................... 32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alki Partners, L.P.* v. *Vatas Holding GmbH¸*
769 F. Supp. 2d 478 (S.D.N.Y. 2011).........................................................................16

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..................................................................2, 10, 16, 20n

*In re Bystolic Antitrust Litig.*,
583 F. Supp. 3d 455 (S.D.N.Y. 2022).......................................................................8n

*In re Citigroup Auction Rate Sec. Litig.*,
700 F. Supp. 2d 294 (S.D.N.Y. 2009).....................................................................18n

*In re Crude Oil Commodity Litig.*,
2007 WL 2589482 (S.D.N.Y. Sept. 8, 2007)............................................................31

*Dura Pharm., Inc.* v. *Broudo*,
544 U.S. 336 (2005)..................................................................................................29

*Gamma Traders - I LLC* v. *Merrill Lynch Commodities, Inc.*,
41 F.4th 71 (2d Cir. 2022) ............................................................... *passim*

*Green* v. *Covidien LP*,
2021 WL 1198833 (S.D.N.Y. Mar. 30, 2021) ..........................................................31

*Harrington Glob. Opportunity Fund, Ltd.* v. *CIBC World Markets Corp.*,
2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023)................................................ *passim*

*Howell* v. *Port Chester Police Station*,
2010 WL 930981 (S.D.N.Y. Mar. 15, 2010) .............................................................32

*Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l, Inc.*,
309 F. Supp. 3d 100 (S.D.N.Y. 2018).......................................................................22

*In re London Silver Fixing Ltd., Antitrust Litig.*,
332 F. Supp. 3d 885 (S.D.N.Y. 2018).......................................................................23

*Kessev Tov, LLC* v. *Doe(s)*,
2022 WL 2356626 (N.D. Ill. June 30, 2022) .............................................................3n

*Mangrove Partners Master Fund, LP* v. *683 Capital Partners, LP*,
2020 WL 7335313 (S.D.N.Y. Dec. 14, 2020) ...........................................................13

*Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC,*
    2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023) ............................................................... *passim*

*Phunware, Inc.* v. *UBS Securities LLC,*
    2024 WL 1465244 (S.D.N.Y. Apr. 4, 2024).................................................................. *passim*

*Schuyler* v. *City of New Rochelle,*
    2024 WL 167289 (S.D.N.Y. Jan. 16, 2024) .........................................................................31

*Stanley Black & Decker, Inc.* v. *Gulian,*
    70 F. Supp. 3d 719 (D. Del. 2014)....................................................................................29n

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.,*
    551 U.S. 308 (2007).................................................................................................16, 20n

*United States* v. *Coscia,*
    866 F.3d 782 (7th Cir. 2017) ......................................................................................4, 5–6

*United States* v. *Lab'y Corp. of Am. Holdings,*
    2015 WL 7292774 (S.D.N.Y. Nov. 17, 2015) ....................................................................11

Defendants respectfully submit this reply memorandum of law in further support of their motion to dismiss the Amended Complaint with prejudice for failure to state a claim.[1]

## PRELIMINARY STATEMENT

Mullen is a failing public company that never recognized revenue throughout the relevant time period and has massively diluted its own stock through the issuance of billions of new shares. In fact, Mullen's abysmal performance has caused its stock price to again drop below $1—to $0.34 as of the date of this filing—and very soon, Mullen will face yet another Nasdaq delisting notice. Rather than accept responsibility for its own pervasive mismanagement, Mullen (and two shareholders) filed this action to deflect blame and attempt to piggyback on a series of copycat complaints recently filed in this District that have also alleged "spoofing" claims. In all but one of those other "spoofing" cases, however, courts in this District have dismissed the complaints at the pleading stage for failure to adequately allege loss causation. Undaunted, the instant case stretches these "spoofing" claims even further by improperly lumping together the purported trading activity of eleven separate groups of unidentified actors. This Court should reject this transparent attempt at blame-shifting and conspiracy theorizing.

Even if this were a permissible pleading approach for claims requiring particularity (and it is not), Plaintiffs' Amended Complaint would still fail because, instead of identifying actual trading activity on the part of the named Defendants, it relies on a "probabilistic imputation" methodology ("Methodology") that has ***never*** been accepted by any court. Plaintiffs' Methodology, which relies entirely on highly speculative assumptions about anonymous trading data, unsupported information-and-belief pleading, and egregious group pleading, simply does not

---

[1] Capitalized terms have the meaning ascribed in Defendants' opening brief ("Defs. Br.") (ECF No. 38). Plaintiffs' Opposition (ECF No. 61) is referred to herein as "Opposition" or "Opp." Unless otherwise noted, emphasis is added and internal citations and quotations are omitted.

and cannot meet the heightened pleading requirements of Rule 9(b) and the PSLRA.  As set out in Defendants' opening brief, and below, Plaintiffs' Amended Complaint offers no plausible basis to infer a manipulative act (Section I.A), a strong inference of scienter (Section I.B), or loss causation (Section I.C) as to any of the Defendants.  It should be dismissed with prejudice.  *See* Section II.

## ARGUMENT

### I.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE EXCHANGE ACT

#### A.    Plaintiffs Fail To Adequately Allege a Manipulative Act by Any Defendant

Plaintiffs' refrain throughout their Opposition is that Defendants' motion to dismiss need not be fully considered because courts in "***other*** spoofing cases" found ***those*** complaints adequately pleaded a manipulative act.  (*See, e.g.*, Opp. at 2, 10, 14, 16, 23–24, 40.)[2]  While Defendants acknowledge that a series of copycat complaints have been filed in this District using a similar jumble-everyone-together technique to allege a pattern of market manipulation, that does not mean the applicable heightened pleading requirements are in fact being met.  And it certainly should not provide a free pass for more plaintiffs to fabricate a purported pattern in order to "get to discovery and see it for themselves" if the actual trading activity could possibly support their "theory," as Plaintiffs urge here (Opp. at 17 n.15).

The aggregation pleading tactic employed in this, and similar complaints, necessarily relies on speculative inferences and is flatly inconsistent with the Second Circuit's decision in *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007).  But, even if one were to accept

---

[2] Plaintiffs rely heavily on decisions in three cases (*Harrington*, *Northwest*, and *Phunware*) to argue that Defendants "ignore recent precedent in this District," glossing over the fact that in two of these three cases, the court ***dismissed*** the claims for lack of loss causation.  *See Phunware, Inc.* v. *UBS Securities LLC*, 2024 WL 1465244, at *8 (S.D.N.Y. Apr. 4, 2024); *Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*, 2023 WL 9102400, at *28–34 (S.D.N.Y. Dec. 29, 2023), *report and recommendation adopted sub nom. Northwest Biotherpeutics, Inc.* v. *Canaccord Genuity LLC*, 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024).  In both cases, plaintiffs have filed, or seek to file, amended complaints that purportedly address the loss causation deficiencies; defendants in each case challenge those contentions.  No court has yet ruled on the viability of these amended (or proposed amended) allegations.

this type of tactic as appropriate under the PSLRA (and it is not), the speculative leaps in the Amended Complaint go well beyond the pleadings in *Harrington*, *Northwest*, and *Phunware*.

Indeed, it is clear that the de-anonymized trading data Plaintiffs have attributed to Defendants (and their purported customers) ***does not*** reveal the same supposed pattern asserted in any of these other cases. Instead, far from being "accepted by the courts" (Opp. at 16), Plaintiffs' theory is based on their own "probabilistic imputation" Methodology that was not even presented, let alone accepted, in any of the spoofing cases on which Plaintiffs so heavily rely. Worse, even by Plaintiffs' own guesswork, their "probabilistic" imputations are wrong 14% of the time.[3] (Defs. Br. at 39.) And, even setting Plaintiffs' flawed "Methodology" aside, the supposed de-anonymized trading data for each "Spoofing Episode" does not even belong to a single Defendant (or other market participant), but to a mix-and-matched group of eleven groups of unidentified actors. (*See* Defs. Br. at 22, 27–28.)

For the reasons set out below, Plaintiffs' flawed methodology, group pleading, and other highly speculative allegations do not properly plead a manipulative act under the heightened pleading requirements of Rule 9(b) and the PSLRA.

### 1. Plaintiffs Have Not Adequately Alleged Purported "Spoofing Indicia"

The Amended Complaint takes routine market activity—namely, cancelled sell-side orders placed within two minutes of any purchase by Defendants—and (1) attributes all such orders and

---

[3] In fact, Plaintiffs admit that this error rate is just an "estimate" (*i.e.*, a complete guess). (*See* Opp. at 19 n.18 (noting their success rate reflects a "conservative estimate").) Plaintiffs have not pointed to anything to suggest it is a reliable indicator of the accuracy of Plaintiffs' Methodology. Moreover, as will be explained further in IMC's future Rule 11 motion, Plaintiffs' Methodology falsely leads them to assert that IMC spoofed on numerous dates on which IMC did not trade in Mullen stock at all. Clear Street similarly plans to pursue sanctions because it simply did not enter the orders and trades alleged in the "example" spoofing episodes attributed to Clear Street in the Amended Complaint. Plaintiffs could have proceeded—as numerous other plaintiffs have done in similar circumstances—by proceeding against Doe defendants, subpoenaing the exchanges to secure the trade data and identifying information for the parties behind certain trades, and then proceed against the parties that ***actually*** engaged in the trades at issue with the requisite evidentiary support. *See, e.g., Kessev Tov, LLC* v. *Doe(s)*, 2022 WL 2356626 (N.D. Ill. June 30, 2022).

cancellations to Defendants; and (2) labels them "Baiting Orders." (Defs. Br. at 13–15.) Plaintiffs argue that this activity presents "indicia of spoofing" that distinguishes a "manipulative spoofing scheme from ordinary market activity." (Opp. at 11.) It does not for three primary reasons.

First, as courts have explained, spoofing involves the placing of orders with "an intent to cancel the order *at the time it was placed*," which can be shown through a pattern of a trader placing orders in a manner "designed specifically to avoid being filled." *See, e.g.*, *United States* v. *Coscia*, 866 F.3d 782, 789–95 (7th Cir. 2017). Plaintiffs argue that they have pleaded a "distinctive pattern of irregular trading activity" by purportedly demonstrating an "irregular amount of shares in cancelled Baiting Orders relative to Executed Purchases"; a "high concentration of Defendants' cancelled sell orders during Spoofing Episodes"; a "stark contrast between median Executed Purchases . . . and median executed sell orders"; and a "stark contrast between the size of cancelled Baiting Orders . . . and executed sell-orders[.]" (Opp. at 11–12 (citing AC ¶¶ 68–75, 85–87).)[4] For example, Plaintiffs purport to compare the number of shares purchased by or attributed to Defendants within a certain time period to the number of shares sold by or attributed to Defendants over the same period (AC ¶ 74) and the number of cancelled sell-side orders (which Plaintiffs label as "Baiting Orders") to the number of filled buy-side orders (or executed purchases) (*id.* ¶ 75). But Plaintiffs offer no explanation as to why either of these measures (or any other) would be suggestive of spoofing, as opposed to merely indicating that, at these particular points in time, more of Defendants' purported customers were seeking to sell than seeking to buy, or vice versa.

---

[4] Plaintiffs do not dispute that they fail to define certain metrics they use for these comparisons, rendering this "data" meaningless. (Defs. Br. at 32 n.41 (citing AC ¶ 69 (comparing the amount of cancelled sell-side orders in a "Cancellation Period" that is undefined); ¶ 74 (comparing the median share volume of Executed Purchases to the share volume of sell-side orders during an undefined amount of time "[a]fter [p]urchases")).)

Similarly, most of Plaintiffs' purported measures and comparisons are based on Plaintiffs' having labelled certain orders "by Defendants" as "Baiting Orders," labelled other orders by "other market participants" as legitimate orders, and then offering a series of measures comparing the two. (Defs. Br. at 13–15; *see, e.g.*, AC ¶ 68 (comparing "new sell-side order activity" prior to purchases during what Plaintiffs have labelled "Spoofing Episodes" to purchases during what Plaintiffs have labelled "not in Spoofing Episodes"); *id.* ¶ 70 (comparing cancelled sell-side orders of shares per purchase by the "Known Defendants" and cancelled sell-side orders of shares per purchase by "other market participants").) But again, Plaintiffs do not explain why these measures indicate any distinctive pattern suggestive of spoofing. Moreover, Plaintiffs merely repeat, but do not substantively address, Defendants' argument that Plaintiffs' allegations are circular because they start with the premise that all cancelled orders within a certain timeframe are "Baiting Orders" and then highlight that "Baiting Orders" were cancelled. (Defs. Br. at 13–14.)

Plaintiffs are no doubt hoping that if they throw a bunch of calculations at the wall, something will stick. But without explaining why any of their calculations plausibly demonstrate that Defendants had no intent to execute an alleged Baiting Order when placed, Plaintiffs' calculations are meaningless and do not satisfy their pleading burden.[5]

Second, Plaintiffs argue that Defendants' activity is suggestive of spoofing because they claim each Defendant began canceling "Baiting Orders" within "seconds of placing them." (Opp. at 12); *Coscia*, 866 F.3d at 789 (explaining that spoofing can sometimes be shown through the existence of orders "designed specifically to avoid being filled" by, for example, placing large

---

[5] Defendants also noted in their opening brief that "many of the statistics and examples" in the Amended Complaint are contrary to Plaintiffs "spoofing theory" and others are simply "incomprehensible." (Defs. Br. at 16 n.23, 34 n.45.) Plaintiffs do not even respond to those points, much less rebut them. Similarly, Plaintiffs do not dispute that their allegations lack any of the hallmark attributes of spoofing, like "parking" or "irrationally high bids." (Defs. Br. at 35 n.47; Opp. at 12. n.10.)

market-moving orders and then cancelling them within milliseconds). Again, Plaintiffs' allegations rely on the circular assumption that all cancelled orders are Baiting Orders. Moreover, because Plaintiffs admittedly do not attempt to match the placement and cancellation of any particular order (*see, e.g.*, Opp. at 4 n.3), they have not pled that any particular order was cancelled "within seconds" of that order being placed.[6] All Plaintiffs have pled is that, at times, there were cancellations close in time to orders being placed. This simply does not plead a manipulative act.[7]

Finally, Plaintiffs state that some courts have found "indicia" suggestive of spoofing where a complaint pleads "conduct that is contradictory to that of ordinary market making behavior." (Opp. at 11.) Plaintiffs again argue that they have adequately plead this indicia because some of their calculations suggest that "Defendants did not flatten their inventory" or otherwise "execute roughly the same amounts of purchases and sales" as one would expect of a market-maker.[8] (*Id.* at 12.) Yet, as discussed in more detail in Section I.A.2 *infra*, all of Plaintiffs' allegations are based on the aggregated trading activity of each market-maker, their purported numerous customers, and a vast group of other unidentified market participants. Notwithstanding their repeated admission of this point, Plaintiffs offer no explanation (and there could be none) as to why the **combined** activity of a market-maker, its customers, and numerous other third parties should be "flat" or consist of "roughly the same amounts of purchases and sales."

---

[6] Plaintiffs have offered no explanation for why they did not attempt to match sell side orders with corresponding cancellations based on the ITCH data in their possession.

[7] Further, it is undisputed that the mere existence of cancellations, even rapid cancellations, is insufficient to plead a manipulative act. (Defs. Br. at 14.)

[8] Notably, the Amended Complaint relies both on allegations that Defendants **did not** maintain a flat position or otherwise act as a typical market maker and, as discussed in Section I.A.3 *infra*, an imputation methodology that assumes Defendants **did** "maintain a flat inventory position" and otherwise act as a typical market maker (AC ¶ 43).

### 2.    Plaintiffs' Aggregation of the Trading of Each Defendant, and Many Others, Does Not Properly Plead a Pattern of Trading

Plaintiffs attempt to defend their aggregation of the trading activity of numerous market participants by claiming that their Amended Complaint is no different than complaints in other recent spoofing cases. Citing these cases, Plaintiffs argue that the Court need not determine "who the specific decisionmaker behind the spoof was," claiming that it is a "question of fact" inappropriate for a motion to dismiss. (Opp. at 14–16.) This misapprehends Defendants' argument. Defendants are not arguing that Plaintiffs' only failure is to name a specific decision-maker. Rather, Defendants are pointing out that it is highly speculative—and implausible—to assume that the admitted combination of market activity across numerous independent actors reflects the intent of anyone or otherwise establishes a pattern of trading of any single Defendant. (Defs. Br. at 15–16.)

Plaintiffs' sole retort is that this argument was not accepted at the motion to dismiss phase in other spoofing cases. But the Amended Complaint here is materially different than the complaints in those cases in important respects. In *Phunware*, the complaint "state[d] only that the trading 'may have been executed by Defendant . . . for client accounts, for which [Defendant] acted as a broker,' which is distinct from executing the trades **on a client's orders**." 2024 WL 1465244, at *4. Similarly, in *Northwest*, the allegations that the "spoofing activity . . . may have been executed by Defendants for their own accounts . . . or for client accounts" did not plead that clients "decide[d] whether and when to place an order and at what price." 2023 WL 9102400, at *18.

In contrast, here, Plaintiffs allege that the trading at issue was done "[p]ursuant to the instructions of either their customers' or their own proprietary traders." (AC ¶ 54(a).) Plaintiffs argue that this allegation is no different than the allegations in *Phunware* and *Northwest* because

7

they use the word "or" in their allegations.  But the courts in these cases were not focused on the use of the word "or," but rather the fact that a broker-dealer allegedly trading for client accounts (as pled in those complaints) was "distinct from executing the trades **on a client's orders**."  *See, e.g.*, *Phunware*, 2024 WL 1465244, at *4.  Plaintiffs here affirmatively plead that some portion of the trading was done **"[p]ursuant to the instructions" of clients**.  (AC ¶ 54(a).)  Moreover, Plaintiffs' group pleading allegations here are nothing like the complaints in these other cases, because they admittedly attribute not only "Defendants' proprietary trades" but "those placed by other entities such as clients, customers, or third parties."[9]  (Opp. at 21.)  Plaintiffs do not and cannot suggest that any court has ever accepted such a broad theory.  Because the Amended Complaint admittedly rests on the trading decisions of multiple distinct actors, it has not, and cannot, plead a pattern as to anyone.[10]

Another major distinction is that, in the other spoofing cases, plaintiffs pled that it was the defendants that "substantively controlled the trading strategies alleged" because defendants "specifically designed and implemented algorithmic trading programs to execute its spoofing

---

[9] Plaintiffs do not deny that this broad swath of third parties includes the conduct of any (1) of Defendants' purported "customers or clients," (2) "third part[ies] acting on behalf of or at the instruction of the Defendant," (3) "third part[ies] acting on behalf of or at the instruction of . . . Defendant's customers or clients," (4) "third part[ies] acting . . . for the benefit of the Defendant," (5) "third part[ies] acting . . . for the benefit of . . . Defendant's customers or clients," (6) "corporate parent[s]," (7) "subsidiary[ies]," (8) "sibling[s]," (9) "affiliate[s]," (10) "collaborator[s]," and (11) "co-conspirator[s]."  (Defs. Br. at 22 (citing AC ¶ 46).)

[10] Plaintiffs also concede that they are grouping the conduct by two Defendants, Clear Street Markets LLC and Clear Street LLC.  (Opp. at 22.)  Plaintiffs' only response is to supplement their pleading with facts not found in the Amended Complaint about the purported common control between Clear Street Markets LLC and Clear Street LLC, which is plainly inappropriate.  *See In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455, 488–89 (S.D.N.Y. 2022), *aff'd sub nom. Watson Lab'ys, Inc.*, 101 F.4th 223 (2d Cir. 2024).  Further, the notion that Clear Street Markets LLC and Clear Street LLC operate at a "unified whole" (Opp. at 22 n.25) makes no sense because, among other things, it ignores that, pursuant to Section 15 of the Exchange Act (15 U.S.C. § 78o(g)), broker dealers maintain strict information barriers across business groups such that the business groups are segregated from each other—and certainly from other broker dealers.  That is because broker dealers must implement controls reasonably designed to prevent the misuse of material non-public information.  *See id.*  In any event, Plaintiffs have no response to well-settled law that, notwithstanding the requirements of Rule 9(b), "[b]oth Rule 8 of the Federal Rules of Civil Procedure and *Twombly* require more than that—mere speculative generalizations as to a defendant are insufficient.  The fact that two separate legal entities may have a corporate affiliation does not alter this pleading requirement."  (Defs. Br. at 23 n.29 (citing *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1344429, at *3 (S.D.N.Y. Mar. 23, 2015).)

schemes." *Phunware*, 2024 WL 1465244, at *4; *see also Northwest*, 2023 WL 9102400, at *18 (relying on allegations that "it was Defendants' algorithms that controlled the trades").

Here, Plaintiffs allege that the spoofing scheme was carried out through algorithmic trading programs that Defendants "and/or their customers" designed and implemented. (AC ¶ 79.) In other paragraphs of their Amended Complaint, Plaintiffs further allege that all of their allegations as to the "market or trading activity" of any Defendant necessarily sweeps in the activity of numerous third parties (AC ¶ 46), suggesting that the algorithmic trading programs they challenge may have even been designed and implemented by ***any of the eleven groups of unidentified actors***. In support of this claim, Plaintiffs quote ***Northwest*** (and not their own complaint) to argue that Defendants "misapprehend[] Plaintiffs' 'theory of the case, which focuses on Defendants' control over the high-speed trading algorithms and Defendants' responsibility to monitor such algorithms.'" (Opp. at 15–16 (quoting *Northwest*, 2023 WL 9102400, at *18).)[11] But that is not what is alleged in ***this*** Amended Complaint.

Plaintiffs cite *Harrington II* to argue in a footnote that their use of "and/or" in this instance should be excused as it was meant "to encompass the full scope of ***possible*** misconduct." (Opp. at 15 n.13.) But Plaintiffs were required to plead with particularity the nature, purpose, and effect of the alleged fraudulent conduct. Their "and/or" approach only highlights that they have no basis to claim that these ***named Defendants*** actually designed and implemented improper trading algorithms. Moreover, Plaintiffs mischaracterize *Harrington II*. In *Harrington II*, the court discussed the use of "and/or" language in describing the breadth of the conduct and the alleged

---

[11] Plaintiffs cite to paragraph 49 of the Amended Complaint in an attempt to compare their allegations with the allegations in *Northwest* about "Defendants' control over the high-speed trading algorithms." (Opp. at 21.) But paragraph 49 of the Amended Complaint makes no such allegation, and again pleads a nonsensical imputation theory that Defendants and third parties are "closely coordinating." Not only does this have nothing to do with controlling trading algorithms, but Plaintiffs cannot rely on a conspiracy theory that they do not allege.

beneficiary, *i.e.*, that the conduct was "disseminat[ing] ***and/or*** effect[ing] orders" that benefitted "Defendants ***and/or*** their customers to purchase [the shares at issue] at lower prices." *Harrington Glob. Opportunity Fund, Ltd.* v. *CIBC World Markets Corp.*, 2023 WL 6316252, at *3, 5 (S.D.N.Y. Sept. 28, 2023). The issue in *Harrington II* was not, as here, that plaintiffs failed to plead ***who*** allegedly engaged in the wrongful conduct.

In short, Plaintiffs speculate that "[p]ursuant to the instructions of either their customers' or their own proprietary traders," each Defendant or one or more of their customers (or one of the many unnamed third parties identified in the Amended Complaint) designed and implemented algorithmic trading programs that allegedly carried out spoofing schemes. This does not properly "plead with particularity . . . what manipulative acts were performed, which defendants performed them, [or] when the manipulative acts were performed" as required under the applicable pleading requirements. *ATSI*, 493 F.3d at 102. The Amended Complaint should be dismissed for this reason as well.

### 3. Plaintiffs' "Probabilistic Imputation" Methodology Has Not Been Accepted By Any Court and Is Highly Speculative

As implicitly acknowledged in the Amended Complaint, Plaintiffs cannot plead the same alleged pattern of trading as in other spoofing cases using the de-anonymized data in their possession.[12] Thus, on "information and belief," Plaintiffs ask this Court to assume that all anonymized trading activity that occurred close in time to a Defendant's activity was in fact the activity of that Defendant, or of a customer of that Defendant, or of someone the Defendant or a customer controlled, or of someone else in the numerous categories of unidentified market

---

[12] As Plaintiffs explain: "It is difficult to identify [allegedly] manipulative schemes in listed securities like Mullen on the basis of publicly available data because," *inter alia*, "most order flow in listed securities is publicly available only in anonymized form." (AC ¶ 32.) This purported difficulty is not a basis to excuse the applicable pleading requirements.

participants relied on by Plaintiffs. Plaintiffs claim this "probabilistic imputation" Methodology is a "meticulous and conservative implementation of a well-established method of imputing anonymized activity to market participants." (Opp. at 17.) But Plaintiffs' Methodology is neither conservative nor well-accepted, and it is not sufficient to meet Rule 9(b) and the PSLRA.

As an initial matter, Plaintiffs argue that their "information and belief" allegations should be permitted because "anonymized orders, by definition" are "matters that are peculiarly within the opposing party's knowledge."[13] (Opp. at 17.) This argument is belied by Plaintiffs' own Amended Complaint, which alleges that the "deanonymized order flow" it purports to need to "confirm[]" their claims is available from "Defendants, *FINRA, and other nonparties*." (AC ¶ 51.) Plaintiffs have no response to Defendants' contention that "information and belief" allegations are inappropriate in this circumstance.[14] (Defs Br. at 20 (citing *United States* v. *Lab'y Corp. of Am. Holdings*, 2015 WL 7292774, at *7 (S.D.N.Y. Nov. 17, 2015)); *see also* 2015 WL 7292774, at *7 ("Rule 9(b) may be relaxed 'where information is *only* within the opposing party's knowledge,' not where third parties are alleged to have relevant information that is *also* in defendant's control.") (emphasis in original).

Nonetheless, "on information and belief," Plaintiffs offer a "probabilistic imputation" Methodology, which they claim "has been accepted by the courts." (Opp. at 16.) Plaintiffs cite to a single case (*Northwest*) that purportedly accepted a methodology "to link anonymized market activity to deanonymized orders."[15] (Opp. at 18.) However, *Northwest* did not consider, let alone

---

[13] Of course, Plaintiffs' premise that Defendants have the data that Plaintiffs seek would only be true if the anonymized orders were in fact orders placed by one of the Defendants (and not by one of the numerous other market participants who traded in Mullen stock on the Nasdaq). Plaintiffs offer no support for that premise.

[14] Plaintiffs' claim that the Amended Complaint "goes far beyond information and belief" (Opp. at 17) is also flatly contradicted by Plaintiffs' own complaint. (*See* AC at 21 n.29 ("Unless otherwise indicated, *all* allegations in this First Amended Complaint regarding the Known Defendants' participation in spoofing schemes is on information and belief based upon the Methodology and the Manipulation Analysis").)

[15] Plaintiffs claim their Methodology is a "standard methodology accepted by *other courts* in this District." (Opp. at

accept, the sweeping methodology that Plaintiffs urge here. In *Northwest*, plaintiffs relied on "detailed trading records" from two exchanges: OTC Link and Global OTC. 2023 WL 9102400, at *4, n.7. The latter was de-anonymized, so plaintiffs were able to identify purchases attributable to particular market participants. Executions on the former, however, were anonymized. To identify the relevant market participant on OTC Link, plaintiffs "matched" anonymized *executions* to changes in displayed *quotes*: "if a transaction [was] followed by a change in a market participant's bid within five seconds that [was] *equal in volume and price* to that of the transaction, the Executing Purchase [was] attributed to that market participant." *Id.*

Here, Plaintiffs do not "match" public orders to anonymized executions; in fact, Plaintiffs do not "match" anything. Rather, they are asking the Court to assume that any orders that happened close in time to a Defendant's orders were also that same Defendant's orders (or the orders of another market participant in the other eleven categories of third parties listed by Plaintiffs). That is just rank speculation, and nothing in *Northwest* or any other case supports it. Moreover, as Plaintiffs acknowledge, the plaintiffs in *Northwest* matched orders to executions not just upon consideration of timing, but where they also matched "in volume and price." (Opp. at 19 n.19.) Plaintiffs' Methodology is not limited by these parameters; it does not consider price, volume, or direction of the trade. (AC ¶¶ 39–40.)[16]

---

18.) Only one decision cited by Plaintiffs actually addresses the use of an imputation methodology in pleading a manipulative act and, as discussed above, it is far more limited than Plaintiffs maintain. The only other decision cited by Plaintiffs is a discovery order that did not hold that "trades occurring within the same millisecond were relevant 'evidence of coordination,'" as Plaintiffs claim. (Opp. at 18.) The order merely directed one of the defendants to "provide deanonymized data for specific trades [plaintiff] identifies that occurred in the same millisecond and that *may be relevant* to Plaintiff's allegations of coordination." Order, *Harrington Glob. Opportunity Fund, Ltd.* v. *BofA Securities, Inc.*, No. 21-cv-00761 (S.D.N.Y. Mar. 21, 2024), ECF No. 210.

[16] Plaintiffs' claim that DTCC data supports their attribution "Methodology" is also absurd. According to Plaintiffs, "changes in a Defendant's DTCC daily positions provide Plaintiffs with a reasonable basis to infer" Defendants traded anonymously in Mullen stock on a particular day. (Opp. at 23.) The DTCC data, however, reflects *all* trading activity by *all* brokers and customers that clear with the DTCC entity and would show nothing about anonymized orders placed or cancelled throughout the day by any particular Defendant. Moreover, Plaintiffs have absolutely no "reasonable basis to infer" anything from DTCC data for Defendant IMC, which Plaintiffs concede clears through Goldman Sachs.

Plaintiffs attempt to defend their Methodology by arguing that "trading information [is] essential to many of [Plaintiffs'] claims" and they do not have it.  (Opp. at 17 n.15.)  Thus, they argue, "if not for information and belief allegations" and their invented Methodology, there is no other way to "get to discovery and see [this "essential" data] for themselves."  (*Id.*)  But, however inconvenient Plaintiffs may find the requirements of the PSLRA, they are not waivable here. Plaintiffs must specifically and sufficiently allege that these Defendants engaged in a fraudulent scheme before they are entitled to discovery.  *See, e.g.*, *Mangrove Partners Master Fund, LP* v. *683 Capital Partners, LP*, 2020 WL 7335313, at *2 (S.D.N.Y. Dec. 14, 2020) (rejecting argument that plaintiff was unduly prejudiced by being denied discovery and holding that that outcome "was intended by Congress when it passed a statute requiring that plaintiff plead a securities fraud claim that passes a motion to dismiss before she is entitled to discovery").

Moreover, as Plaintiffs admit, their Methodology is ***frequently wrong***.  (Opp. at 19 n.18 (estimating that there is a 14% likelihood that their order and trade allegations are misattributed); AC ¶¶ 42, 44 (same).)  As the Second Circuit has held, "pleading based on rote probabilities"—as Plaintiffs advocate here—is "disfavored."  *Gamma Traders - I LLC* v. *Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 78–79 (2d Cir. 2022).  Plaintiffs reject *Gamma Traders* because, they assert, "Plaintiffs do not use probabilistic imputation" to attempt to allege the loss causation element of their claim, "as the *Gamma Traders* plaintiff did."  (Opp. at 20.)[17]  *Gamma Traders* was not so

---

(Opp. at 23 n.26.)

Plaintiffs also do not dispute that "Pegged Orders" allow an order price to be automatically set with reference to the NBBO, and that the Nasdaq INET system changes these trades automatically pursuant to market makers' obligations under Nasdaq rules.  (Defs. Br. at 22 n.28.)  Nor do Plaintiffs dispute that that pegged orders negate "any notion, as Plaintiffs allege, that it is virtually impossible for orders arriving in the same nanosecond to originate from different sources."  (*Id.*)  Instead, Plaintiffs offer several unsupported and nonsensical explanations why this is consistent with their claims.

[17] As discussed below, Plaintiffs improperly use probabilistic imputation for their loss causation allegations as well. (Opp. at 40 n.46.)

limited.  Indeed, as Plaintiffs acknowledge, *Gamma Traders* was concerned about the "obvious absurdity" of "statistical pleading" permitting any plaintiff "'who traded with even modest frequency . . . [to] state a claim . . . without ever plausibly alleging that she suffered a loss as a result of the defendant's conduct.'"  (Opp. at 20 (quoting *Gamma Traders*).)  Yet, Plaintiffs urge an even more "absurd" result here of allowing Plaintiffs to plead the manipulative act element of their claim—one that indisputably must meet the heightened requirements of Rule 9(b)—based on an admittedly flawed statistical analysis layered on top of impermissible group pleading.[18]

In sum, Plaintiffs' Methodology is highly speculative, has never been accepted by any court, and does not satisfy Plaintiffs' burden to plead a manipulative act with particularity.

### 4. Plaintiffs' "Illustrative Examples" of Alleged Spoofing Episodes Do Not Properly Plead a Manipulative Act

As set out in Defendants' opening brief, Plaintiffs' eight "illustrative examples" (AC ¶¶ 94–156) and Exhibit 1 to the Amended Complaint, purporting to be a "complete list" of alleged "spoofing episodes," lack the requisite level of detail mandated by the PSLRA and Rule 9(b). (Defs. Br. at 25–26.)  As Defendants pointed out, these allegations—often based on vague ranges and sums—make it impossible for Defendants or the Court to identify or evaluate the particular trading activity being challenged.  (*Id*.)

In Defendants' opening brief, they pointed out that—among numerous other deficiencies— Plaintiffs' Exhibit 1 failed to provide sufficient detail to support the claim that the alleged trading

---

[18] Plaintiffs also fail to meaningfully address the flawed and contradictory assumptions inherent in their Methodology. (Defs. Br. at 21–22.)  For example, on the one hand, Plaintiffs allege it was Defendants' "substantial sell-side imbalance" that sent "false and misleading pricing signals to the marketplace." (AC ¶ 58.)  At the same time, however, Plaintiffs ask this Court to accept an imputation Methodology that assumes the exact opposite—that Defendants actively sought "to maintain a flat inventory position." (AC ¶ 43.)  Plaintiffs attempt to explain this discrepancy by arguing that Defendants "may still wish to place **at least some** orders on the opposite side of the Limit Order Book . . . to hide the scope of their potential misconduct." (Opp. at 20 n.20.)  But even accepting that premise does not explain why **all** orders should be imputed to a Defendant under Plaintiffs' Methodology.

activity met Plaintiffs' own theory of the case. (Defs. Br. at 25–29.) For example, the core of Plaintiffs' claims here is that Defendants allegedly pushed down the price of Mullen stock so that Defendants could purchase it at depressed prices. Yet, over 86% of the "Executing Purchases" identified in the original Exhibit 1 were purportedly made at the ***same price*** as the alleged best offer at the time. In a footnote, Plaintiffs now blame a "clerical error" that "inadvertently truncated" the prices in the original Exhibit 1. (Opp. at 24 n.27.) Yet they offer no excuse—and there is none—for sitting on this alleged clerical error for over three months.[19]

More broadly, Plaintiffs' procedurally improper amendment only validates the concerns highlighted in Defendants' opening brief: Defendants are being denied the specificity to which they are entitled to be able to defend fraud claims. (Defs. Br. at 25–26.) Even if this Court accepts Plaintiffs' belated amendment (and it should not), the underlying issue remains that Plaintiffs' Amended Complaint, with either version of the Exhibit, lacks meaningful detail to put Defendants on sufficient notice of the purportedly manipulative activity on which Plaintiffs base their claims.

### B.    Plaintiffs Have Failed To Adequately Allege a Strong Inference of Scienter

Plaintiffs claim that because their fabricated "Methodology" shows Baiting Orders must have been placed, they have satisfied their burden to allege the fraudulent intent of Defendants. (*See, e.g.*, Opp. at 26, 29 (citing allegations that Defendants "deploy[ed]" or "flooded the market with over 10,000 Baiting Orders" as sufficient to plead both motive and conscious misbehavior or recklessness).) Putting aside that their invented data is insufficient to plead a manipulative act,

---

[19] Without notice or permission, Plaintiffs now appear to concede that their Exhibit 1 is deficient, and purport to amend the Amended Complaint by submitting a new version of the exhibit that they claim corrects one of the many issues identified by Defendants in their motion to dismiss. (Opp. at 24 n.27.) Notably, Defendants filed their second motion to dismiss identifying this issue on May 1, 2024, but Plaintiffs did not bother to address it until they filed their Opposition on August 2, 2024. (*See* Tountas Decl. Ex. 1.) More importantly, having already amended their complaint once as a matter of right, any further amendment of their pleading required Plaintiffs to obtain the Defendants' "written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Plaintiffs did neither, and Plaintiffs' "Corrected Complaint Exhibit 1" should be stricken as improper.

Plaintiffs' conclusory allegations do not come close to meeting the high standard to plead scienter for each of the Defendants. *See Alki Partners, L.P.* v. *Vatas Holding GmbH¸* 769 F. Supp. 2d 478, 493–94 (S.D.N.Y. 2011), *aff'd sub nom. Alki Partners, L.P.* v. *Windhorst*, 472 F. App'x 7 (2d Cir. 2012).

As the Supreme Court has made clear, to adequately plead scienter, the fraudulent inference of a plaintiff's allegations "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). Here, Plaintiffs fail to explain how their manufactured spoofing theory is at least as compelling an inference as the straightforward reason for Mullen's stock price decline—that it is a failing company. (*See* Defs. Br. at 5.) Merely speculating that Defendants must have placed fraudulent orders based on egregious group pleading and some "imputation" theory is not, and indeed ***cannot***, be the standard for pleading scienter. Otherwise, a plaintiff could always escape the strict pleading requirements of the PSLRA with a mere recitation of acts that could constitute an alleged scheme. *ATSI*, 493 F.3d at 102 ("[T]he PSLRA's heightened standards for pleading scienter" are "particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation.").

As explained below and in Defendants' opening brief, because Plaintiffs have failed to plead any plausible motive or any conscious misbehavior or recklessness on the part of any Defendant, the Amended Complaint should be dismissed.

### 1.    Plaintiffs Have Not Adequately Alleged Any Motive to Defraud

Plaintiffs argue that it is sufficient for them to allege that Defendants "sought to take advantage of artificially depressed prices" of Mullen stock to plead that Defendants derived "'a concrete and personal benefit . . . resulting from the fraud.'" (Opp. at 26 (quoting *Northwest*, 2023

WL 9102400, at *24).)  But Plaintiffs have failed to articulate how each separate Defendant realized an actual benefit from depressed prices from the alleged spoofing scheme.

First, Plaintiffs' claims rely on the aggregation of the alleged trading activities of not just Defendants and their purported clients, but **at least eleven groups of unidentified actors**.  (*See* Section I.A, *infra*; Defs. Br. at 22, 27–28.)  Plaintiffs dismiss this point as "irrelevant" because other spoofing cases have concluded that alleging trades on behalf of clients does not "undercut . . . allegations that Defendants designed and operated the algorithms that spoofed [Plaintiffs'] stock."  (Opp. at 26 (quoting *Northwest*, 2023 WL 9102400, at *26).)  In contrast to the other spoofing cases Plaintiffs cite, however, the Amended Complaint's allegations are not limited to Defendants' trades on behalf of themselves "and/or their customers."[20]  Plaintiffs assert that the alleged spoofing activity also encompasses trades and orders made by numerous unnamed **third parties** who may not have been acting on behalf of or at the instruction of Defendants.  (*See, e.g.*, AC ¶ 46 ("any reference . . . to a Defendant's market or trading activity . . . **also** includes trades executed and orders placed . . . **by a third party** acting on behalf of or at the instruction of . . . or for the benefit of the Defendant (**or Defendant's customers or clients**)").)  In other words, Plaintiffs seek to hold Defendants responsible for activity that **may not have been executed by Defendants on their own platforms**.  Not one of *Northwest*, *Phunware*, or *Harrington*—the three cases upon which Plaintiffs heavily rely—endorse such an expansive view of imputed intent.

---

[20] *Compare* First Am. Compl. ¶ 38, *Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC, et al.*, No. 1:22-cv-10185 (S.D.N.Y. Apr. 10, 2023), ECF No. 95 (alleging that "[t]he spoofing activity that forms the basis of the claims in this action may have been executed by Defendants for their own accounts . . . or for client accounts"); Compl. ¶ 19, *Phunware, Inc.* v. *UBS Sec. LLC*, No. 1:23-cv-6426 (S.D.N.Y. Jul. 25, 2023), ECF No. 1 (same); First Am. Compl. ¶ 58, *Harrington Glob. Opportunity Fund, Ltd.* v. *CIBC World Mkts. Corp., et al.*, No. 1:21-cv-761 (S.D.N.Y. May 6, 2021), ECF No. 63 (alleging spoofing activity "enabl[ed] all Defendants to purchase . . . shares at artificially manipulated lower prices for either their client's accounts or their own proprietary accounts.").

Second, the "profits" Defendants purportedly realized from this alleged scheme are so small that, even in the aggregate, they completely refute Plaintiffs' theory of motive. According to Plaintiffs' latest "data,"[21] the purported spoofing activity would have saved IMC only $420.38 per year, the Clear Street Defendants only $591.64 per year, and UBS only $835.79 per year.[22] Plaintiffs provide no explanation for why this Court should find these miniscule profits sufficient when courts in this district routinely find profits in the *millions of dollars* to be inadequate. (*See, e.g.*, Defs. Br. at 30 n.38 (collecting cases).) Plaintiffs' only retort is that "high-frequency trading" somehow makes this case different. (*See* Opp. at 27 n.30.) But there is no "high-frequency trading" exception to the PSLRA's requirement to specifically plead a defendant's alleged fraudulent intent. *See* 15 U.S.C. § 78u-4(b)(2)(A). And Plaintiffs do not explain how profits of $420, $591, and $835 per year could possibly allege motive for these trading firms.[23]

---

[21] Notably, as this Court is aware, Plaintiffs have revised their trading allegations several times. As explained *supra* footnote 19, Plaintiffs submitted with their Opposition yet another "corrected" list of Spoofing Episodes. Although Plaintiffs imply that this third version of their data should show higher profits from these purported trades (*see* Opp. at 24 n.27), Plaintiffs' revised data shows that Defendants' alleged savings were even *lower* than what was reflected in their earlier data. (*Compare* AC Ex. 1 (total alleged aggregate benefit for all Defendants of $3,730.78) *with* Tountas Decl. Ex. 1 (total alleged aggregate benefit for all Defendants of $3,695.62).)

[22] Contrary to Plaintiffs' assertions, $420, $591, and $835 are significantly less than the $3,000 per year at issue in *Northwest*. (*See* Opp. at 28 n.31.) And although Plaintiffs dismiss Defendants' calculations as "self-serving" and reflecting a "misunderstanding" of the markets (*Id*. at 24 n.27, 28 n.31), these figures accurately reflect the potential profit Plaintiffs allege Defendants realized from this purported scheme: the sum of the discounts from the prevailing best offers for their alleged Executing Purchases. (AC ¶¶ 97, 106, 114, 120, 128, 135, 143, 152 (characterizing "the prevailing best offer" as "the price that" Defendants "would have [otherwise] had to pay to purchase shares of MULN stock at that moment [had] [they] not engaged in spoofing activity").) *See also Harrington I*, 585 F. Supp. 3d at 418 (economic gains from spoofing derived from the "difference of the price" spoofers "paid versus the price they would have paid had they not engaged in spoofing").

Recognizing that Defendants' total profits would have been *de minimis*, Plaintiffs can only respond by more incredible speculation, claiming that Defendants' trading could have "result[ed] in hundreds of millions of dollars in profit for the spoofer." (Opp. at 4–5.) At the profit amounts reflected in Plaintiffs' own "data," however, which average $0.00133 per share, Defendants would have had to fraudulently purchase *75 billion shares* of Mullen stock to generate $100 million in profit.

[23] Plaintiffs also argue that Defendants were allegedly motivated by receiving certain "transaction fees" from their customers, but they provide zero factual allegations to support that claim. (Opp. at 26–27; AC ¶ 50.) Indeed, one of the named Defendants, IMC, engages in only proprietary trading and does not even trade on behalf of any customers. (*See* Defs. Br. at 15 n.22.) In any event, "[c]ourts have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter." *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009).

Recognizing that the only actual profits they allege are much too small to support any credible inference of motive, Plaintiffs lean into their baseless assertion that all of the Defendants are constantly engaging in spoofing transactions across "hundreds of securities" in the market. (*See* Opp. at 28.)  Plaintiffs, however, fail to make ***any allegation of a single transaction*** by any of the Defendants in any other security.  This offensive claim, which boils down to an accusation that Defendants' entire businesses are fraudulent, is precisely the type of fabricated allegation the PSLRA was enacted to prevent.[24]

Third, even assuming Plaintiffs accurately identified Defendants' orders and cancellations (and they have not), Plaintiffs failed to plead the corresponding transactions necessary to establish that Defendants actually received any profits from this purported scheme.[25]  Indeed, after multiple complaints and accompanying Exhibits, Plaintiffs still have not alleged a single corresponding sale at a profit.[26]  Instead, they rely entirely on speculation of five alleged short positions they assert Defendants closed with Executing Purchases.

Plaintiffs argue that they have alleged more than just "hypothetical" short sale transactions that other courts have refused to credit.  (*See* Opp. at 29 n.32 (quoting *Northwest*, 2023 WL 9102400, at *5 n.9).)  But the Amended Complaint makes clear that to "conclude that an Executing Purchase closed out a preexisting short position," Plaintiffs merely "imputed" "short sales . . . immediately prior to the Executing Purchases" and assumed the Executing Purchases closed them

---

[24] *See* 15 U.S.C. § 78u-4(b)(2)(A); S. Rep. No. 104-98, at 15 (1995) (stating that the purpose of the PSLRA's particularity requirement for scienter is to "establish a uniform and stringent pleading requirement to curtail the filing of abusive lawsuits"); H.R. Conf. Rep. No. 104-369, at 41 (1995) (noting "need to establish uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits").

[25] Plaintiffs also do not explain how Defendants could have profited from subsequent sales following a rebound of the stock price, when they also claim that there was no price reversion.  (*See* Opp. at 38–39; *infra* at Section C.1.)

[26] Plaintiffs only allege two instances where "UBS sold shares of Mullen both before and after" an "Executing Purchase," and thus could theoretically have "convert[ed] profits . . . regardless of whether the Executing Purchases established a long position . . . or were used to close out a . . . short position." (*See* AC ¶¶ 131, 146.)  Such allegations are precisely the type of "hypothetical" transactions rejected in *Northwest*.  *See* 2023 WL 9102400, at *5 n.9.

out.  (*See* AC ¶ 90 n.40 (acknowledging that "short sales are not publicly disclosed" in the ITCH data).)  Even if Plaintiffs had correctly identified short sales, however, their claims still would make no sense.  Indeed, the share volume for four of the five alleged short sales do not match the share volume of their supposed corresponding Executing Purchases, including an alleged Executing Purchase on June 20, 2023 that would not have even been sufficient to cover the short position it purportedly closed.  (*See* AC ¶¶ 106–09 (100-share short sale; 698-share Executing Purchase), ¶¶ 120–23 (100-share short sale; 300-share Executing Purchase), ¶¶ 135–38 (200-share short sale; 1,000-share Executing Purchase), ¶¶ 152–55 (1,900-share short sale; 213-share Executing Purchase).)[27]  For similar reasons, the *Northwest* court rejected short-sale allegations as impermissibly "hypothetical."  2023 WL 9102400, at *5 n.9.

Because Plaintiffs have failed to plead anything beyond hypothetical transactions with *de minimis* profits, Plaintiffs have failed to adequately plead any motive to defraud.[28]

### 2.    Plaintiffs Have Not Adequately Alleged Conscious Misbehavior or Recklessness

Plaintiffs' fabricated "data" similarly dooms their circumstantial theory of scienter.  In their Opposition, Plaintiffs repeat their circular claim that because they have alleged that Defendants spoofed, they have raised the required strong circumstantial inference of scienter.  (*See* Opp. at

---

[27] Even Plaintiffs' assertion that it identified short positions opened "immediately prior to the [underlying] Executing Purchases" (AC ¶ 90 n.4) cannot be trusted.  The Clear Street Defendants purportedly opened the short positions it closed on March 8, 2023 and June 20, 2023, 53 minutes and 42 minutes, respectively, before their supposed Executing Purchases—an eternity in the world of high-frequency trading.  (*See* AC ¶¶ 100, 109.)  IMC purportedly opened the short position that it closed on March 10, 2023 a full day before its Executing Purchase.  (*See* AC ¶ 123.)  And UBS purportedly opened the short position that it closed on June 20, 2023 **almost five days** before its underlying Executing Purchase.  (*See* AC ¶ 155.)  Plaintiffs have no basis to assume these short positions were even still open at the time of the alleged Executing Purchases, much less to assume the alleged Executing Purchases actually closed the positions.

[28] Plaintiffs' contention that they "need not plead more than a 'plausible economic rationale'" to establish scienter is plainly incorrect.  (*See* Opp. at 29 (quoting *Harrington II*, 2023 WL 6316252, at *8).)  Plaintiffs must allege facts that support a "cogent" inference of scienter that is "***at least as compelling as any opposing interference of nonfraudulent intent***."  *Tellabs*, 551 U.S. at 314; *see also ATSI*, 493 F.3d at 104 ("A strong inference of scienter is not raised by alleging that a legitimate investment vehicle . . . creates an opportunity for profit through manipulation.").

29–30.)  But Plaintiffs' theory goes only so far as their group pleading and "probabilistic imputation" Methodology—which fails to link the alleged trades to Defendants.  *See supra* at Section I.A.3.

Setting aside the flaws in their attribution of trading activity, the data that forms the basis of Plaintiffs' "particularized indicia of spoofing" (*see* Opp. at 31) is plainly unreliable.  Plaintiffs admit they have not matched placed and cancelled orders to identify supposed Baiting Orders.  (Opp. at 31 n.34 (claiming that "there is no need for the cancellation to be the same exact order").)  Instead, Plaintiffs calculate the volume of Baiting Orders for each spoofing episode by taking "the lesser of the volume of sell-side orders cancelled in the two minutes after the Executing Purchase and the volume of sell-side orders created in the two minutes prior to the Executing Purchase." (Tountas Decl. Ex. 1 at n.3.)  Even a cursory review of Plaintiffs' allegations shows that their data is incredibly flawed.  Notably, Plaintiffs did not account for the fact that many of their purported "Spoofing Windows" overlap and rely on the same purported Baiting Orders multiple times, meaning their allegations, and the calculations on which they are based, grossly double count purported Baiting Orders.[29]  This error alone, which is apparent on the face of Exhibit 1, confirms that Plaintiffs' allegation that Defendants submitted Baiting Orders "totaling at least 470,931,814 shares" (AC ¶¶ 58, 65) is, at best, egregiously inflated.  As a further example, Plaintiffs list the same "4E+06"—or 4,000,000—shares of "Baiting Orders" for 18 different purported "Executing Purchases" on March 13, 2023 (Tountas Decl. Ex. 1 at 115–16)—inflating its final total by *72 million shares* through this double-counting example alone.  Indeed, a full 42% of all of the alleged IMC spoofing episodes, 62% of all of the alleged Clear Street spoofing episodes, and 88% of all

---

[29] (*See, e.g.*, Tountas Decl. Ex. 1 at 1 (alleging three separate spoofing Executing Purchases between 11:17:12.1486 and 11:17:12.159 on November 9, 2021); *id.* at 13 (alleging ten separate spoofing Executing Purchases between 9:47:58.057 and 9:48:04.430 on February 22, 2022); *id.* at 106–07 (alleging eighteen separate spoofing Executing Purchases between 9:31:08.043 and 9:31:31.091 on March 3, 2022).)

of the alleged UBS spoofing episodes have overlapping spoofing windows.  (*See generally id*.)  This renders Plaintiffs' "data," and the suppositions they make, completely unreliable.[30]  With no accurate data to support them, Plaintiffs' "particularized indicia" are meaningless.

Without Plaintiffs' faulty indicia, their circumstantial theory of scienter falls apart.  Since Plaintiffs cannot point to any credible trading activity to show Defendants' alleged behavior was anything other than standard market-making behavior, Plaintiffs are left to arguing that the use of high-frequency trading algorithms is, itself, sufficient to establish scienter.  (*See* Opp. at 30–32.)  Such standard trading activity alone cannot give rise to a strong inference of scienter.  *See Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 119–20 (S.D.N.Y. 2018) (finding scienter not pled where trading activities had numerous "plausible nonculpable explanations").

Because Plaintiffs have failed to adequately plead any facts to show that Defendants acted with an intent to deceive, Plaintiffs' claims should be dismissed for lack of scienter.

### C.    Plaintiffs Fail to Adequately Allege Loss Causation

Plaintiffs dismiss Defendants' loss causation arguments, asserting that pleading this element is a low bar that does not require a close analysis from this Court.  (*See* Opp. at 33–34.)  But Plaintiffs ignore that this Court and others ***regularly*** dismiss spoofing claims for failure to plead loss causation, including in the spoofing cases on which Plaintiffs rely.  *See Gamma Traders*, 41 F.4th at 80; *Phunware*, 2024 WL 1465244, at *7; *Northwest*, 2023 WL 9102400, at *31–32.

---

[30] These flaws also refute any inferences that could be drawn by Plaintiffs' comparisons to purported "median" statistics.  (*See, e.g.*, AC ¶ 75 (comparing the "the median size of the Baiting Orders that were cancelled" and "the median size of the bona-fide purchases that were executed".)  But since Plaintiffs failed to account for their overlapping spoofing windows, their purported comparisons to median data are entirely meaningless.  And even putting aside their problematic data, Plaintiffs have not even responded to Defendants' argument that their comparisons to "median" statistics that lump all four Defendants together is improper group pleading.  (*See* Defs. Br. at 32–33.)

The reason for these frequent dismissals is simple: Spoofing inherently involves "a reversion of prices to the market-level" and thus courts have recognized that "the period of [price] artificiality may be brief." *In re London Silver Fixing Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018). As a result, Plaintiffs must provide a "factual basis" sufficient to "justify an inference that the market price was still artificial" when they supposedly traded. *Gamma Traders*, 41 F.4th at 80.[31] "Even pleading same-day, post-spoof trades does not justify an inference of injury without" that factual basis. *Id.* Plaintiffs not only fail to provide any factual basis to support their loss causation theory—their allegations affirmatively undercut their claims.

### 1. Plaintiffs' Loss Causation Allegations Are Fundamentally Inconsistent With Their Spoofing Claims

Plaintiffs do not (and cannot) dispute the basic economic principle that, in efficient markets, new information is "***immediately incorporated*** into share prices." (Defs. Br. at 37.) In fact, their claims rely on that premise. (*See* AC ¶ 26–31; *see also* Opp. at 3, 9 (Plaintiffs "reli[ed] on an efficient market").) Relatedly, Plaintiffs cannot seriously dispute that, ***if*** the alleged Baiting Orders caused Mullen's share price to decline, ***then*** Mullen's share price must have rebounded when those Baiting Orders were cancelled. (Defs. Br. at 38–39.) These basic economic principles—that a company's share price "immediately" reacts to the placing and cancelling of Baiting Orders in an efficient market—are common sense, have been repeatedly recognized in spoofing cases and academic literature, and serve as a basis for Plaintiffs' own spoofing claims. (*See* Defs. Br. at 37–39; Opp. at 4.)[32]

---

[31] Plaintiffs state that the Second Circuit's decision in *Gamma Traders* is distinguishable because that case "involved spoofing in commodities, not securities." (Opp. at 33.) But Plaintiffs do not explain why that distinction matters. Nor could they. This Court's spoofing cases involving securities consistently apply *Gamma Traders*. *See Phunware*, 2024 WL 1465244, at *7; *Northwest*, 2023 WL 9102400, at *31–32.

[32] In fact, Plaintiffs repeatedly argue that the Defendants profited "by selling the shares acquired in an executed purchase ***after a price rebound***." (Opp. at 8; *see also id.* at 3.)

This fundamental and indisputable aspect of spoofing schemes is also ***entirely inconsistent*** with Plaintiffs' loss causation allegations.  In fact, Plaintiffs loss causation allegations show the ***opposite*** of a price rebound following the cancellation of the alleged Baiting Orders.  As explained in Defendants' opening brief—and is unrebutted in Plaintiffs' Opposition—Plaintiffs allege that "Mullen's share price never reverted to pre-spoofing levels—***or even to the Executing Purchase price levels***—following the alleged cancellation of the Baiting Orders." (Defs. Br. at 38; *see* Opp. at 38–39.)  That fact leads to only two possible conclusions: (1) the market for Mullen stock was not efficient and did not incorporate the new information from the cancelled Baiting Orders; or (2) Defendants' supposed spoofing did not cause Mullen's share price to decline, and any decline that did occur was the result of some other variable.  (Defs. Br. at 39.)[33]  Either conclusion is fatal.

Plaintiffs offer only two responses, both of which affirmatively undercut their claims. First, Plaintiffs state that they do not need to "plead a ***full*** 'price reversion'" to pre-spoofing levels to state a claim.  (Opp. at 38.)  Remarkably, the only support that Plaintiffs provide for that argument is an invented and inapt analogy to bouncing a basketball.  (Opp. at 38 n.44.)  But a full price reversion is ***necessarily*** part of spoofing in an efficient market, and Plaintiffs do not explain why the basic economic principles underlying spoofing do not apply here.  (*See supra* at 22–23; Defs. Br. at 37–39.)  Regardless, Plaintiffs' allegations do not even meet its own flawed analogy. (Defs. Br. at 38.)  Again, Plaintiffs affirmatively allege ***a continued price decline*** following the Executing Purchases with ***no rebound*** at all.  (*Id.* at 38.)  To use Plaintiffs' analogy, the allegations in the Amended Complaint reflect a scenario where a basketball does not bounce when dribbled;

---

[33] Plaintiffs make an unintelligible attempt in a footnote to distinguish two market-efficiency cases cited by Defendants.  (Opp. at 39 n.45.)  But Plaintiffs do not address the narrow and commonsense point from those cases: Plaintiffs cannot embrace market efficiency to establish the reliance element of their claims and simultaneously rely on market inefficiency to satisfy the loss causation element.  (Defs. Br. at 39.)

instead, it continues to fall through the floor never returning to the surface.  That is obviously absurd.

Second, Plaintiffs claim that *Northwest*—which recognized that spoofing inherently involves price reversion—addressed a "typical" spoofing scheme with "a full reversion of prices to the market-level."  (Opp. at 38.)[34]  Plaintiffs argue that they allege a different scheme, where Defendants supposedly profited "by closing out short positions in MULN."  (Opp. at 39.)  But the elements of the underlying spoofing scheme in *Northwest* are ***identical*** to the scheme alleged in this case.  (*See* Defs. Br. at 8; Opp. at 4; AC ¶ 54); *see also Northwest*, 2023 WL 9102400, at *2.  And the court in *Northwest* concluded that this "cycle of trading activity" includes "the placement of manipulative Baiting Orders driving the price in one direction" and "the virtually immediate cancellation of those orders and the execution of trades that ***push the price in the other direction***."  *Id.* at *32.  Plaintiffs do not explain why the method by which Defendants purportedly profited from this sequence is relevant.

Simply put, Plaintiffs have no explanation for their fundamentally inconsistent allegations.  The Amended Complaint should be dismissed for that reason alone.

### 2.    Plaintiffs Fail to Address the Egregious Group Pleading in the Amended Complaint

Plaintiffs do not dispute that they are attempting to "hold the Defendants liable for the conduct of an enormous group of unidentified third parties."  (Defs. Br. at 39.)  Plaintiffs themselves also estimate that there is a 14% likelihood that their order and trade allegations are misattributed.  (*Id.*)  These concessions defeat any notion of loss causation.  (*Id.*)  In response, Plaintiffs simply claim that "the likelihood that at least one of the imputations" in the Amended

---

[34] This claim is false.  The spoofing plaintiff in *Northwest*, like Plaintiffs here, attempted to allege that "the market neither immediately nor fully rebounded."  *Northwest*, 2023 WL 9102400, at *31; (AC ¶ 160).

Complaint "will be correct crosses the 99% (average) threshold with only three imputations." (Opp. at 40 n.46 (cleaned up).)  Plaintiffs miss the point.  Under Plaintiffs' spoofing theory, the Defendants allegedly entered a *series* of orders, executing purchases, and cancellations.  (Opp. at 4; AC ¶ 54.)  However, by Plaintiffs' reasoning, a Defendant might only be *correctly* imputed for just *one* of the elements of a spoofing episode (say, an Executing Purchase) but *incorrectly* imputed for the other *two* elements of a spoofing episode (Baiting Orders and cancellation).  In that unremarkable scenario, a Defendant simply executed a trade, while other unrelated market participants placed and cancelled orders to sell shares.  That error rate, combined with Plaintiffs' group pleading, is untenable.  Such "rank speculation" is insufficient to adequately allege loss causation.  (Defs. Br. at 39 (citing *In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021).)[35]

### 3.    The Opposition Confirms that Plaintiffs Have Failed to Meet the Second Circuit's Loss Causation Requirements for Spoofing Cases

Plaintiffs concede that they can only establish loss causation in one of two ways under Second Circuit precedent: (1) a long-term price impact theory that sets forth a "factual basis" showing that the effects of Defendants' alleged spoofing lasted for a protracted period sufficient to "justify an inference that the market price was still artificial" when Plaintiffs traded; or (2) a temporal proximity theory with factual allegations showing that they traded "so close in time to Defendants' spoofing" to "permit [an inference] as a matter of common sense that the market prices were artificial" when Plaintiffs traded.  (Opp. at 33; Defs. Br. at 40); *Gamma Traders*, 41 F.4th at 80.  Plaintiffs do not plead loss causation under either theory.

---

[35] Plaintiffs also point to *Harrington* for support (Opp. at 39–40) but the plaintiffs in *Harrington* did not allege anything near Plaintiffs' extreme group pleading.  *See* Section I.A, *infra*.

### a.    Plaintiffs Fail to Allege Long-Term Price Impact

Plaintiffs do not dispute that this Court consistently rejects claims of long-term price impact in spoofing cases.  (Defs. Br. at 40); *see also Phunware,* 2024 WL 1465244, at \*7; *Northwest*, 2023 WL 9102400, at \*31–32.  Nor do Plaintiffs seriously dispute that *Northwest* and *Phunware* rejected allegations of long-term price impact that are nearly identical to the allegations here.  (*See* Defs. Br. at 40–41.)[36]  Instead, Plaintiffs fall back on three responses, all of which fail.

First, Plaintiffs continue to rely heavily on the so-called Milgrom Report.  (Opp. at 34–35.)  But they do not dispute that multiple courts have explicitly rejected the relevance of that report in spoofing cases.  (Defs. Br. at 42.)  Instead, Plaintiffs claim that the *Northwest* court ignored the Milgrom Report because it was not attached to the complaint in that action.  (Opp. at 35.)  That claim is misleading at best.  In reality, the *Northwest* court found that the Milgrom Report does not concern spoofing, but a distinct form of manipulative conduct (fixing the ISDAfix benchmark interest rate), and "the fact that some forms of market manipulation . . . may have a 'permanent price impact' does not justify a reasonable inference that spoofing has such an impact."  2023 WL 9102400, at \*32.[37]  The court in *Phunware* likewise rejected a spoofing plaintiff's reliance on the Milgrom Report, holding that "the relevance of Prof. Milgrom's report is minimal in the context of spoofing."  *Phunware*, 2024 WL 1465244, at \*7.[38]  Plaintiffs do not even address *Phunware*.

---

[36] Plaintiffs contend that their long-term price impact allegations are "nowhere close" to those rejected by other courts, (Opp. at 34 n.36), ignoring the fact that their allegations are nearly ***verbatim*** to the allegations rejected in *Phunware* and *Northwest*.  (Defs. Br. at 40–41.)  Further the spoofing mechanics alleged here—Baiting Orders, Executing Purchases, cancellation—are identical to *Phunware* and *Northwest*, as is Plaintiffs theory of long-term price decline. (*See supra* at Section C.1.)  Simply put, Plaintiffs do not identify any material differences in their allegations.

[37] Further, Plaintiffs neglect to mention that the plaintiff in *Northwest* did file the Milgrom Report with its objections to the magistrate judge's report and recommendation (Ex. A to Pl.'s Limited Obj., *Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*, No. 1:22-cv-10185 (S.D.N.Y. Jan. 12, 2024), ECF No. 142-1), and the District Court still adopted the report and recommendation in full.  *Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*, 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024).

[38] As discussed *infra* Section C.3.b, academic literature and the government's experts in spoofing cases affirmatively refute the notion that spoofing has a permanent price impact—reinforcing the irrelevance of the Milgrom Report.

(Defs. Br. at 42; Opp. at 35.)  This Court should reach the same logical conclusion as *Phunware* and *Northwest* and reject the Milgrom Report.

Second, Plaintiffs turn to the *Harrington* case for the proposition that long-term price impact allegations should survive the motion to dismiss stage.  (Opp. at 35–36.)  But the decisions in *Harrington* do not reach this issue.  As the *Northwest* court explained in its rejection of *Harrington's* loss causation analysis, "the *Harrington* court did not analyze loss causation under the *Gamma Traders* framework, as *Gamma Traders* had not been decided at the time of *Harrington I* and was not cited in the parties' briefs in *Harrington II* on the loss causation issue." *Northwest*, 2023 WL 9102400, at *34.[39]

Finally, as Defendants explained in their opening brief, on "nearly all of the 'Spoofing Example' dates, Mullen was the subject of negative press releases and SEC filings." (Defs. Br. at 42–43.)  Instead of disputing that point, Plaintiffs resort to characterizing these facts as "mudslinging" with "cherry-picked negative coverage that can be found on the internet for any company." (Opp. at 36.)  Far from it.  The press releases from Mullen's own website and Mullen's own SEC filings identified in Defendants' opening brief were selected based on the Spoofing Example dates that Plaintiffs provided in the Amended Complaint.   (Defs. Br. at 42.)   And Plaintiffs' suggestion that "any company" experiences the same magnitude of negative press is laughable.  Plaintiffs do not (and cannot) seriously dispute that "Mullen is a failing company,

---

[39] Plaintiffs also cite *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 234 (2d Cir. 2014) for the proposition that the "efficient market hypothesis, premised upon the speed (efficiency) with which new information is incorporated into the price of a stock, does not tell us how long the inflationary effects of an uncorrected misrepresentation remain reflected in the price of a security."  (Opp. at 35 n.40.)  But that citation just highlights Plaintiffs' misunderstanding of how spoofing functions.  By analogy, the alleged "misrepresentation" in a spoofing scheme is the artificial supply created by the alleged Baiting Orders, which is "corrected" when the Baiting Orders are cancelled, and the artificial supply is eliminated.  As a result, there should be no artificial price impact following the elimination of the Baiting Orders.  That is why the Second Circuit in *Gamma Traders* held that Plaintiffs must provide a "factual basis" that is sufficient to "justify an inference that the market price was still artificial" when they supposedly traded and "[e]ven pleading same-day, post-spoof trades does not justify an inference of injury."  *Gamma Traders*, 41 F.4th at 80.  The "uncorrected misrepresentation" in *Carpenters* is thus completely irrelevant here.

burdened with numerous reverse stock splits, the issuance of more than 5 billion new shares, Nasdaq delisting notices, multiple years with zero revenue, federal lawsuits alleging corporate mismanagement and fraud, and specious attempts at blame shifting." (Defs. Br. at 42.) This rampant and frequent corporate mismanagement and misconduct is the obvious cause of Mullen's share price decline—not Plaintiffs' nonsensical spoofing theory. (*Id.* at 43); *see also Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 343 (2005) (Where there are a "tangle of factors affecting price," "the longer the time between" the wrongful act and the sale, "the more likely that other factors caused the loss.").[40]

In sum, Plaintiffs utterly failed to provide a "factual basis" indicating that the effects of the alleged spoofing lasted for a protracted period to "justify an inference that the market price was still artificial" when Plaintiffs traded. *See Gamma Traders*, 41 F.4th at 80.

### b.    Plaintiffs Fail to Allege Temporal Proximity

Plaintiffs admit that, under *Gamma Traders*, "[e]ven pleading same-day, post-spoof trades does not justify an inference of injury." (Opp. at 37 (quoting *Gamma Traders*, 41 F.4th at 80); Defs. Br. at 43.) That is because spoofing is characterized by rapid reversion to pre-spoofing market prices. (Defs. Br. at 43; *see also supra* at Section C.1.) Plaintiffs also concede that stock prices on efficient electronic exchanges, like the relevant exchange here (Nasdaq), respond to new information within "seconds or milliseconds." (*See* Opp. at 7; Defs. Br. at 43, 43 n.56.) Nor do Plaintiffs address the government's expert reports in spoofing enforcement cases, which explain that "99% of the unadjusted market loss occurs within the first five seconds after the placement of

---

[40] Plaintiffs' attempt to distinguish *Dura* fails. Plaintiffs state that "courts have recognized this language as limited to 'transactions involving allegations of inflated share prices' as a result of a misrepresentation." (Opp. at 36 (citing *Stanley Black & Decker, Inc.* v. *Gulian*, 70 F. Supp. 3d 719, 729 (D. Del. 2014).) Not so. Instead, the court in *Stanley* explained that *Dura* applies in "'fraud on the market' securities cases." 70 F. Supp. 3d at 727–29. That is exactly the type of case that Plaintiffs bring here.

the Spoof Order . . . and practically all of the unadjusted market loss occurs within the first thirty seconds." (Defs. Br. at 44 n.58 (citing Declaration of Kumar Venkataraman, ECF 828-3 ¶ 13, *U.S.* v. *Smith*, No. 19-CR-000669 (N.D. Ill., Dec. 22, 2022).)   And Plaintiffs do not dispute that government spoofing experts "take the view that restitution in spoofing cases is limited to only participants that transacted 'while Defendants spoof orders were active.'" (*Id.*)   Finally, Plaintiffs ignore the academic literature cited by Defendants, which finds that spoofing price effects exist for "a very brief period of time" and "will be so brief as to have no real economic efficiency implications." (Defs. Br. at 44 n.57 (citing Merritt B. Fox et al., *Spoofing and Its Regulation*, 2021 COLUM. BUS. L. REV. 1244, 1288, 1318 (2021).)[41]   Plaintiffs also do not deny that their closest "example" spoofing episode was a full ***two minutes and twenty-five seconds*** before the next sale was allegedly priced. (Defs. Br. at 45.)[42]   Because the uncontested authorities cited above show that the effects of spoofing last mere seconds (at most), Plaintiffs' temporal proximity theory fails.

Plaintiffs' ***only*** response is that *Gamma Traders* did not definitively decide how long the effects of spoofing last.   (Opp. at 37.)   But *Gamma Traders* tasks the Court with drawing a "common sense" inference of price effects from the allegations in the complaint.   41 F.4th at 80. Here, Plaintiffs consistently allege that Defendants "placed and then cancelled the Baiting Orders

---

[41] Plaintiffs address only one economic journal cited by the Defendants, claiming that it stands for the proposition that limit orders have a "highly persistent" effect on prices.   (Opp. at 37 n.42 (discussing Nikolaus Hautsch & Ruihong Huang, *The market impact of a limit order*, 36 J. OF ECON. DYNAMICS & CONTROL 501, 502 (2012)).)   But that quote refers only to the fact that "***order book inventory*** is highly persistent." *Id.*   Just a few sentences later, the journal explains that "limit orders ***temporarily*** narrow the spread." *Id.*   The journal's conclusion also has nothing to do with the passing reference to the Korean study mentioned by Plaintiffs, but instead unequivocally states: "We observe that quotes adjust relatively quickly." *Id.*   Plaintiffs cherry-pick the word "permanent" to imply that the limit order's effects never dissipate, but they ignore that "order book activities" not only include "incoming limit or market orders" but also "limit order ***cancellations***." *Id.* at 503.   Thus, the article signals that the ***cancellation*** of limit orders has the same immediate reaction as their placement. *See id.* at 511.

[42] Plaintiffs also do not dispute that a significant portion of their Mullen trades were priced more than an hour after an alleged spoofing episode (Defs. Br. at 44 nn.60–61; *see* Opp. at 37–38) and that all of these alleged sales are "too remote in time from alleged Spoofing Episodes to plead 'close proximity' under *Gamma Traders*," (Defs. Br. at 44, 44 n.61 (citing *Northwest*, 2023 WL 9102400, at *31)).

***within seconds and even milliseconds***" (AC ¶ 83), supporting the "common sense" inference that the effects of the orders dissipated as quickly as they were allegedly placed and cancelled.[43] Plaintiffs have thus failed to demonstrate that they traded in sufficient proximity to the alleged spoofing to justify an inference of loss causation.[44]

## II.    THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

The Amended Complaint should be dismissed with prejudice for four reasons.  First, Plaintiffs have now had ample opportunity to salvage their allegations and have failed to do so. Plaintiffs have already amended once in response to a motion to dismiss, and this Court should not "indulge [Plaintiffs'] attempts at piecemeal pleading . . . to eventually cobble together an adequate complaint under the Court's guidance while inflicting significant prejudice on" Defendants.  *Green* v. *Covidien LP*, 2021 WL 1198833, at *15 (S.D.N.Y. Mar. 30, 2021).  Second, Plaintiffs' request to amend, "contained solely in [their] opposition memorandum, is procedurally defective since a bare request to amend a pleading contained in a brief, which does not also attach the proposed amended pleading is improper under Fed. R. Civ. P. 15."  *Schuyler* v. *City of New Rochelle*, 2024 WL 167289, at *4 (S.D.N.Y. Jan. 16, 2024).  Third, Plaintiffs' cursory request for another opportunity to amend appears in only a footnote (Opp. at 41 n.47), which is plainly insufficient. *See In re Crude Oil Commodity Litig.*, 2007 WL 2589482, at *3–4 (S.D.N.Y. Sept. 8, 2007). Finally, in that footnote, Plaintiffs fail to identify any proposed amendment, much less how any amendment would correct the incurable flaws in the Amended Complaint.  Plaintiffs' failure to

---

[43] Plaintiffs also suggest that *Northwest* definitively determined some "range" of acceptable temporal proximity that includes trades "within minutes."  (Opp. at 38.)  They are wrong.  The *Northwest* court dismissed the operative complaint on loss causation grounds, 2023 WL 9102400, at *31–32, and the parties have fully briefed another motion to dismiss on this and other loss causation issues. *See Northwest Biotherapeutics, Inc.* v. *Canaccord Genuity LLC*, No. 1:22-cv-10185 (S.D.N.Y.), ECF Nos. 155–57, 160–63.

[44] For the same reasons outlined above and in Defendants' opening brief, Plaintiffs' common law fraud claim should be dismissed.  (Defs. Br. at 45–46.)

"explain . . . why amendment would not be futile" is fatal.  *Howell* v. *Port Chester Police Station*, 2010 WL 930981, at *2 (S.D.N.Y. Mar. 15, 2010).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Amended Complaint in its entirety with prejudice.

Dated:  August 23, 2024
New York, New York

**CAHILL GORDON & REINDEL LLP**

By: /s/ Herbert S. Washer
Herbert S. Washer
Tammy L. Roy
32 Old Slip
New York, NY 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
troy@cahill.com

*Attorneys for UBS Securities LLC*

**MORRISON & FOERSTER LLP**

By: /s/ Anthony S. Fiotto
Anthony S. Fiotto
Mitchell Feldman (*pro hac vice* forthcoming)
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 648-4774
Facsimile: (617) 830-0142
afiotto@mofo.com

Eric D. Lawson
250 West 55th Street
New York, NY 10019
Telephone: (212) 336-4067
Facsimile: (212) 468-7900
elawson@mofo.com

*Attorneys for Clear Street Markets LLC and*
*Clear Street LLC*

**PAUL HASTINGS LLP**

By: /s/ Jennifer L. Conn
Jennifer L. Conn
Zachary Melvin
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6004
Facsimile: (212) 319-7004
jenniferconn@paulhastings.com
zacharymelvin@paulhastings.com

Ryan P. Phair
Robert A. Silverstein
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1751
Facsimile: (202) 551-0251
ryanphair@paulhastings.com
robertsilverstein@paulhastings.com

*Attorneys for IMC Financial Markets*

33