ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/28/25

MULLEN AUTOMOTIVE, INC.; HYON CHA;
and SHAYAN KHORRAMI,

                    Plaintiffs,

        - against -

IMC FINANCIAL MARKETS; CLEAR STREET
MARKETS LLC; CLEAR STREET LLC; UBS
SECURITIES, LLC; and JOHN DOES 1
THROUGH 10,

                    Defendants.

23 Civ. 10637 (LLS)

OPINION & ORDER

        Plaintiffs Mullen Automotive, Inc.; Hyon Cha; and Shayan

Khorrami filed this securities action against Defendants Clear

Street Markets LLC; Clear Street LLC; UBS Securities, LLC; IMC

Financial Markets; and John Does 1 through 10. Plaintiffs allege

that the Defendants unlawfully "spoofed" the market for Mullen

stocks. Before the Court is Defendants' Motion to Dismiss

Plaintiffs' First Amended Complaint ("FAC") in its entirety.

(Dkt. No. 37). For the following reasons, that Motion is denied.

## BACKGROUND

        The following facts are alleged in the FAC (Dkt. No. 30)

and accepted as true for the purposes of this Motion. See Buon

v. Spindler, 65 F.4th 64, 69 n.1 (2d Cir. 2023).

        Plaintiffs are stock market participants who sold or issued

Mullen shares during the relevant period. FAC ¶¶ 6-9. Mullen is

an American electric vehicle manufacturer whose shares are

1

currently listed on Nasdaq under the "MULN" ticker symbol. Id. ¶ 6. Hyon Cha and Shayan Khorrami are individual investors who sold Mullen shares during the relevant period. Id. ¶¶ 8-9.

Defendants Clear Street Markets LLC; Clear Street LLC; UBS Securities, LLC; and IMC Financial Markets are registered broker-dealers and market makers that execute securities transactions. Id. ¶¶ 10-20. John Does 1 through 10 are entities whose identities are currently unknown, but who Plaintiffs believe participated with Defendants in the scheme to spoof Mullen securities. Id. ¶ 21.

Spoofing is a form of market manipulation to artificially inflate or deflate the price of a security through the strategic placement and cancellation of thousands of orders to sell shares on the Nasdaq Limit Order Book. Id. ¶¶ 1-2, 30. These orders, known as Baiting Orders, are not intended to be executed and are instead meant to create a false signal that the price of a security is trending downward, tricking other market participants into entering their own orders to sell. Id. ¶ 2. Spoofers then execute orders to buy, known as Executing Purchases, at artificially low prices and promptly cancel their Baiting Orders. Id. While the impact and profits from individual spoofing episodes may be minor, the aggregate effect can be substantial, as spoofing schemes are often repeated throughout an extended trading period and across numerous securities,

2

leading to sustained negative impacts on security prices and significant profits for spoofers. Id. ¶¶ 31, 91.

Plaintiffs allege that Defendants spoofed Mullen securities from November 5, 2021, to November 15, 2023, by using algorithmic trading programs on high frequency computer systems. Id. ¶¶ 1, 3, 92. Plaintiffs provide a complete list of Defendants' spoofing episodes, divided by each Defendant, including the volume of Executing Purchases and Baiting Orders, their date and time, minimum and maximum prices, and estimated price decline. (Dkt. No. 30, ex. 1). Plaintiffs gathered this information using a probabilistic imputation methodology that matched deanonymized activity to anonymized activity that occurred within the same nanosecond or millisecond, with, conservatively, an 86-90% success rate. FAC ¶¶ 38-45. Plaintiffs also provide lists of all of their sales of Mullen shares that occurred in close proximity to Defendants' spoofing episodes, including the transaction date, number of shares sold, sale price, closest spoofing episode and which Defendant was responsible, and average price decline. (Dkt. No. 30, exs. 2-4).

The FAC also details eight specific instances of spoofing that occurred during the relevant period. FAC ¶¶ 94-156. These examples include all known Defendants, with each instance pertaining to one particular Defendant. Id. For each example, Plaintiffs detail the share volume of each Defendant's Baiting

3

Orders within a two-minute period, the share volume of Executing

Purchases, the price decline, each Defendant's cancellation of

the Baiting Orders, and each Defendant's subsequent sale of MULN

stock and projected return. Id.

Plaintiffs allege that Defendants' behavior differed from

that of a bona-fide market maker in a number of respects,

including:

> (1) the short time period between the continuous and
> repeated placement and cancellation of the Baiting
> Orders; (2) the concentration of cancelled Baiting
> Orders during the limited period when each spoofing
> event occurred; (3) the average size of the Baiting
> Orders that were cancelled, in comparison to the
> average size of the bona-fide sell orders that were
> executed; (4) the ratio of cancelled Baiting Orders to
> sell compared to the executed bona-fide orders to buy
> that existed; and (5) the reoccurrence of the same
> trading patterns.

Id. ¶ 61.

In total, Defendants placed Baiting Orders for 470.9

million shares and Executing Purchases for 2.78 million shares

during the relevant period, while Mullen sold or issued over 5

billion shares. Id. ¶¶ 4, 58, 61, 157, 166, 173, 190, 201.

Plaintiffs suffered financial harm, as they sold Mullen shares

at artificially depressed prices, and the share prices neither

immediately nor fully rebounded after the spoofing episodes were

completed. Id. ¶¶ 4, 160. Plaintiffs allege that Defendants

violated Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") and Rule 10b-5(a) and (c) promulgated

4

thereunder, Section 9(a)(2) of the Exchange Act, and New York
common law. Id. ¶¶ 193-216.

## **LEGAL STANDARDS**

On a motion to dismiss, the Court accepts "all factual
allegations in the complaint as true, drawing all reasonable
inferences in favor of the Plaintiff." Kelly-Brown v. Winfrey,
717 F.3d 295, 304 (2d Cir. 2013). To survive a motion to dismiss
for failure to state a claim, a complaint must plead "enough
facts to state a claim to relief that is plausible on its face."
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is
facially plausible "when the Plaintiff pleads factual content
that allows the court to draw the reasonable inference that the
Defendant is liable for the misconduct alleged." Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009). This requires "more than labels
and conclusions, and a formulaic recitation of the elements of a
cause of action will not do." Twombly, 550 U.5. at 555.

There is a heightened pleading standard for securities
fraud claims. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d
87, 99 (2d Cir. 2007). First, a complaint must satisfy the
pleading requirements of Fed.R.Civ.P. 9(b), which requires a
party to "state with particularity the circumstances
constituting fraud." "Allegations that are conclusory or
unsupported by factual assertions are insufficient." ATSI, 493

F.3d at 99. Second, a complaint must satisfy the elevated scienter standards of the Private Securities Litigation Reform Act ("PSLRA"), which requires a party to "state with particularity facts giving rise to a strong inference that the Defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

"To state a claim for market manipulation under Section 10(b), a Plaintiff must plausibly allege (1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the Defendant's use of the mails or any facility of a national securities exchange." Set Cap. LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 76 (2d Cir. 2021) (internal quotations and citations omitted). "The analysis of claims under Section 9(a) [of the Exchange Act] closely parallels the analysis of claims under Section 10(b)... Likewise, the elements of a claim for common law fraud are essentially the same as for a claim under Section 10(b)." Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC, 2023 WL 9102400, at *13 (S.D.N.Y. Dec. 29, 2023) [hereinafter "Northwest I"] (internal quotations and citations omitted); see also Axar Master Fund, Ltd. v. Bedford, 806 F. App'x 35, 38 n.2 (2d Cir. 2020) ("[T]he elements of claims for federal securities fraud and New York common law fraud are

nearly identical[.]").

## DISCUSSION

Defendants argue that the Plaintiffs do not adequately plead (1) a manipulative act, (2) scienter, or (3) loss causation. For the reasons that follow, the Court finds that Plaintiffs adequately state a claim for market manipulation.

### Manipulative Act

"[A] manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the Defendants." ATSI, 493 F.3d at 102. "This test will be satisfied if the complaint sets forth, to the extent possible, what manipulative acts were performed, which Defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." Id.

Plaintiffs satisfy this standard. The FAC outlines Defendants' efforts to artificially depress the price of Mullen securities and the subsequent effects on the market. See FAC ¶¶ 52-58 (nature and purpose of spoofing scheme), ¶¶ 58-65 (effect on market), ¶ 158 (same), ¶ 160 (same), ¶ 166 (same). Plaintiffs list all of Defendants' alleged spoofing episodes, divided by each Defendant, including the volume of Executing Purchases and Baiting Orders, their date and time, minimum and

7

maximum prices, and estimated price decline. (Dkt. No. 30, ex. 1). Plaintiffs plead the scheme with particularity by providing eight illustrative examples of spoofing episodes by the Defendants. FAC ¶¶ 94-156. These examples are sufficient to allege market manipulation at this stage of proceedings, contrary to Defendants' allegations. See Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp., 2023 WL 6316252, at *6 (S.D.N.Y. Sept. 28, 2023) [hereinafter "Harrington II"] ("It would be both unwieldy and unreasonable to require Plaintiff to proffer detailed descriptions of each alleged [spoofing] episode in order to plead a sufficient claim. For this purpose, the seven illustrative examples and the thirty-episode chart are sufficient."). These examples also differentiate the Defendants' behavior from routine market activity where orders were placed and later cancelled, contrary to Defendants' assertions about Plaintiffs' "circular" allegations, which have been rejected by other courts in this district. See Phunware, Inc. v. UBS Sec. LLC, 2024 WL 1465244, at *5 (S.D.N.Y. Apr. 4, 2024) [hereinafter "Phunware I"] (rejecting a Defendant's arguments that cancellations are insufficient to plead a manipulative act and that allegations defining Baiting Orders as orders that were cancelled after being placed are circular).

Defendants also argue that "Plaintiffs improperly aggregate

the trading of each broker-dealer and its many customers." Def.
Br. at 15 (Dkt. No. 38). However, Plaintiffs separate their list
of spoofing episodes by each individual Defendant. (Dkt. No. 30,
ex. 1). Additionally, Plaintiffs allege that "each Defendant
(and/or their customers) specifically designed and implemented
algorithmic trading programs that routed orders, executed trades
and otherwise carried out the spoofing schemes...[and]
Defendants — each of which is a sophisticated entity that uses
cutting edge technology — closely monitored, modeled, and
analyzed the performance, impact, and effects of their
algorithmic trading program throughout the Relevant Period." FAC
¶ 79. "Courts in this District have held that claims based on
similar allegations adequately state a claim, rejecting
arguments akin to Defendant[s'], that a complaint must tie
trading activity to particular clients or accounts." Phunware I,
2024 WL 1465244, at *4; See Northwest I, 2023 WL 9102400, at *18
("[Plaintiff] need not allege that Baiting Orders were placed
and cancelled by clients, let alone the same client,...
[because] Plaintiff's theory of the case...focuses on
Defendants' control over the high-speed trading algorithms and
Defendants' responsibility to monitor such algorithms."); 
Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets
Corp., 585 F. Supp. 3d 405, 416 (S.D.N.Y. 2022) [hereinafter
"Harrington I"] ("That the Complaint mentions that Defendants

9

trade for their own proprietary accounts and the accounts of
their customers does not undercut the Complaint's numerous
allegations that Defendants designed and operated the algorithms
that spoofed Concordia stock."), reconsideration denied, No. 21
Civ. 761, 2022 WL 580787 (S.D.N.Y. Feb. 25, 2022).

        Defendants also take issue with Plaintiffs' "probabilistic
imputation methodology," which "imputes deanonymized activity to
anonymized activity," attributing "orders sent by a Nasdaq
market maker only if they were placed within the same nanosecond
or millisecond of each other," with roughly 90% accuracy. FAC
¶¶ 38-39, 44. At this stage of litigation, that is sufficient to
draw a reasonable inference in favor of the Plaintiffs,
particularly considering some information is uniquely in the
Defendants' knowledge. See ATSI, 493 F.3d at 102 ("A claim of
manipulation, however, can involve facts solely within the
Defendant's knowledge; therefore, at the early stages of
litigation, the Plaintiff need not plead manipulation to the
same degree of specificity as a plain misrepresentation
claim.").

**Scienter**

        Plaintiffs adequately plead scienter. "The requisite state
of mind, or scienter, in an action under section 10(b)...that
the Plaintiff must allege is an intent to deceive, manipulate or

10

defraud." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001)
(internal quotations and citations omitted). "The Plaintiff[s]
may satisfy this requirement by alleging facts (1) showing that
the Defendants had both motive and opportunity to commit the
fraud or (2) constituting strong circumstantial evidence of
conscious misbehavior or recklessness." ATSI, 493 F.3d at 99.
"This pleading requirement is particularly important in
manipulation claims because in some cases scienter is the only
factor that distinguishes legitimate trading from improper
manipulation." Id. at 102.

Plaintiffs allege that the Defendants had a profit motive
to spoof Mullen shares. Pl. Br. at 26-29 (Dkt. No. 61). "[I]t is
well-settled that pointing to a company's general profit motive
is insufficient to plead scienter." Bermudez v. Colgate-
Palmolive Co., 2023 WL 2751044, at *12 (S.D.N.Y. Mar. 31, 2023).
However, "a scheme to take advantage of depressed
prices...suffices to plead scienter under a motive-and-
opportunity theory." Northwest I, 2023 WL 9102400, at *24
(internal quotations and citations omitted). Defendants argue
that their profits were not sufficient to show scienter, as they
were "de minimis at best," ranging from approximately $800 to
$1,600 for each Defendant over a two-year period, and "only
fractions of a penny per share." Def. Br. at 3, 28. However,
Plaintiffs allege that the Defendants are market makers who are

11

active in a large number of securities, meaning that "the
accumulation of profits due to spoofing activity may be
substantial, because rapid placement and cancellation allows the
strategy to be repeated over and over and applied to numerous
securities on an industry- or even market-wide basis." FAC ¶ 91.
This is sufficient under Northwest I, which squarely rejected
Defendants' argument and held that, "[w]hile profits from any
single episode may be miniscule, spoofers can generate
substantial returns by repeating the scheme thousands of times
across the same and different issuers' securities." 2023 WL
9102400, at *25. "Whether Defendants' alleged misconduct was
ultimately economically rational is a matter to be explored at
summary judgment or trial." Harrington II, 2023 WL 6316252, at
*8.

Plaintiffs also allege more than a mere profit motive. The
FAC describes a pattern of conscious or reckless misbehavior.
Courts look to various indicia of spoofing to differentiate it
from legitimate trading activity, including:

> (1) a short period of time, often milliseconds,
> between placing and cancelling orders and between
> executing transactions and cancelling orders on the
> other side of the market, (2) the cancellation of
> orders when some orders on the same side of the market
> are partially or completely fulfilled, (3) 'parking'
> Baiting Orders behind legitimate orders placed by
> other traders to ensure they are not fulfilled, (4)
> large disparities between volume of alleged Baiting
> Orders on one side of the market and executed orders
> on the other, and (5) other conduct unlike ordinary

market making activity.

Phunware I, 2024 WL 1465244, at *5.

Here, Plaintiffs identify a number of actions that differentiate the Defendants from typical market participants. Defendants placed far more orders for sell-side shares that were subsequently canceled and then purchased far more shares at depressed prices following spoofing episodes, ultimately executing far more buy-side share orders than sell-side share orders, with a stark contrast between the number of Baiting Orders and Executing Orders and asymmetric cancellation rates. FAC ¶¶ 72-76. The Defendants placed and then cancelled a high volume of Baiting Orders within seconds and even milliseconds, repeating this pattern thousands of times, often with multiple episodes per trading day. Id. ¶¶ 83-84, 88. That is strong circumstantial evidence that the Defendants, who were registered broker-dealers familiar with industry rules and regulations, knew or recklessly ignored that they were engaging in spoofing. Id. ¶¶ 80-81.

**Loss Causation**

Plaintiffs adequately allege loss causation. "Loss causation...is the proximate causal link between the alleged misconduct and the Plaintiff's economic harm." ATSI, 493 F.3d at 106. "Plaintiffs' burden is not a heavy one," as the "complaint

13

must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 187 (2d Cir. 2015) (internal quotations and citations omitted). "The question of whether Rule 9(b) applies to loss causation has not yet been definitively addressed by the Second Circuit, but the vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8." Wilamowsky v. Take-Two Interactive Software, Inc., 818 F. Supp. 2d 744, 748 n.7 (S.D.N.Y. 2011).

Plaintiffs adequately allege loss causation under a temporal proximity theory, as they all sold or issued Mullen shares in close proximity to Defendants' spoofing, leading to financial losses while the share prices were artificially deflated. Defendants argue that Plaintiffs' trades were not sufficiently close in time, as "[e]ven pleading same-day, post-spoof trades does not justify an inference of injury without any factual allegations to support the inference that the effects of the spoof linger for the remainder of the trading day." Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc., 41 F.4th 71, 80 (2d Cir. 2022). However, in Gamma Traders, the Plaintiffs did not plead when their own trades took place, let alone that they occurred close in time to Defendants' spoofing. Id. at 80-81;

14

see also Phunware, Inc. v. UBS Sec. LLC, 2024 WL 4891891, at *2
(S.D.N.Y. Nov. 26, 2024) [hereinafter "Phunware II"] ("In
contrast to Gamma Traders, where the Plaintiff was unable to
identify when it traded its stocks, here, Phunware states that
it traded stocks within seconds of the spoofing, supporting a
common-sense inference of loss."). Exhibit 2 lists multiple
sales by Mullen that occurred within fifteen minutes before the
close of trading (denoted with "**") and many others within one
hour (denoted with "*"). (Dkt. No. 30, ex. 2). Exhibits 3 and 4
include temporally proximate trades for the individual
Plaintiffs as well. (Dkt. No. 30, exs. 3-4). For example, on
August 3, 2023, Shayan Khorrami sold 100,000 shares of Mullen
stock at 1:37 PM, just three minutes after Clear Street engaged
in a spoofing episode at 1:34 PM. (Dkt. No. 30, ex. 3). On May
11, 2022, Hyon Cha sold 2,904 shares of Mullen stock at 2:31 PM,
after Clear Street engaged in a spoofing episode at 12:10 PM.
(Dkt. No. 30, ex. 4). Because there is no bright-line rule for
temporal proximity in this district, and "the effects of
spoofing pose questions of fact," these allegations are
sufficient at this stage to allege loss causation. Gamma
Traders, 41 F.4th at 80; See also Northwest I, 2023 WL 9102400,
at *30 ("Plaintiff's allegations regarding the 30 instances in
its chart in which Spoofing Episodes occurred within an hour of
the market's close are sufficient to plead loss causation under

15

the temporal proximity theory outlined in Gamma Traders.");
Phunware II, 2024 WL 4891891, at *2 (finding loss causation
under a temporal proximity theory where a Plaintiff sold shares
three minutes after a Defendant's spoofing episode).

The FAC alleges that "Defendants' fraudulent trading
activities had both temporary and long-term adverse effects on
the market price of Mullen's securities." FAC ¶ 170. Defendants
argue that courts in this district rejected similar allegations
in Northwest I and Phunware I. Def. Br. at 40. However, in
Northwest I, the Plaintiff failed to plead a long-term or
persistent price impact where the allegations in its complaint
demonstrated a quick reversion in stock price, such that
subsequent sales were at or above the previously existing best
offer. 2023 WL 9102400, at *33. Phunware I found a complaint
insufficient where the Plaintiff relied on conclusory statements
and Professor Milgrom's report, which has minimal relevance in
the context of spoofing. 2024 WL 1465244, at *7. While
Plaintiffs here also cite Professor Milgrom's report, they
provide additional factual allegations to support their
conclusions, including two tables showing a consistent decrease
in the average cumulative return across spoofing episodes from
thirty minutes prior to the end of the trading day, along with
the average change in Mullen share prices from two minutes prior
to the trading days thereafter. FAC ¶¶ 181, 188. At this stage,

16

those factual allegations are sufficient to "justify a reasonable inference...that spoofed Baiting Orders continue to emit a false pricing signal to the market after they have been cancelled." Northwest I, 2023 WL 9102400, at *31. Whether these spoofing events actually had a long-term price impact is a factual question better left for later stages of litigation. See Harrington I, 585 F. Supp. 3d at 419 ("It would not be proper to draw the inference sought by Defendants - that individual spoofing events cannot have a long-term cumulative effect on the price of a stock - at the motion to dismiss stage.").

Defendants also argue that the lack of a price reversion is plainly inconsistent with spoofing. They explain that, "[i]n an efficient market, if the Baiting Orders caused a price decline, then the cancelation of those Baiting Orders should have resulted in a price reversion." Def. Br. at 37. Without a reversion, either Mullen's share price declined for other reasons, or the market was not efficient. Id. at 39. Defendants' central theory is that Plaintiffs "cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation." Meyer v. Greene, 710 F.3d 1189, 1198-99 (11th Cir. 2013). However, another court in this district recently rejected a very similar argument, explaining that allegations "that the Spoofing Episodes lasted only two minutes do[] not

17

mean that the effects of the spoofing lasted for only seconds beyond that." Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC, 2025 WL 368717, at *9 (S.D.N.Y. Jan. 31, 2025) [hereinafter "Northwest II"]. "[C]ourts in this District and elsewhere have consistently rejected the argument that, where a Plaintiff contends it took the market days to fully absorb information into the price of a security, that contention is irreconcilable with an efficient market presumption." Id. Even the Supreme Court has "made clear that, in recognizing the 'fraud on the market' presumption of reliance premised on the efficient market hypothesis, it was not endorsing 'any particular theory of how quickly and completely publicly available information is reflected in market price.'" Id. at 8 (quoting Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 272 (2014)). Given the light burden for pleading loss causation, and the potential factual disputes inherent in this analysis, these arguments are better suited for summary judgment or trial.

**New York Common Law Fraud**

New York common law fraud requires "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the Plaintiff and damages." Eurycleia Partners, LP v. Seward & Kissel, LLP, 910 N.E.2d 976, 979 (N.Y. 2009). Because "the elements of a claim

for common law fraud are essentially the same as for a claim

under Section 10(b)," Plaintiffs adequately state a claim for

relief. Northwest I, 2023 WL 9102400, at *13 (internal

quotations and citations omitted).

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is

denied.

So ordered.

Dated:     New York, New York
           March 28 2025

Louis L. Stanton
LOUIS L. STANTON
U.S.D.J.

19